# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

|  |  |  |
|---|---|---|
| The Right Reverend Charles G. vonRosenberg, et al., | ) ) ) | Civil Action No. 2:13-587-RMG |
| Plaintiffs, | ) ) | |
| The Episcopal Church, | ) ) | **ORDER AND OPINION** |
| Plaintiff in Intervention v. | ) ) ) ) | |
| The Right Reverend Mark J. Lawrence, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

This matter is before the Court on Plaintiff-in-Intervention The Episcopal Church's Motion to Exclude the Genericness Expert Report of Hal Poret (Dkt. No. 580), Defendants The Right Reverend Mark J. Lawrence, *et al.*'s Motion to Exclude Walter Edgar (Dkt. No. 585), Defendants The Right Reverend Mark J. Lawrence, *et al.*'s Motion to Exclude Mark Keegan (Dkt. No. 597) and Defendants The Right Reverend Mark J. Lawrence, *et al.*'s Motion to Exclude Robert L. Klein (Dkt. No. 598).[1]

## I.     Background

This case arises out of a schism in 2012 in the Historic Diocese, originally known as the "Protestant Episcopal Church in the State of South Carolina," in which certain members and parishes sought to dissociate from The Episcopal Church, a nationwide hierarchical church. The

---

[1] The Court is also issuing a separate Order on the Parties' Motions for Summary Judgment (Dkt. Nos. 584, 595, 603, 610) and an Order on the Disassociated Parishes' motions for summary judgment (Dkt. Nos. 556 – 570, 572 – 579, 581 – 583; 587 – 593, 599 – 600).

parties have litigated property issues relating to the schism in the state courts of South Carolina, culminating in a 2017 decision in the South Carolina Supreme Court, and have raised in this action issues surrounding the use of certain federal and state law marks in contest between the national church and its affiliates and the disassociating diocese and its affiliates. As in separate Orders, it is important to identify the major parties in this dispute. The parties are as follows:

1. Plaintiff The Episcopal Church of the United States (hereafter "TEC") is the national church and an Intervenor Plaintiff in this action;

2. The Protestant Episcopal Church in the State of South Carolina (hereafter the "Historic Diocese"), which was formed as early as 1785 and has long affiliated with TEC;

3. Plaintiff The Episcopal Church in South Carolina (hereafter "TECSC"), which was headed initially by Plaintiff Bishop Charles G. vonRosenberg and subsequently by Plaintiff Provisional Bishop Gladstone B. Adams, III and is affiliated with TEC;

4. Defendant The Diocese of South Carolina (hereafter "Disassociated Diocese"), headed by Defendant Right Reverend Mark Lawrence and was formed following the schism in 2012 to disassociate from TEC;

5. The Defendant parishes associated with the Disassociated Diocese (hereafter "Disassociated Parishes").

In conjunction with the summary judgment briefing, the Parties have filed four *Daubert* motions to exclude or limit the testimony of the opposing Parties' experts. (Dkt. Nos. 580, 585, 586, 597, 598.) Each one has been fully briefed, with opposing Parties responding to the motion and the moving Party filing a reply. (Dkt. Nos. 617, 623, 639, 640, 648.)

## II.    **Legal Standard**

Under Rules 104(a) and 702 of the Federal Rules of Evidence, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Thus, even if a witness is "qualified as an expert by knowledge, skill, experience, training or education," the trial court must ensure that (1) "the testimony is the product of reliable principles and methods," that (2) "the

expert has reliably applied the principles and methods to the facts of the case," and (3) that the "testimony is based on sufficient facts or data." Fed. R. Evid. 702(b) – (d). "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid," *Daubert*, 509 U.S. at 592 – 93, and whether the expert has "faithfully appl[ied] the methodology to facts," *Roche v. Lincoln Prop. Co.*, 175 F. App'x 597, 602 (4th Cir. 2006).

Factors to be considered include "whether a theory or technique…can be (and has been) tested," "whether the theory or technique has been subjected to peer review and publication," the "known or potential rate of error," the "existence and maintenance of standards controlling the technique's operation," and whether the theory or technique has garnered "general acceptance." *Daubert*, 509 U.S. at 593 – 94. However, these factors are neither definitive nor exhaustive, *United States v. Fultz*, 591 F. App'x 226, 227 (4th Cir. 2015), *cert. denied*, 135 S. Ct. 2370 (2015), and "merely illustrate[] the types of factors that will bear on the inquiry." *United States v. Hassan*, 742 F.3d 104, 130 (4th Cir. 2014). This is especially true as the *Daubert* standard applies to non-scientific expert testimony as well. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

The Court is mindful that the Daubert inquiry involves "two guiding, and sometimes competing, principles." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). "On the one hand,… Rule 702 was intended to liberalize the introduction of relevant expert evidence," *id.*, and "the trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. Stanley*, 533 Fed. Appx. 325, 327 (4th Cir. 2013) *citing* Fed. R. Evid. 702 advisory committee's note. On the other hand, "[b]ecause expert witnesses have the potential to be both powerful and quite misleading,' it is crucial that the district court conduct a careful analysis into the reliability of the expert's proposed opinion." *United States v. Fultz*, 591 F. App'x 226, 227 (4th Cir. 2015) *quoting Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199

(4th Cir. 2001).

### III.   Discussion

#### A.   The Episcopal Church's Motion to Exclude Hal Poret (Dkt. No. 580)

Plaintiffs move to exclude the report produced by Defendants' expert, Hal Poret, which reported on a "Teflon" survey[2] conducted by Poret to assess the genericness of TEC's mark "The Episcopal Church." (Dkt. Nos. 580; 586.) As an overview of Poret's survey, Poret asked respondents to choose whether certain names constituted a "trademark name," which was defined as being used by "one organization, or by branches of that organization," or a "category name" which was defined as "a name that identifies a category that can include various organizations that are not affiliated with each other" and "can be used by more than one organization to identify what type of organization they are." (Dkt. No. 586-1 at 8) (emphasis added). The survey gave, as an example, "Chase Bank" and "The Democratic National Committee" as "trademark name[s]," and "Savings Bank" and "The Liberal Left" as a "category name[s]." (*Id.* at 9 – 10.) After asking whether the respondents understood the difference, they were then asked a test question juxtaposing "The American Medical Association," intended to be a "trademark name," versus "The Medical Profession," intended to be a "category name." (*Id.* at 10-11.) Respondents who answered correctly were then asked a series of questions regarding whether certain names in the "area of religious organizations or institutions" were "trademark names" or "category names." (*Id.* at 11.) Six terms in total were shown. (*Id.* at 12 – 13.) Relevantly, the survey asked whether "The Episcopal Church" was a "trademark name" or a "category name" and, according to Poret's survey,

---

[2] Named after a survey performed to determine if "Teflon" was a valid trademark, a Teflon survey gives respondents an explanation of the generic versus trademark distinction and then asks respondents, generally, to identify whether a term refers to a brand name or a common name. *See* 2 McCarthy on Trademarks and Unfair Competition § 12:16 (5th ed.).

43.7% of respondents stated that "The Episcopal Church" is a "trademark name" while 55.3% stated it to be a "category name." (*Id.* at 18.)

The Court finds that Poret's survey must be excluded for four independent reasons, each sufficient to mandate exclusion: first, the Fourth Circuit's decision in *Hunt Masters* forecloses the relevance of survey evidence to determine the weight of public perception of a non-coined term; second, because Poret's survey fails to determine whether the public perceives "The Episcopal Church" to denote a religion; third, because Poret's survey's use of the terms "category" and "trademark" are confusing and likely lead to irrelevant responses, and; finally, Poret's use of the term "trademark" makes a legal conclusion. The Court addresses each in turn.

Fourth Circuit precedent prohibits consideration of Poret's survey here. As the Plaintiffs correctly argue, Poret's Teflon survey is, as a matter of law, inadmissible under *Hunt Masters, Inc. v. Landry's Seafood Rest., Inc.*, 240 F.3d 251 (4th Cir. 2001). In *Hunt Masters*, the Fourth Circuit explained that there were two ways in which a product could be generic: "1) where the term began life as a 'coined term'[3]; and (2) where the term was commonly used prior to its association with the products at issue." *Id.* at 255. The court went on to explain that looking to consumer understanding is important for a "coined word" that has "become generic though common usage." *Id.* The court concluded that since the term in *Hunt Masters*, "crab house," was not a coined term, "it is not necessary to determine whether the term has become generic through common use, rendering Hunt's customer survey irrelevant." *Id.* This holding, finding survey evidence irrelevant where alleged genericness was based on alleged prior generic use, has been repeated by multiple courts of appeal. *See Schwan's IP, LLC v. Kraft Pizza Co.*, 460 F.3d 971, 976 (8th Cir. 2006)

---

[3] A "coined" word marks consist of "invented words that have been created for the sole purpose of serving as a trademark." 2 McCarthy on Trademarks and Unfair Competition § 11:5 (5th ed.). There is no, nor could there be, an argument that "The Episcopal Church" is a coined mark.

(citing *Hunt Masters* and holding that "Brick Oven was commonly used before either party began labeling their frozen pizzas with the term, and it was not error for the district court to omit the survey evidence from its genericness analysis."); *Miller Brewing Co. v. Joseph Schlitz Brewing Co.*, 605 F.2d 990, 995 (7th Cir. 1979) ("When Judge Learned Hand said that whether a word is generic depends on what 'buyers understand by the word,'…he was referring to a coined word for a commercial product that was alleged to have become generic through common usage. He was not suggesting that the meaning of a familiar, basic word in the English vocabulary can depend on associations the word brings to consumers as a result of advertising.").[4]  Each party here acknowledges that the words making up "The Episcopal Church" was used, in some form, prior to TEC's adoption of the mark,[5] and therefore Poret's survey is irrelevant as it is not being used to assess a coined term which has become generic. (Dkt. Nos. 586 as 12; 610-1 at 6; 623 at 5.)

In addition to the decisions of the Fourth Circuit and other Courts of Appeal, the United States Patent and Trademark Offices and at least one district court have applied *Hunt Masters* and other courts' decisions to exclude a defendant's survey evidence where the case does not involve

---

[4] Though the case ultimately found that the term at issue, "BOOKING.COM," was "coined," a recent decision affirmed by the Fourth Circuit reiterated the central holding of *Hunt Masters*. *See Booking.com B.V. v. Matal*, 278 F. Supp. 3d 891, 916–17 (E.D. Va. 2017), *amended*, No. 116CV425LMBIDD, 2017 WL 4853755 (E.D. Va. Oct. 26, 2017), *aff'd sub nom. Booking.com B.V. v. United States Patent & Trademark Office*, 915 F.3d 171 (4th Cir. 2019), *as amended* (Feb. 27, 2019) (finding term not generic and recognizing that "*Hunt Masters* forecloses reliance on consumer surveys," for marks that were "commonly used prior to its association with the products at issue."). The Fourth Circuit affirmed the district court's decision. *See Booking.com B.V. v. United States Patent & Trademark Office*, 915 F.3d 171, 183 (4th Cir. 2019), *as amended* (Feb. 27, 2019) *petition for cert. filed* (No. 19-46) ("while consumers surveys are relevant to determining whether a term is generic under the former scenario [a coined term], they are not in the latter [where the term was commonly used previously].").

[5] While all Parties agree that the term, or similar terms, were commonly used prior to TEC's adoption of the mark, as addressed in a separate Order, Defendants have presented no evidence creating a dispute of material fact that the Defendants can claim prior use to the marks at issue as they are not the successor to the Historic Diocese.

a coined term. *See Nat'l Nonwovens, Inc. v. Consumer Prod. Enterprises, Inc.*, 397 F. Supp. 2d 245, 254 (D. Mass. 2005) (excluding plaintiff and defendant surveys where "neither party contends that the Plaintiff invented the term 'wool felt' or that it has since become 'genericized[,]'" and holding that surveys presented by plaintiffs and defendants were irrelevant as "Defendant argues that Plaintiff has appropriated a generic term, while Plaintiff argues that the term 'wool felt' is 'merely descriptive' for a product that is known generically as 'felted wool fabric.' In either case, the 'primary significance' test for genericness is inapposite, and survey evidence is therefore unnecessary."); *Frito-Lay N. Am., Inc. v. Princeton Vanguard, LLC*, 124 U.S.P.Q.2d 1184, *13, *22 (T.T.A.B. 2017) (holding as to both parties' surveys, "we note that various courts have found that Teflon surveys are only appropriate to consider in a case where the question is whether a coined or arbitrary mark has become generic, and is not appropriate to prove recognition of an otherwise not inherently distinctive mark. We discuss this issue in more detail, *infra*, but note initially that we agree with those circuit court decisions that Teflon surveys are not relevant when a term is not inherently distinctive.").

Indeed, Defendants here recognize this distinction, noting that surveys would not be relevant to the analysis of whether Plaintiffs' marks were generic *ab initio* as a generic term cannot acquire distinctiveness. (Dkt. No. 623 at 4.) Defendants cannot have it both ways: they argue that Plaintiffs co-opted a generic phrase from the public domain, not that widespread use of a coined phrase has caused it to become generic.[6] While they have failed to create any dispute of material

---

[6] Defendants do not argue that "The Episcopal Church" is a coined term, and therefore *Hunt Masters* holds that it is "not necessary to determine whether the term as become generic thorough common use." *Hunt Masters*, 240 F.3d at 255. Nonetheless, the Defendants' argument that "The Episcopal Church" has "become" generic, focuses on alleged common use long pre-dating Plaintiffs' registration of the mark or listed date of first use. (Dkt. No. 610-1 at 16, "the terms "episcopal" and "The Episcopal Church" have become generic since *before* and after adoption by Plaintiffs." *Id.* at 21 – 22, identifying third party use of marks with "episcopal church" for

fact on this point, with their own experts explaining that "The Episcopal Church was a descriptive phrase for "churches who either were current or former parishes in the Church of England" (Dkt No. 609-6 at 4), they cannot now rely on survey evidence to determine the weight of public perception of a non-coined term under *Hunt Masters*.[7]

Yet, regardless of the Fourth Circuit's decision in *Hunt Masters*, Poret's survey is inadmissible as it is irrelevant to the determination of whether TEC's mark here, "The Episcopal Church," is generic. The Court has, in a separate Order, explained this issue at length but, in brief, it is clear from the decisions of multiple courts of appeal that a mark for a denominational organization is generic where it names a religion but is descriptive where it properly differentiates a specific denominational organization offering religious services. *See TE-TA-MA Truth Found.- -Family of URI, Inc. v. World Church of Creator*, 297 F.3d 662, 666 (7th Cir. 2002) ("A mark is 'generic' when it has become the name of a product (e.g., 'sandwich' for meat between slices of bread) or class of products (thus 'church' is generic)" but finding mark not generic where "[i]t does not name the class of monotheistic religions[, as] [i]n the contemporary United States, variations on 'Church of [Deity]' are used to differentiate individual denominations, not to denote the class of all religions."); *Jews For Jesus v. Brodsky*, 993 F. Supp. 282, 297 (D.N.J.), aff'd, 159 F.3d 1351 (3d Cir. 1998) ("although the Plaintiff Organization sometimes refers to its members as 'Jews' who are 'for Jesus,' during the past twenty-four years the Plaintiff Organization has

---

"hundreds of years") (emphasis added). Further, Defendants submissions do not even identify post-first use widespread use of "The Episcopal Church" as a whole mark, instead dissecting the term and focusing on uses of "episcopal," "episcopacy," "episcopalian," and "episcopate." (Dkt. Nos. 601; 610-1 at 17 – 19.) Defendants therefore do not allege that "The Episcopal Church," even if a coined term (which it is not), "became" generic after its first use.

[7] Plaintiffs cite certain cases where Teflon surveys were submitted for non-coined terms. (Dkt. No. 623 at 7 – 8.) However, none of the cases are from the Fourth Circuit or district courts in the Fourth Circuit, and further do not address the relevance issues raised by *Hunt Masters*.

consistently used the phrase 'Jews for Jesus' to refer to the organization itself."); *Gen. Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 413 (6th Cir. 2010) ("It would be inappropriate to conclude as a matter of law... that the public considers 'Seventh-day Adventist' to refer generically to a religion."); *Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1011 (8th Cir. 2011) (finding mark not generic where defendant could not demonstrate that "registered marks have become generic because they identify religion, not COC as an institution."). Therefore, Poret's survey fails to ask the relevant question for genericness here.

Poret's survey asks about a "trademark name" versus a "category name." (Dkt. No. 586-1.) The flaw, however, is that, in the religious sphere, the name of a denomination, such as "Seventh-day Adventist" discussed by the Sixth Circuit in *Gen. Conference Corp. of Seventh-Day Adventists*, 617 F.3d 402, can also serve as a category of affiliated religious institutions. The proper question, therefore, is whether a mark refers to an organization or a religion.[8] This issue is further heighted by the flawed terms used in Poret's survey. As already explained in a separate Order, Poret's survey defines "category name" as "a name that identifies a category that *can* include various organizations that are not affiliated with each other" and "*can* be used by more than one organization to identify what type of organization they are." (Dkt. No. 586-1) (emphasis added). Based on that definition, a respondent could mark "category," the response coded as

---

[8] The district court in in *Gen. Conference Corp. of Seventh-Day Adventists* stated that this is the proper question to ask when assessing the genericness of a religious organization. *See Gen. Conference Corp. of Seventh-Day Adventists v. McGill*, 624 F. Supp. 2d 883, 894 (W.D. Tenn. 2008), *aff'd*, 617 F.3d 402 (6th Cir. 2010) (relying on survey that juxtaposed "religious organization or church" with "a religion" and holding that "[t]he Defendant has not introduced any survey evidence that shows whether the relevant public believes that the term 'Seventh-day Adventist' refers to a religion or to a specific denomination, despite the fact that such evidence is increasingly common in trademark disputes.")

generic, for a term that "can" be, but is not necessarily, used by organizations that are not affiliated with each other. (Dkt. No. 586-1 at 8.) Notably, the "can" in that sentence permits the opposite to be true as well: a respondent could choose "category" if the mark refers to a "type of organization" that *is* affiliated with another organization. Therefore, a Respondent could mark "category" if they perceived "The Episcopal Church" to be a descriptive term for the type of church that is part of the Anglican communion and affiliated with TEC. As noted by Plaintiffs, a response of "category" thus could still point to "The Episcopal Church" as a source identifier for every church that is a member of The Episcopal Church. (Dkt. No. 586 at 27 – 29.) As opposed to "automobile" or "sandwich" which can be tested as "common" names (as used in the original Teflon survey), here there is no claim that there are multiple organizations titled "The Episcopal Church" in the world, compared to the multiple car manufacturers and sandwich makers, and the term "category" therefore does not answer the fundamental genericness question of whether a term refers to a class of product, here a religion, or a specific organization offering that product. Poret's survey is therefore irrelevant to genericness.

Finally, Poret impermissibly used the term "trademark" in his survey. While Federal Rule of Evidence 704 permits an expert to offer an opinion on an "ultimate issue," an expert is not permitted to "state[ ] a legal standard or draw[ ] a legal conclusion by applying law to the facts...." *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006). *See e.g., Priester v. Futuramic Tool & Eng'g Co.*, No. 2:14-CV-01108-DCN, 2017 WL 193577, at *4 (D.S.C. Jan. 18, 2017) (holding that testimony that determined defendant was "negligent" and was the "cause" of an explosion is impermissible, but testimony that defendant "did not act to prevent" a situation was permissible) (collecting cases). "Trademark" is a legal term, and a plaintiff must prove in any trademark infringement case that it owns a valid mark.

In addition to asking the Court to permit an expert to make the legal conclusion of what constitutes a trademark, the definition is also overly narrow. Poret defines "trademark name" as: "a name that identifies one specific organization." (Dkt. No. 586-1 at 8.) The definition goes on to state that "[a] trademark name can only be used by one organization, or by branches of that organization, to identify itself." (*Id.*) It is true that a trademark identifies "the source of one seller's goods and distinguish[es] that source from other sources." 1 McCarthy on Trademarks and Unfair Competition § 3:1 (5th ed.). However, the second half of Poret's definition, permitting a respondent to answer "trademark" if a name is used by "branches of [that] organization," bakes into the survey the question this case is attempting to answer. Namely, a respondent could decline to respond "trademark" where it knows of an organization calling itself an "episcopal church" that is actually a Disassociated Parish. There is further no definition of "branch" in the survey, permitting a respondent to answer "trademark" where it knows of The Episcopal Church and a parish associated with The Episcopal Church, but does not know whether the parish qualifies as a "branch" in this context. The Court cannot permit a survey to give a conclusion of law or to make up its own, erroneous and confusing, definition of an already well-settled legal phrase. This is particularly true here, where the survey results are so close as to be a few responses away from irrelevance.[9]

_____

[9] Only 55.3% of respondents answered that "The Episcopal Church" is a "category name." (Dkt. No. 586-1 at 18.) The Court does not exclude the report based on Plaintiffs' argument that, at the lower bound of the margin of error for the survey, the rate of Episcopalians who responded "category" rather than "trademark" would fall below 50%, thus arguably negating its ability to show that a "majority" of individuals consider the mark generic. *See* 2 McCarthy on Trademarks and Unfair Competition § 12:6 (5th ed.) (for genericness, "majority use controls"). (Dkt. No. 586 at 21.) While this wide margin of error is relevant to weight, Plaintiffs' argument asks the Court to weigh which end of the margin of error should be credited, something that goes to weight rather than admissibility. Further, Plaintiffs' arguments regarding the proper makeup of the 300 respondents goes to weight rather than admissibility. (Dkt. No. 586 at 17 – 21.) Nonetheless, as explained above, the survey must be excluded for other reasons.

Therefore, Poret's survey is excluded for four independent, and sufficient, reasons: first, the Fourth Circuit's decision in *Hunt Masters*, supported by multiple other courts of appeal, forecloses the relevance of survey evidence to determine the weight of public perception of a non-coined term; second, because Poret's survey fails to determine whether the public perceives "The Episcopal Church" to denote a religion; third, Poret's use of the term "trademark" makes a legal conclusion, and; finally, because Poret's survey's use of the terms "category" and "trademark" are confusing and likely lead to irrelevant responses.[10] Poret's survey is therefore excluded.

## B.   Defendants' Motion to Exclude Walter Edgar (Dkt. No. 585)

Defendants move to exclude Dr. Walter Edgar, Plaintiffs' expert in history. (Dkt. No. 585.) Dr. Edgar produced two reports. The first, dated April 13, 2018, reported on a review of various city directories, telephone directories, encyclopedias, history textbooks, magazines and newspapers dating back to the early Twentieth Century to assess whether references to "Episcopal" or "Protestant Episcopal" churches referred to churches affiliated with TEC ("Dr. Edgar's First Report"). (Dkt. No. 585-3.) A second report, dated September 11, 2018, included a review of the first twenty pages of search results on Google and Yahoo of the mark "The Episcopal Church," and concluded that every search result referred to either Plaintiff TEC or an affiliated parish or diocese ("Dr. Edgar's Second Report"). (Dkt. No. 585-4.) Dr. Edgar's Second Report includes results from two searches: one conducted by Dr. Edgar in South Carolina, the second by his son-in-law in Massachusetts, purportedly to limit geographical bias. (*Id.*)

---

[10] *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 452 F. Supp. 2d 772, 778 (W.D. Mich. 2006), *aff'd*, 502 F.3d 504 (6th Cir. 2007) (noting that to be admissible, a survey must, among other facts, ensure that "the questions to be asked of interviewees were framed in a clear, precise and non-leading manner[.]").

Defendants first argue that Dr. Edgar's First Report should be excluded as his opinions regarding the use of "Episcopal" or "Protestant Episcopal" in multiple historical texts dating back a century was merely a summary of information that did not require application of his specialized historical knowledge, and instead is akin to a "lay witness who has reviewed a range of publicly available records and search results." (Dkt. No. 585-1 at 10.) Instead, this type of evidence, synthesizing voluminous historical texts, is precisely the type of expertise that courts acknowledge historians possess. *See Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135–36 (2d Cir. 2013) ("A historian could, for example… helpfully synthesize dense or voluminous historical texts…."); *Burton v. Am. Cyanamid*, No. 07-CV-0303, 2018 WL 3954858, at \*4 (E.D. Wis. Aug. 16, 2018) ("Finally, a historian's synthesis of various source materials that enables the jury to perceive patterns and trends can also be "helpful" within the meaning of Rule 702. Courts have recognized the helpfulness of expert historians testifying in these ways.") (collecting cases); *Waterhouse v. R.J. Reynolds Tobacco Co.*, 368 F. Supp. 2d 432, 436 (D. Md. 2005), *aff'd*, 162 F. App'x 231 (4th Cir. 2006) (considering expert testimony that "synthesiz[ed]" "popular magazines, government documents, manuscript collections, scholarly histories, state and federal laws regarding tobacco and cigarette smoking, curriculum guides and school text books approved for use in various states (including Maryland), religious publications, polling and survey data, movies, television programs, and other forms of popular culture."). Dr. Edgar's opinion, identifying, reviewing and synthesizing voluminous historical texts, therefore required specialized knowledge and is appropriate for expert testimony.

Defendants also argue that Dr. Edgar's opinions are unreliable and inaccurate as he has a "life-long" connection to The Episcopal Church, and further that he failed to quantify the number of times the researched terms appeared but did not refer to TEC. (Dkt. No. 585-1 at 11 – 12.)

First, the Court refuses to exclude Dr. Edgar's report or testimony because of his religious affiliation or find that the reliability of his testimony or report are in any way affected by his religious affiliation. To the extent Defendants believe Dr. Edgar's attendance of Episcopal churches affects his credibility, "it is well-established that an expert's bias is not a proper basis to bar testimony under Daubert." *In re: Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig.*, No. 2:14-MN-02502-RMG, 2016 WL 2940784, at *5 (D.S.C. May 6, 2016) (collecting cases). Dr. Edgar's failure to quantify the number of times the researched terms appeared but did not in reference to the TEC further does not necessitate exclusion of his report. Dr. Edgar does not purport to be a statistician or present any form of mathematic assessment of the use of "Episcopal" or "Protestant Episcopal." Instead, Dr. Edgar opined, from a historical perspective over the past century, whether the terms "Episcopal," "Protestant Episcopal" and "diocese" reference to TEC and churches affiliated with TEC. (Dkt. No. 585-3.) By reviewing historical documents and applying his experience, Dr. Edgar used the common tools of a historian, he was not required to perform any mathematic quantification in addition. To the extent Defendants argue a quantification of non-responsive results was necessary to support his conclusions factually, that argument does not support exclusion. *See Synergetics, Inc. v. Hurst*, 477 F.3d 949, 955 (8th Cir. 2007) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility....") (citations omitted).

Finally, Defendants argue that the Court should exclude Dr. Edgar's Second Report as it is a compilation of Google and Yahoo search results by a historian, and therefore cannot meet the reliability factors of *Daubert*. (Dkt. No. 585-1 at 14.) The Court agrees that Dr. Edgar cannot testify to these search results as an expert, however it is for a more fundamental reason: Dr. Edgar is not qualified to testify as an expert regarding internet search results. There is no indication on

Dr. Edgar's CV or his testimony submitted to the Court that he has any specialized knowledge, training or experience in forming internet search results or in interpreting the meaning of those results. As noted by Defendants, this may be particularly important as search engines tailor their results to ensure that the responses are "most helpful to the searcher." *Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 438 (S.D.N.Y. 2014). To the extent Plaintiffs may assert that Dr. Edgar's qualifications come from his repeated use of search engines in his daily life, his opinion would not help a prospective finder of fact, as anybody is just as capable of reviewing internet search results. *See In re Titanium Dioxide Antitrust Litig.*, No. CIV.A. RDB-10-0318, 2013 WL 1855980, at *7 (D. Md. May 1, 2013) ("[E]xpert testimony is inadmissible when it addresses lay matters which [the trier of fact] is capable of understanding without the expert's help") (citation omitted). Without any demonstrated qualifications in a relevant field, which is not confined to computer science but could also include academics who often work with search results, the Court finds it inappropriate to allow Dr. Edgar to testify as an expert regarding his Second Report.

However, while Dr. Edgar may not testify to these searches as an expert, his signed reports, including pages of Google and Yahoo search results, still contain relevant information. As both Parties acknowledge, even if Dr. Edgar cannot testify as an expert concerning his Second Report, he can still testify as a fact witness. (Dkt. Nos. 617 at 29; 639 at 5.) Cases cited by Plaintiffs support this point, as the court in *Globalaw Ltd. v. Carmon & Carmon Law Office*, 452 F. Supp. 2d 1 (D.D.C. 2006) reviewed search result evidence included in an attorney declaration. Further, as this Court previously held, internet search results may be relevant to determining a mark's strength. *See Codename Enterprises, Inc. v. Fremantlemedia N. Am., Inc.*, No. 16CIV1267ATSN, 2018 WL 3407709, at *7 (S.D.N.Y. Jan. 12, 2018) ("Given the importance of search engines in today's internet-based economy, search results may be one indicator of commercial strength.")

(citations omitted); *Am. Eagle Outfitters, Inc. v. Am. Eagle Furniture, Inc.*, No. 11 C 02242, 2013 WL 6839815, at *12 (N.D. Ill. Dec. 27, 2013) ("[t]he number of Google results may say something of the mark's strength."). Therefore, as a fact witness, Dr. Edgar is permitted to offer the relevant testimony regarding the results of his own internet search results. However, as Dr. Edgar is a fact-witness as to the search results, he is not permitted to testify regarding his son-in-law's search results, as it would constitute hearsay and further Dr. Edgar would not be able to authenticate the documents. To the extent Plaintiffs' wish to admit the out of state searches performed by Dr. Edgar's son-in-law, his son-in-law would be required to testify.

Therefore, Dr. Edgar is excluded as an expert solely as to his Second Report but is permitted to testify regarding his own Google and Yahoo search results as a fact witness.

## C. Defendants' Motion to Exclude Mark Keegan (Dkt. No. 597)

Defendants move to exclude the report of Plaintiff's rebuttal expert, Mark Keegan. (Dkt. No. 597.) Keegan's report, like Poret's, reports on a "Teflon survey" that Keegan performed to determine consumer perception of "The Episcopal Church." (Dkt. No. 597-2 at 5.) The study surveyed 400 Episcopalians and asked the respondents whether they perceived the phrase "The Episcopal Church" to refer to a "religious organization," which Plaintiffs argue would be non-generic, or a "religion," which Plaintiffs argue would be generic. (*Id.*) After a number of preliminary questions, and narrowing the respondents down to only Episcopalians who had not taken a survey on a related topic, the survey defined two terms for respondents: "religious organization" which could be a "local, stand-alone organization, or a larger, regional, national or international organization with local affiliates." (*Id.* at 10 – 14.) The definition concluded by stating that either, a local organization or a larger organization, are "religious organizations" if they "are formally entities that practice and/or teach the doctrine of a religion." (*Id.*) The next term was "religion," which was defined as a "system of beliefs." (*Id.*) The survey gave two

examples to respondents, noting that "Judaism" and "Christianity" are religions, whereas "Temple Emanu-El of New York" and the "United Methodist Church" are religious organizations. (*Id.* at 15.) After ensuring that the respondents understood these terms, respondents were shown five terms to categorize as a "religion" or "religious organization:" Islam, Southern Baptist Convention, Hinduism, United Church of Christ and The Episcopal Church. (*Id.* at 16.) As relevant here, the survey results stated that 96 percent of all respondents identify "The Episcopal Church" as the name of a religious organization, whereas only 4 percent state it identifies a religion. (*Id.* at 17.)

In the first instance, while neither Party briefed the issue, the Court notes that its holding regarding Keegan's report is also affected by the Fourth Circuit's ruling in *Hunt Masters*, discussed above in relation to Poret's survey. As with Poret's survey, as "The Episcopal Church" is not a coined term, Keegan's "Teflon" survey is irrelevant to genericness since a party cannot rely on survey evidence to determine the weight of public perception of a non-coined term under *Hunt Masters*. Therefore, as to genericness, Keegan's survey is excluded. Nonetheless, as the survey may be relevant to strength of the mark, the Court addresses Defendants' motion.

Defendants make four overall arguments regarding the admissibility of Keegan's report: first, Keegan is not qualified; second, Keegan's survey is fundamentally flawed based on the responses offered in the survey (religion or religious organization); third, Keegan's survey is not helpful as it produced no evidence of consumer connection to a particular organization, and; fourth, Keegan's survey impermissibly limited the universe of respondents to Episcopalians. (Dkt. No. 597-1.) The Court takes each in turn.

First, Keegan is clearly qualified to testify. Under Federal Rule of Evidence 702, an expert can be qualified by "knowledge, skill, experience, training or education[.]" Keegan clearly meets this test. Keegan's CV makes his qualifications clear: he holds a Juris Doctor from Brooklyn Law

School, is a Professional Certified Marketer from the American Marketing Association, is currently enrolled in a Market Research Certificate Program at the University of Georgia and is a member of five national and international associations for marketing and consumer research. Further, he has worked the field of market research since at least 1991 and has performed consumer research studies since 2001. (Dkt. No. 595-93.) Additionally, Keegan has conducted approximately ninety consumer surveys in the past six years. (Dkt. No. 617-1 at ¶ 11.) The Court recognizes some relevant criticisms of Keegan's background, which includes a juris doctorate and some postgraduate MBA work, and his professional experience focused on litigation strategy with market research rather that a focus solely on consumer research. (Dkt. No. 597-1 at 10.) However, these critiques do not negate Keegan's eighteen years of experience in the field, current training from University of Georgia, and membership in various relevant market groups. The criticisms therefore go to weight rather than admissibility. *See Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs., LLC*, 858 F. Supp. 2d 505, 512 (D. Md. 2012) ("Any issues…with [the expert's] qualifications…are more 'properly explored on cross-examination,' going to 'his testimony's weight and credibility—not its admissibility.'") *citing McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir.1995).

Defendants correctly note that one court has previously excluded a survey based on Keegan's qualifications. *See Warner Bros. Entm't v. Glob. Asylum, Inc.*, No. CV129547PSGCWX, 2013 WL 12114836, at *7 (C.D. Cal. Jan. 29, 2013), *aff'd sub nom. Warner Bros. Entm't v. Glob. Asylum, Inc.*, 544 F. App'x 683 (9th Cir. 2013). However, the decision is from six years ago and since that time Keegan conducted approximately ninety additional consumer surveys, supporting the Court's holding that he is properly qualified. Further, the court in *Warner Bros.* noted that it had "no indication of the topic about which" Keegan had previously

testified and the biography provided to the court did not indicate whether Keegan had even crafted or analyzed "consumer perception surveys." *Id.* The facts here are starkly different as the Court has Keegan's entire CV and a list of the multiple cases in which he has performed research or surveys in litigation. The Court therefore finds that Keegan's extensive additional experience since 2013, and the record in this case, render *Warner Bros.* inapplicable here.[11]

Next, Defendants argue that the two choices provided to respondents, "religion" or "religious organization," were improper survey terms. However, as explained above, these are the correct terms when assessing the genericness of a denominational organization. Indeed, at least one district court, affirmed by the Sixth Circuit, held that substantially similar terms provide the proper question when assessing the genericness of a religious organization. *See Gen. Conference Corp. of Seventh-Day Adventists v. McGill*, 624 F. Supp. 2d 883, 894 (W.D. Tenn. 2008), *aff'd,* 617 F.3d 402 (6th Cir. 2010) (relying on survey that juxtaposed "religious organization or church" with "a religion"). The terms are therefore proper and identify the heart of the genericness dispute: whether "The Episcopal Church" refers to a religion or a set of religious beliefs, or whether it identifies a specific organization.

Next, Defendants argue that Keegan's survey is not helpful because it produced no evidence of consumer connection to a particular entity. To begin with, regarding genericness, the question is not whether a name is a source-identifier but rather whether the mark refers to "the common name of a product or service" or the "genus of which the particular product is a species." *Retail Servs., Inc. v. Freebies Publ'g*, 364 F.3d 535, 538 (4th Cir. 2004). The question in a Teflon

---

[11] Defendants also note that in *Flushing Bank v. Green Dot Corp.*, 138 F. Supp. 3d 561 (S.D.N.Y. 2015), the court did not credit Keegan's criticisms of an expert, Hal Poret, as his background was not "sufficiently deep or tested." *Id.* at 582 n.16. However, in *Flushing Bank*, the court did not exclude Keegan's report, it simply did not credit his opinion regarding the opposing party's expert.

survey, therefore, focuses on whether a name is a "common name," thus prohibiting it from having trademark protection. A Teflon survey does not, inherently, identify *which* "particular entity" produces the "brand" name, as Defendants seem to argue is necessary. (Dkt. No. 597-1 at 16.) Instead, this would go to the issue of "secondary meaning" for a descriptive mark.[12] Regardless, as affirmed by the Fourth Circuit, a Teflon survey nonetheless can be relevant to secondary meaning even though it does not identify a particular entity. *See* "*Booking.com B.V. v. Matal*, 278 F. Supp. 3d 891, 920 (E.D. Va. 2017), *aff'd sub nom. Booking.com B.V. v. United States Patent & Trademark Office*, 915 F.3d 171 (4th Cir. 2019) ("Teflon surveys are also a generally accepted way of measuring secondary meaning.").

Finally, Defendants argue that Keegan improperly limited respondents to self-identified Episcopalians, thus surveying the wrong universe of respondents. As the Fourth Circuit held, "A 'universe' is 'that segment of the population whose perceptions and state of mind are relevant to the issues in the case.' A 'survey of the wrong 'universe' will be of little probative value in litigation." *PBM Prod., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 123 (4th Cir. 2011) *citing* McCarthy on Trademarks and Unfair Competition § 32:159 (4th ed.2003). The limit of respondents to self-identified Episcopalians (Dkt. No. 597-2 at 13) is impermissible here. To begin with, this limit clearly excludes a variety of individuals who may be consumers, such as relatives of local students, students at The Porter-Gaud School, and carriage tour-guides in Charleston. (Dkt. No. 595-1 at 20 – 22.) However, the larger issue with excluding all non-Episcopalians is that it has the inappropriate effect of improperly weighing members affiliated with the Plaintiffs'

---

[12] Defendants confusion is clear by their statement that "[a] mark that is generic, and therefore merely descriptive, can only gain trademark protection if it has 'acquired secondary meaning....'" (Dkt. No. 597-1 at 16 – 17.) The statement is incorrect. A generic mark can *never* act as a trademark. Instead, a descriptive name, the next and separate level of distinctiveness, can gain protection only if it has acquired secondary meaning.

-20-

organizations stronger than members of the Defendants. While self-identified Episcopalians may attend the Defendants' parishes, the failure to include an additional term, such as Anglican[13] or even Christian, likely has the effect of improperly weighing respondents who currently attend Plaintiffs' parishes and excluding parishioners of the, thus excluding highly-relevant respondents and skewing the results to those who most-identify "The Episcopal Church" as a religious organization. This defect with choosing the proper universe, skewing the results and excluding individuals who are relevant consumers, requires exclusion of the survey.[14] *See IDV N. Am., Inc. v. S & M Brands, Inc.*, 26 F. Supp. 2d 815, 830 (E.D. Va. 1998) ("By excluding persons in the market for both kinds of products (tobacco and liqueur cordials), the survey contained a built in bias. That alone leads the Court to conclude that the survey is of limited probative value in determining the likelihood of confusion issue.").

Therefore, the Court excludes Keegan's survey.

## D. Defendants' Motion to Exclude Robert L. Klein (Dkt. No. 598)

Robert L. Klein, the president and co-founder of a market research and consulting firm who has worked in the field since 1970, is Plaintiffs' "actual confusion" expert. (Dkt. No. 598-2.) Klein produced a report which surveyed whether people believed that "The Protestant Episcopal Church in the Diocese of South Carolina" and "The Episcopal Diocese of South Carolina," two marks that Defendants acknowledge they use, were affiliated with a "national or international

---

[13] The term the Disassociated Diocese now uses to refer to themselves. (Dkt. No. 621-2 at 5, website stating that the Disassociated Diocese is "An Anglican Diocese, Making Biblical Anglicans for a Global Age.")

[14] Plaintiffs argue "Episcopalian" is the best universe of respondents as a Teflon survey should only survey customers or potential customers. (Dkt. No. 617 at 6 – 7.) To support their argument, Plaintiffs cite to *Stocker v. Adventists*, 39 U.S.P.Q.2d 1385 (T.T.A.B. 1996), where the USPTO found "Adventist Christians" to be the most relevant public. The distinction in *Stocker* is that all Parties in the case claimed to be Adventist Christians, yet here it is very possible that certain potential consumers may identify as Anglicans based on the Disassociated Diocese's current logo.

organization" and, if the respondent answered is yes, the respondents were asked "which" organization. (*Id.*) The survey results show that forty-one percent of Episcopalians, and eighteen percent of South Carolina residents overall, associate "The Protestant Episcopal Church in the Diocese of South Carolina" with TEC. (*Id.* at 14 – 17.) Further, sixty-four percent of Episcopalians, and twenty-four percent of South Carolina residents overall, associate "The Episcopal Diocese of South Carolina" with TEC. (*Id.*) The survey also used a control cell of "The Protestant Church in the District of South Carolina," a name that does not include either the words "Episcopal" or "Diocese." (*Id.* at 10.) Only 0.9% of Episcopalians believed that the control cell name was affiliated with the TEC, and 0.8% and 0.9% of other Christians and South Carolina residents overall, respectively, similarly responded that the control cell name was affiliated with TEC. (*Id.* at 13 – 16.)

Defendants do not attack Klein's qualifications, instead arguing that Klein's opinions must be excluded as his survey did not test the marks used by Defendants as they appear in the marketplace, that his survey lacked an appropriate control, that his survey included leading questions, and finally that Klein improperly coded responses which caused inflated confusion rates. (Dkt. No. 598-1.) The Court takes each argument in turn.

First, Klein's survey did not fail to simulate market conditions. Defendants fault Klein for surveying two marks, "The Protestant Episcopal Church in the Diocese of South Carolina" and "The Episcopal Diocese of South Carolina," that Defendants claim they "own[]" but are "seldom used in public." (Dkt. No. 598-1 at 8.) Defendants further argue that the surveyed marks fail to include styling, words and symbols that are often included with the marks. (Dkt. No. 642 at 7.) To begin with, Defendants' argument is factually incorrect. Instead, the record evidence demonstrates that, especially shortly after the 2012 schism, Defendants have repeatedly referred

to the Disassociated Diocese as the "Episcopal Diocese of South Carolina" and the "Protestant Episcopal Church in the Diocese of South Carolina," including in a publications, Jubilate Deo, published by the Disassociated Diocese, the Disassociated Diocese's Canons, Generational Ministries forms sent to parishes, and the journal of the diocesan convention. (*See, e.g.* Dkt. Nos. 595-71; 595-72; 595-73; 595-94 – 595-95.) To the extent the Defendants allege they may have ceased using some of these marks, or use them less often, that does not affect the Court's determination that these marks were used in commerce as "it is well established that the voluntary discontinuance of challenged activities by a defendant does not necessarily moot a lawsuit." *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 800 (4th Cir. 2001). Defendants more-recent decision to limit their use of the marks cannot preclude the Court from assessing confusion of marks that Defendants still profess ownership over.

Further, in these publications, the marks are included in simple black and white written text, not with the full stylization identified by the Defendants in their Reply. (Dkt. Nos. 595-71; 595-72; 595-73; 595-94 – 595-95; 642 at 7.) Therefore, the undisputed evidence demonstrates that these marks *do* appear in the marketplace in much the same way as they were presented in the report. Defendant's argument regarding market conditions further misses the fact that TECSC asserts to own these *exact* marks, and therefore the stylization of the Disassociated Diocese's used marks is indeed *identical* to marks used by Plaintiffs' here. Finally, the case cited by Defendants, *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 462 (E.D. Va.), *aff'd*, 707 F. App'x 138 (4th Cir. 2017), is inapplicable here. As opposed to in *Valador*, where the mark at issue "typically appears…accompanied by a triangular symbol, blue coloring" and an additional stylized logo, here the mark, as demonstrated above, is often used in commerce simply as a written name, which

makes sense as a term used to identify a religious organization as opposed to a mark for a software used to render images as in *Valador*.

Defendants also argue that the survey does not replicate market conditions as the Disassociated Diocese repeatedly advises parishioners of the ongoing dispute between the Parties. However, this is no evidence that this disclaimer of any association actually takes place when potential consumers view the mark in public and instead, as cited above, the record evidence demonstrates that the marks often appear in commerce without an immediate disclaimer.[15]

Second, Klein's survey did not lack an appropriate control. Defendants fault Klein for not using a non-infringing control which "included the term 'episcopal.'" (Dkt. No. 598-1 at 10.) However, as acknowledged by Defendants, a proper control should be "similar in appearance to the test cell, except for the designation whose influence is being tested." McCarthy on Trademarks and Unfair Competition § 32:187 (5th ed.) Defendant's argument ignores the fact that the word "episcopal," *is* the designation whose influence is being tested in the marks used by Defendants. Further, Defendants argument seems to continue to be premised on the claim that "The Episcopal Church" is a generic mark, which the Court has held it is not, and using a control to test, in part, the use of the same dominant word "episcopal" was entirely appropriate. Regardless, even if a better control could be chosen, that will go to weight rather than admissibility. *See Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 740 (S.D.N.Y. 2011), *on reconsideration in part*, No.

---

[15] As held in the Court's Order on summary judgment, a disclaimer will not be effective to dispel likely confusion where there is no evidence that these disclaimers were actually present with the marks or that consumers would see the disclaimers when generally encountering Defendants' marks in the marketplace. *See The Shell Co. (Puerto Rico) v. Los Frailes Serv. Station, Inc.*, 605 F.3d 10, 22 (1st Cir. 2010) ("signs stating 'We Do Not Sell Shell Gasoline' were not enough to avoid likely confusion, not least because customers could only see those signs after they were already at the gas pump."). So too here, a disclaimer that is not part of, or closely included with, a mark does not affect the assessment of market conditions.

09 CIV. 4373 SAS, 2011 WL 6326032 (S.D.N.Y. Dec. 16, 2011) ("However, while the fact that a survey used a control that could have been 'stronger' or 'better' may mean it is entitled to less weight, it does not mean that the survey does not provide relevant information.").

Third, Defendants argue Klein's survey included improper leading questions. Again, Defendants point to *Valador, Inc.*, 242 F. Supp. 3d at 466, which found a question to be leading that asked "'[h]ow likely do you think it is that there will be confusion between' the two products, the two product names, and the two 'VIVE' names 'if they are used by different companies selling similar product." The court noted this created a "demand effect" by indicating that the two "VIVE" labels came from the same company. *Id.* Here, there is no such issue. Instead, the survey asked "Do you or do you not believe that this group of churches is affiliated with a national organization," and *only* if a respondent answered yes were they then asked to name the organization. (Dkt. No. 598-2 at 10.) The question explicitly provides two possibilities, "do you or do you not," negating any possible demand effect as the question points towards neither yes nor no. It is further not leading as respondents are only asked the name of a national organization if they first answer yes to the prior question. This, therefore, does not implicate any of the court's concerns regarding the question in *Valador*, which asked respondents to assume only one possibility: that the marks, implicitly owned by one company, were being used by separate companies. The other cases cited by Defendants suffer from similar defects, with each not asking an open-ended question and instead pointing respondents towards a particular answer. Klein's survey here suffers from none of those defects. [16]

---

[16] As above, to the extent the phrasing of the question is relevant, the criticism goes to weight and not admissibility. *See United States v. H & R Block, Inc.*, 831 F. Supp. 2d 27, 35 (D.D.C. 2011) ("Moreover, the survey question cannot be considered to be as 'leading' as the questions identified as problematic in the plaintiff's cited authority[.] Accordingly, this critique goes to the weight of the evidence and not to admissibility.").

Finally, Defendants argue Klein's survey was improperly coded. Defendants assert that Klein's coding of the open-ended question of the survey, which asked "which" organization respondents believed the mark was affiliated with, led to unreliable and inflated rates of confusion. (Dkt. No. 598-1 at 12.) Klein coded a variety of responses as indicating confusion: "The Episcopal Church," "The Episcopal Diocese," "Episcopal," "The national Episcopal group – I do not know the name," "Episcopalian & Anglican Communion," "Episcopal Church International." (Dkt. No. 598-2 at 12.) Klein also excluded certain responses that included the word "episcopal," such as "Episcopal Church of South Carolina" and "United Episcopal Church." (*Id.*) The Court recognizes some valid critiques to the potential overbreadth of the phrases Klein included as indicating confusion, yet also notes that his coding overall is rational and includes responses indicating a broad "Episcopal" organization. This criticism from Defendants, therefore, is the type of issue that goes to weight but would not, and cannot, be used to exclude Klein's report. This is particularly true in an open-ended survey, as another court has recognized,

> Clearly, a survey in which all respondents explained their conclusions in this idealized manner would be preferable to one in which few or no respondents did so. It is equally clear, however, that expecting survey respondents to be able to parse their thought processes with such a high degree of specificity in response to an open-ended "why-do-you-say-that" question is unrealistic.

*Gucci Am., Inc.*, 831 F. Supp. 2d at 741.[17]

Therefore, the Court finds that Klein's survey and his testimony is admissible.

---

[17] Klein's survey here also contains none of the coding errors identified by the Court in *Bd. of Regents, Univ. of Texas Sys. ex rel. Univ. of Texas at Austin v. KST Elec., Ltd.*, 550 F. Supp. 2d 657 (W.D. Tex. 2008), which addressed a Klein survey. In *Bd. Of Regents*, Klein did not count as "confused" respondents who responded "Texas Longhorns" or "Texas football" when seeing the University of Texas at Austin Longhorns silhouette logo as it "did not make reference to an academic institution." *Id.* at 676. Nothing so indefensible occurred here, and instead Klein's coding was focused on respondents who, in an open-ended, unprompted question, identified a large "Episcopal" institution. The coding here would go to the weight of the report and is no reason to exclude the report.

## IV.  Conclusion

For the foregoing reasons, the Court **GRANTS** Plaintiff-in-Intervention The Episcopal Church's Motion to Exclude the Genericness Expert Report of Hal Poret. (Dkt. No. 580.)

The Court **DENIES** Defendants The Right Reverend Mark J. Lawrence, *et al.*'s Motion to Exclude Walter Edgar.  (Dkt. No. 585)

The Court **GRANTS** Defendants The Right Reverend Mark J. Lawrence, *et al.*'s Motion to Exclude Mark Keegan.  (Dkt. No. 597.)

The Court **DENIES** Defendants The Right Reverend Mark J. Lawrence, *et al.*'s Motion to Exclude Robert L. Klein (Dkt. No. 598).

**AND IT IS SO ORDERED.**

Richard Mark Gergel
United States District Court Judge

September 19, 2019
Charleston, South Carolina