**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| The Right Reverend Charles G.<br>vonRosenberg, et al., )<br> )<br>Plaintiffs, )<br> )<br>The Episcopal Church, )<br> )<br>Plaintiff in Intervention )<br>v. )<br> )<br>The Right Reverend Mark J. Lawrence, )<br>et al., )<br> )<br>Defendants. )<br>_____ ) | Civil Action No. 2:13-587-RMG<br><br><br>**ORDER AND OPINION** |

This matter is before the Court on Plaintiffs The Right Reverend Charles G. vonRosenberg, *et al.*'s Motion for Summary Judgment (Dkt. No. 584), Plaintiff-in-Intervention The Episcopal Church's Motion for Summary Judgment (Dkt. No. 595), Defendants The Right Reverend Mark J. Lawrence, *et al.*'s Motion for Summary Judgment (Dkt. No. 603), and Defendants The Right Reverend Mark J. Lawrence, *et al.*'s Motion for Summary Judgment as to Genericness. (Dkt. No. 610.).[1]

**I.  Background**

This case arises out of a schism in 2012 in the Historic Diocese, originally known as the "Protestant Episcopal Church in the State of South Carolina," in which certain members and parishes sought to dissociate from The Episcopal Church, a nationwide hierarchical church. The parties have litigated property issues related to the schism in the state courts of South Carolina,

---

[1] In addition to this Order, the Court issues orders on the Disassociated Parishes' motions for summary judgment (Dkt. Nos. 556 – 570, 572 – 579, 581 – 583; 587 – 593, 599 – 600) and on the Parties' *Daubert* motions (Dkt. Nos. 580, 585, 597, 598.)

culminating in a 2017 decision in the South Carolina Supreme Court. In this action, the Parties have raised issues surrounding the use of certain trademarks in contest between The Episcopal Church and its affiliates and the disassociating diocese and its affiliates.

It is important at the outset to identify the major parties in this dispute, a process complicated by the fact that the Defendant disassociating diocese has attempted to identify itself through the use of marks which the national church and its affiliates assert infringe on and dilute their trademarks and constitute false advertising. The principal parties are as follows:

1) Plaintiff The Episcopal Church (hereafter "TEC") is the national church and an Intervenor Plaintiff in this action;

2) The Protestant Episcopal Church in the State of South Carolina (hereafter the "Historic Diocese"), which was formed as early as 1785 and was long affiliated with TEC;

3) Plaintiff The Episcopal Church in South Carolina (hereafter "TECSC"), which was headed initially by Plaintiff Bishop Charles G. vonRosenberg and subsequently by Plaintiff Provisional Bishop Gladstone B. Adams, III and is affiliated with TEC;

4) Defendant The Diocese of South Carolina (hereafter the "Disassociated Diocese"[2]), headed by Defendant Right Reverend Mark Lawrence and was formed following the schism in 2012 to disassociate from TEC.

5) The Defendant parishes associated with the Disassociated Diocese (hereafter "Disassociated Parishes").

By way of background, in 1784 former members of the Church of England in multiple states, including in South Carolina, formed a convention as part of an effort to form a church that would continue the rites and ceremonies of the Church of England but conform to the principles of the nascent American Revolution and the constitutions of the many states. (Dkt. 595-3 at 14,

---

[2] The term "disassociated diocese" was utilized by Chief Justice Beatty in the controlling decision of the South Carolina Supreme Court in *Protestant Episcopal Church in the Diocese of South Carolina v. The Episcopal Church,* 421 S.C. 211, 250 n. 29 (S.C. 2017), when he stated: "In my view, the disassociated diocese can make no claim to being the successor to the Protestant Episcopal Church in the Diocese of South Carolina."

17 – 19, 24 – 26; 603 at 17.) By October 4, 1785, this new organization was called "The Protestant Episcopal Church in the United States of America." (Dkt. No. 595-3 at 24.) The convention was successful, and in October 1789, TEC adopted its first constitution under the name "The Protestant Episcopal Church in the United States of America." (Dkt. Nos. 595-3 at 102; 603 at 17.) Around the same time, and perhaps as early as May 1785, the "Protestant Episcopal Church in the State of South Carolina," began a similar process of planning the transition from the Church of England to a new organization. (Dkt. Nos. 603 at 23; 608-1 at 1; 609-7 at 15.)

This current dispute arises out of a schism in the Historic Diocese that occurred in 2012. Two competing entities, TECSC and the Disassociated Diocese, now claim to be the successor to the Historic Diocese. TECSC was initially led after the schism by a bishop, Plaintiff vonRosenberg following his appointment by the leadership of TEC. The Disassociated Diocese is led by Plaintiff Lawrence, who had formerly been appointed the bishop of the Historic Diocese by TEC but was removed from that position when he moved to disassociate from TEC. The disputes in this litigation center on the use of various marks by the Disassociated Diocese and its affiliates which Plaintiffs assert are owned by TEC or its affiliate and successor to the Historic Diocese, TECSC. On the other hand, the Disassociated Diocese claims to be the successor of the Historic Diocese and thus entitled to use certain marks owned by the Historic Diocese.

In 2007, TEC registered five marks with the United States Patent and Trademark Office:

- "The Protestant Episcopal Church in the United States";
- "The Episcopal Church";
- "The Episcopal Church Welcomes You";
- "La Iglesia Episcopal", and;

- The Episcopal Shield.[3]

(Dkt. No. 595-5 – 595-12; 595-64 – 595-69.) All five marks have since had declarations of incontestability filed. (*Id.*) The trademark registration for "The Episcopal Church" includes a first use date of January 1, 1967. (Dkt. Nos. 595-8; 595-9.)

In November 2010, two years before the schism, the Historic Diocese, then led by Defendant Lawrence as bishop, registered the following marks with the South Carolina Secretary of State:

- "Diocese of South Carolina";

- "The Episcopal Diocese of South Carolina";

- "The Protestant Episcopal Church in the Diocese of South Carolina";

- "The Diocesan Seal".[4]

(Dkt. No. 584-3.) In October 2012, the Disassociated Diocese withdrew its association with TEC and its accession to the Constitution of The Episcopal Church. (Dkt. Nos. 439 at ¶ 86; 603 at 17.) After the disassociation, Defendant Lawrence began to lead an organization calling itself the "Diocese of South Carolina."[5] Fifty-five parishes that are part of the Disassociated Diocese are

---



3



4

[5] The Disassociated Diocese now styles itself as the "Diocese of South Carolina" with additional text stating "An Anglican Diocese, Making Biblical Anglicans for a Global Age," using the registered Diocesan Seal. (Dkt. Nos. 621-2; 636-1.)

named as Defendants here.[6]  (Dkt. No. 621-2 at 17 – 20; 621-3 at 1 – 11.)

Concurrently, TECSC, under the leadership of Plaintiff Bishop Charles G. vonRosenberg, continued as the local diocese associated with TEC.  (Dkt. Nos. 595-1 at 12; 603 at 25.)  Because of a state trial court injunction (later overturned by the South Carolina Supreme Court), TECSC was prohibited from using the marks of the Historic Diocese and adopted the name of "The Episcopal Church in South Carolina."  Later, Plaintiff vonRosenberg was succeeded as bishop by Plaintiff Gladstone Adams, who was appointed by the duly authorized leadership of TEC.

On January 4, 2013, the Disassociated Diocese and certain associated churches and parishes sued TEC in the Dorchester County Court of Common Pleas seeking a determination of real and personal property rights.  On March 5, 2013, Bishop vonRosenberg filed this federal action, alleging trademark infringement and false advertising by the Disassociated Diocese.  While this action was pending in federal court, a state trial court issued an order on February 3, 2015 in favor of the Disassociated Diocese on a broad range of issues, including the service marks at issue.  (Dkt. No. 86-3 – 83-6.)  TEC appealed.  On August 2, 2017, the South Carolina Supreme Court held that TEC owned most of the property in dispute and finding that twenty-eight of the Disassociated Parishes held real and personal property in trust for TEC.  *Protestant Episcopal Church in the Diocese of S.C. v. Episcopal Church*, 421 S.C. 211, 265, 806 S.E.2d 82, 111 (2017), *reh'g denied* (Nov. 17, 2017), *cert. denied sub nom. Protestant Episcopal Church in the Diocese of S.C. v. The Episcopal Church*, 138 S. Ct. 2623 (2018).

After the South Carolina Supreme Court's decision, this Court allowed TEC and TECSC to intervene as plaintiffs in this action.  (Dkt. Nos. 87, 140.)  On April 16, 2018, this Court allowed

---

[6] The amended complaints name fifty-five parishes.  (Dkt. Nos. 146 at ¶ 9, 150 at ¶ 8.)  Two Defendant parishes have been dismissed by stipulation.  (Dkt. Nos. 400; 659.)

the Plaintiffs to amend their pleadings to assert false advertising and trademark infringement claims against the Disassociated Diocese, fifty-five Disassociated Parishes, and the Trustees of the Disassociated Diocese. *vonRosenberg v. Lawrence*, No. CV 2:13-587-RMG, 2018 WL 1790827, at *3 (D.S.C. Apr. 16, 2018). The Court prohibited Plaintiffs from amending their pleadings to include trust claims, finding that those claims should remain in state court. *Id.* at *4.

All Parties have now made cross-motions for summary judgment as to all claims. This Order rules on TECSC's Motion for Summary Judgment (Dkt. No. 584), TEC's Motion for Summary Judgment (Dkt. No. 595) and Defendants' Motion for Summary Judgment (Dkt. No. 603) and Motion for Summary Judgment as to Genericness. (Dkt. No. 610.) The issues have been extensively briefed, and each Party filed responses and replies. (Dkt. Nos. 618, 619, 621, 622, 625, 626, 641, 643, 647, 650, 649.)

## II.    **Legal Standard**

To prevail on a motion for summary judgment, the movant must demonstrate that there is no genuine issue of any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party seeking summary judgment has the burden of identifying the portions of the "pleadings, depositions, answers to interrogatories, any admissions on file, together with the affidavits, if any, which show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court will construe all inferences and ambiguities against the movant and in favor of the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The existence of a mere scintilla of evidence in support of the non-moving party's position is insufficient to withstand a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). However, an issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict in favor of the non-movant. *Id.* at 257.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## III. Discussion

The Plaintiffs TEC and TECSC collectively bring five causes of action: trademark infringement under the Lanham Act, trademark dilution under the Lanham Act, false advertising under the Lanham Act, trademark infringement under state law, and cancellation of trademarks under state law. The Court addresses each in turn. However, a significant amount of the briefing has focused on the South Carolina Supreme Court's ruling in *Protestant Episcopal Church in the Diocese of S.C. v. Episcopal Church*, 421 S.C. 211, 806 S.E.2d 82 (2017), *reh'g denied* (Nov. 17, 2017), *cert. denied sub nom. Protestant Episcopal Church in the Diocese of S.C. v. The Episcopal Church*, 138 S. Ct. 2623 (2018) (hereinafter "*Protestant Episcopal Church*"). The South Carolina Supreme Court decision has produced vastly differing interpretations by the Parties, with various implications for this Court's ruling. The Court therefore begins by discussing the South Carolina Supreme Court's decision.

### A. The South Carolina Supreme Court's Decision in *Protestant Episcopal Church*

The South Carolina Supreme Court's majority opinion, the result of three opinions by a majority consisting of former Chief Justice, and then-Acting Justice, Pleicones, Chief Justice Beatty, and Associate Justice Hearn, collectively reversed the lower state court's decision on service marks and deferred to this Court on all trademark-related issues. The opinions by Pleicones

-7-

and Hearn reversed the trial court's holding that the state registered trademarks prevailed over TEC's federally registered trademarks and dissolved the injunction. *Id.* at 231, 248. Chief Justice Beatty, in the controlling opinion, held that his decision "express[ed] no opinion concerning the rights to the service marks," and instead left the decision of service marks to this Court. *Id.* at 251 n. 28 ("[T]his determination should remain with the federal court."). The Beatty opinion drew no distinction between the state and federal trademark claims, and instead explicitly deferred all questions regarding rights to the service marks to this Court, reversing the trial court's attempt to rule on those issues. *Id.*

Defendants argue, rather inexplicably, that this Court should defer to the findings of fact of the reversed state lower court decision regarding service marks, a contention plainly without merit. Under South Carolina law, the party asserting issue preclusion (collateral estoppel) "must demonstrate that the issue in the present lawsuit was (1) actually litigated in the prior action; (2) directly determined in the prior action; and (3) necessary to support the prior judgment." *Carolina Renewal, Inc. v. S.C. Dept. Transp.*, 385 S.C. 550, 554 (S.C. Ct. App. 2009).[7] The issue of the service marks, under either federal or state law, was not "directly determined in the prior action," and the trial court's holdings and findings on this issue were reversed, pending determination by this Court, as held by Justice Beatty. *Protestant Episcopal Church*, 421 S.C. at 251.

Defendants further argue that this Court should look past the South Carolina Supreme Court's ruling on the issue of which organization is the successor to the Historic Diocese. (Dkt.

_____

[7] Defendants also cite the standard for claim preclusion. (Dkt. No. 625 at 12.) The party asserting claim preclusion must establish three elements: "(1) identity of parties; (2) identity of the subject matter; and (3) prior adjudication of this issue." *Catawba Indian Nation v. State*, 407 S.C. 526, 538, 756 S.E.2d 900, 907 (2014). Similarly, the issue of the service marks does not have a binding prior adjudication and was not an unraised claim in the state court action: instead, the trademark claims were explicitly deferred to this Court.

-8-

No. 625 at 16.) Justices Pleicones and Hearn held that the South Carolina Supreme Court must accept as "final and binding" the rulings of TEC recognizing the "Associated Diocese to be the true Lower Diocese of South Carolina…." *Protestant Episcopal Church*, 421 S.C. at 229, 231, 232, 234. Justice Beatty, constituting the third member of the majority, stated that "[i]n my view, the disassociated diocese can make no claim to being the successor to the Protestant Episcopal Church in the Diocese of South Carolina." *Id. at* 251 n. 29. Justice Beatty's holding is clear: the Disassociated Diocese is not the successor to the Historic Diocese, instead the TECSC has succeeded and is the "Protestant Episcopal Church in the Diocese of South Carolina." *Id.*

Defendants contend that the holding in the footnote where Chief Justice Beatty plainly stated that the Disassociated Diocese was not the successor of the Historic Diocese should be limited only to ownership of a single disputed property, Camp St. Christopher. (Dkt. No. 625 at 16 – 20.) A reading of the entire footnote instead mandates the opposite conclusion. Justice Beatty's decision focused, almost exclusively, on the effect of accession to the Dennis Canon on each individual parish, answering the fundamental question of the state case regarding who owned the property occupied by the Disassociated Parishes. The footnote in question, Footnote 29, by contrast, discussed the sole piece of non-parish Diocesan property addressed in his opinion, Camp St. Christopher. Further, as with the state registered trademarks that he deferred to this Court, Justice Beatty ruled clearly: "the disassociated diocese can make no claim to being the successor to the Protestant Episcopal Church in the Diocese of South Carolina." *Protestant Episcopal Church*, 421 S.C. at 251 n.29. This holding was vigorously litigated in the state courts, was determined by the three-person majority of Pleicones, Hearn and Beatty and was necessary to support the judgment regarding Camp St. Christopher, and therefore is precluded from re-

litigation. *Carolina Renewal, Inc. v. S.C. Dept. Transp.*, 385 S.C. 550, 554 (S.C. Ct. App. 2009) (test for issue preclusion). The Court will not disturb this ruling.[8]

Finally, Defendants argue that the Court is collaterally estopped by *Protestant Episcopal Church* regarding the proper interpretation of First Amendment jurisprudence and is mandated to apply a certain interpretation of the South Carolina Supreme Court's prior decision in *All Saints Parish Waccamaw v. Protestant Episcopal Church in the Diocese of South Carolina*, 385 S.C. 428, 685 S.E.2d 163 (2009) (hereinafter, "*All Saints*"). (Dkt. No. 625 at 15 – 16, 20 – 21.) The Court, however, will not assess whether each Justice properly applied *All Saints* to their own decision, and instead is bound by the actual ruling articulated by the South Carolina Supreme Court majority which, as explained above, conclusively reversed the trial court on all holdings or findings related to trademarks, leaving the issue to this Court, and held that the TECSC is the successor to the Historic Diocese. This is the plain reading of Chief Justice Beatty's opinion, the narrowest ruling, which therefore controls. *See Weil v. Weil*, 299 S.C. 84, 90, 382 S.E.2d 471, 474 (Ct. App. 1989) ("[I]f the language employed is plain and unambiguous, there is no room for construction or interpretation, and the effect thereof must be declared in the light of the literal meaning of the language used.") (citations omitted); *State v. Harrison*, 402 S.C. 288, 298, 741 S.E.2d 727, 732 (2013) ("The controlling position is the one 'taken by those Members who concurred in the judgments on the narrowest grounds.'") *citing Marks v. United States*, 430 U.S. 188 (1977).

---

[8] Defendants additionally argue that the ruling of the South Carolina Supreme Court did not resolve these issues since the Court split two to two on granting a petition for rehearing. However, while the vote to grant the petition for rehearing was split, the petition itself was denied by all four members of the South Carolina Supreme Court as the petition failed to receive a majority. (Order on Petition for Rehearing, Dkt. No. 647-1.) The Order on the petition for rehearing therefore has no effect on the finality of the South Carolina Supreme Court's ruling.

Regardless, it is clear that the South Carolina Supreme Court held that the "neutral principles of law approach," articulated in *All Saints*, applies to the state law issues: the justices merely disagreed on the correct outcome based on the application of the *All Saints* rule.[9] The Court therefore is bound by the Justices' actual holding on the ultimate issues, and will not parse, as the Defendants suggest, whether each Justice properly applied *All Saints*.

Having ruled on the relevance of *Protestant Episcopal Church*, the Court turns to the claims at issue here.

### B. Continuation of the Historic Diocese

A core issue related to ownership of the marks is whether TECSC or the Disassociated Diocese is the lawful successor of the Historic Diocese for purposes of trademark ownership, as length of use and prior use of marks is relevant to the determination of trademark rights.

At the outset, as held above, it is settled by a majority of the South Carolina Supreme Court that TECSC is the lawful successor to the Historic Diocese. *Protestant Episcopal Church*, 421 S.C. at 229, 231, 232, 234, 251 n.29. This issue has already been litigated, directly determined and necessary to support a judgment, and therefore Defendants are collaterally estopped from relitigating this issue. Therefore, for legal purposes of intellectual property, Plaintiff TECSC is the successor to the historic Diocese.

Furthermore, this Court independently holds that TECSC is the lawful successor of the Historic Diocese since this Court is mandated to accept as binding the decision of the highest

_____

[9] Two justices, Pleicones and Hearn, would have overruled *All Saints* only as to its specific holding regarding the efficacy of the Dennis Cannon, but otherwise applied *All Saints*' legal framework. *Protestant Episcopal Church*, 421 S.C. at 223. ("I would now overrule *All Saints* to the extent it held the Dennis Canon and the 1987 amendment to the Lower Diocese's Constitution were ineffective in creating trusts over property…."). Nevertheless, all justices applied *All Saints*' "neutral principles" approach, though they disagreed over its proper application. *Id.* at 220, 236, 249, 251, 277.

ecclesiastical body in a hierarchical religious organization. TEC is a hierarchical church. Plaintiffs have submitted unrebutted evidence that TEC is a three-tiered, hierarchical church composed of the "Church's General Convention at the topmost tier, regional dioceses in the middle tier" and congregations on the bottom tier.[10]  (Dkt. No. 595-2 at ¶ 3.)  This matter is not for dispute, and every other court to assess the issue, including the Fourth Circuit, has determined that TEC is hierarchal.[11]  *See Dixon v. Edwards*, 290 F.3d 699, 716 (4th Cir. 2002) ("the Canons of the Episcopal Church clearly establish that it is a hierarchy."); *Dixon v. Edwards*, 172 F. Supp. 2d 702, 715 (D. Md. 2001), *aff'd and remanded*, 290 F.3d 699 (4th Cir. 2002) ("Courts have repeatedly and invariably recognized that the Church is hierarchical. Indeed, there appears to be no case to the contrary and Defendants have noted none.") (collecting cases); *Hiles v. Episcopal Diocese of Massachusetts*, 51 Mass. App. Ct. 220, 227, 744 N.E.2d 1116, 1121 (2001), *rev'd in part on other grounds*, 437 Mass. 505, 773 N.E.2d 929 (2002) ("It is undisputed that the Episcopal Church is hierarchical in structure; 'there are no judicial holdings to the contrary.'"); *Par. of St. Paul's Episcopal Church v. Episcopal Diocese of Connecticut Donations & Bequests for Church Purposes, Inc.*, No. 3:05CV1505 (JBA), 2006 WL 8448063, at *7 (D. Conn. Aug. 21, 2006) ("the Episcopal Church has been held to be a hierarchical religious denomination.").

Therefore, since TEC is hierarchical, "[i]t is axiomatic that the civil courts lack any authority to resolve disputes arising under religious law and polity, and they must defer to the highest ecclesiastical tribunal within a hierarchical church applying its religious law." *Dixon*, 290 F.3d at 714 *citing Serbian E. Orthodox Diocese for the United States & Canada v. Milivojevich*,

---

[10] Defendants do not rebut this evidence, and instead assert that "whether TEC is a hierarchy is not relevant." (Dkt. No. 625 at 21.)

[11] The Court notes that a majority of the South Carolina Supreme Court also determined that TEC is a hierarchical church. *See Protestant Episcopal Church*, 421 S.C. at 229, 233, 248. Collateral estoppel therefore applies to this issue as well.

426 U.S. 696, 709, 96 S.Ct. 2372 (1976). *See also Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 185, 132 S. Ct. 694, 704 (2012) ("Our decisions in that area confirm that it is impermissible for the government to contradict a church's determination of who can act as its ministers."). The issue of the leader of the Historic Diocese is therefore left to the determination of TEC. *See Dixon*, 290 F.3d at 718 ("In the final analysis, it was for the Episcopal Church to determine whether Bishop Dixon was acting within the bounds of her role as Bishop Pro Tempore of the Diocese of Washington."). The Court thus defers to TEC's removal of Bishop Lawrence in 2012 and installation of Bishop vonRosenberg as head of the Historic Diocese. (Dkt. No. 6-16 at ¶¶ 12 – 15.) Anything less would ask this Court to become involved with the question of who is the proper religious leader of a diocese, something that would necessitate impermissible entangling with a religious controversy. *See Serbian E. Orthodox Diocese*, 426 U.S. at 709 ("To permit civil courts to probe deeply enough into the allocation of power within a[]hierarchical[] church so as to decide . . . religious law (governing church polity) . . . would violate the First Amendment in much the same manner as civil determination of religious doctrine.").

In sum, this dispute, regarding church polity and administration of TEC's administrative structure is precisely the type of case in which the Court must defer to a religious institutions' highest ecclesiastical tribunal, which here removed Defendant Lawrence as the head of the Historic Diocese. Therefore, it was for TEC to determine which Bishop was leading the Historic Diocese and the Court is mandated to defer to TEC's designation of Bishop vonRosenberg, and later Provisional Bishop Adams, as the head of the Historic Diocese, and thus the TECSC as the successor to the Historic Diocese.

Finally, Defendants argue that the Court is bound to apply South Carolina substantive law as the rule of decision on "state substantive law" here. (Dkt. No. 625 at 15.) The South Carolina

Supreme Court, in *All Saints Par. Waccamaw v. Protestant Episcopal Church in Diocese of S.C.*, 385 S.C. 428, 442, 685 S.E.2d 163, 171 (2009), held that "South Carolina courts are to apply the neutral principles of law approach...." However, even though South Carolina courts are required to apply the neutral principles of law to state claims, with the exception of the state trademark cause of action brought by the TECSC, this Court is asked to rule on claims arising under federal law, namely, the Lanham Act. Therefore, as the Court is asked to rule on federal law, it is axiomatic that the Court must apply federal law. *See Gorby v. Weiner*, No. CIV.A. TDC-13-3276, 2014 WL 4825962, at *4 (D. Md. Sept. 23, 2014) ("In regard to the federal causes of action—the Lanham Act claims—this Court applies federal law as interpreted by the Fourth Circuit."); *Simone v. VSL Pharm., Inc.*, No. CV TDC-15-1356, 2017 WL 66323, at *2 (D. Md. Jan. 5, 2017) ("On VSL's federal Lanham Act claims, this Court applies federal law as interpreted by the United States Court of Appeals for the Fourth Circuit.").

Indeed, the Supreme Court in *Jones v. Wolf*, 443 U.S. 595, 99 S. Ct. 3020 (1979), recognized that "*a State* is constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute." *Id.* at 604 (emphasis added). Here, this Court is not determining a state law property dispute, but instead is asked to determine the lawful leader and successor of the Historic Diocese, which is an issue of church polity and administration intertwined with the appointment of a new bishop.[12] Therefore, as stated above, this Court must defer to TEC's

_____

[12] The Eleventh Circuit made clear the line between the applicability of *Jones* and *Serbian Eastern Orthodox*, explaining the while *Jones* was concerned with resolving "disputes concerning ownership rights to property," *Serbian Eastern Orthodox* articulated "the principle of deference to decisions of church authorities applies to disputes concerning matters of internal church governance." *Crowder v. S. Baptist Convention*, 828 F.2d 718, 724 – 25 (11th Cir. 1987). Here, in the first instance, the issue of the continuation of the Historic Diocese is a matter of internal church governance and therefore the Court defers to TEC's determination. By contrast, when actually applying the Lanham Act rather than this preliminary issue of church governance, the Court applies the neutral principles that always govern trademark claims. *See Maktab Tarighe*

-14-

acceptance of Bishops vonRosenberg and Adams, and thus TECSC, as the lawful successor of the Historic Diocese.

### C.  TEC's Claims for Trademark Infringement

As Plaintiffs TEC and TECSC claim ownership of different marks, the Court assesses each separately.  As previously mentioned, TEC claims ownership of five marks.  TEC alleges that, while Defendants do not use any of these marks precisely, Defendants are engaging in trademark infringement by using substantially similar marks, such as "The Protestant Episcopal Church in the Diocese of South Carolina," "The Episcopal Diocese of South Carolina," and various institutional names that incorporate "The Episcopal Church" or a variation of the mark. (Dkt. Nos. 150 at ¶¶ 27 – 33; 595-1 at 18 – 19.)  Defendants argue that TEC cannot make out a claim for trademark infringement and additionally assert that the mark "The Episcopal Church" is generic. (Dkt. Nos. 610, 622, 626, 603, 649, 650.)

As the Fourth Circuit has explained, to establish trademark infringement a plaintiff must prove:

> (1) that it owns a valid mark; (2) that the defendant used the mark 'in commerce' and without plaintiff's authorization; (3) that the defendant used the mark (or an imitation of it) 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services; and (4) that the defendant's use of the mark is likely to confuse customers.

*Rosetta Stone, Ltd. v. Google, Inc.*, 676 F.3d 144, 152 (4th Cir. 2012); *see also* 15 U.S.C. § 1114(1)(a).  As explained below, since there are no disputes of material facts regarding all four

---

*Oveyssi Shah Maghsoudi, Inc. v. Kian*far, 179 F.3d 1244, 1249 (9th Cir. 1999) ("[plaintiffs] seek various forms of relief for trademark infringement and false designation of origin, under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a). We have previously applied neutral principles of trademark infringement in disputes between religious organizations.")

elements and Defendants have not demonstrated that "The Episcopal Church" is generic, the Court grants summary judgment to TEC on its claim for trademark infringement.

### 1. Ownership of the Marks

There is no dispute that TEC owns five trademarks:

- "The Protestant Episcopal Church in the United States";

- "The Episcopal Church";

- "The Episcopal Church Welcomes You";

- "La Iglesia Episcopal," and;

- The Episcopal Shield.

Each is federally registered with the United States Patent and Trademark Office. (Dkt. No. 595-5 – 595-12; 595-64 – 595-69.) Further, all five marks have since reached incontestable status and have declarations of incontestability filed. *(Id.)*

Where an affidavit is filed after a mark has been "in continuous use for five consecutive years," without an adverse decision or pending proceedings, a mark achieves incontestable status. 15 U.S.C. § 1065. There is no dispute, and Defendants have presented no evidence to the contrary that TEC has used its marks for over five consecutive years, having registered the marks in 2007, there are no adverse final decisions, no pending proceedings regarding ownership of the marks, and TEC filed declarations of incontestability as to all five marks. (Dkt. No. 595-5 – 595-12; 595-64 – 595-69.) Where a registered trademark becomes incontestable, "the rebuttable presumption that a registered mark has acquired secondary meaning becomes 'conclusive evidence of the registrant's exclusive right to use the registered mark' subject to a number of affirmative defenses enumerated in the Lanham Act." *Retail Servs., Inc. v. Freebies Publ'g*, 364 F.3d 535, 548 (4th Cir. 2004) (citations omitted) *abrogation on other grounds recognized by Verisign, Inc. v.*

*XYZ.COM LLC*, 891 F.3d 481, 488 (4th Cir. 2018) (recognizing abrogation *Retail Servs.* on issue of availability of attorneys' fees). TEC's marks have therefore reached incontestable status.

Defendants, instead, raise a variety of defenses they contend defeat the incontestable status of the marks. Defendants argue that "The Episcopal Church" name is generic and therefore not subject to trademark protections, TEC cannot demonstrate prior use, and that, regardless, TEC's marks have not acquired secondary meaning. (Dkt. Nos. 603 at 22 – 27, 610, 626 at 13 – 35, 650 at 7 – 10.) However, for the reasons set forth below, Defendants have created no dispute of material fact on any of these arguments, and the Court holds that TEC owns five valid and legally enforceable marks registered with the USPTO.

### a. Genericness of "The Episcopal Church"

Defendants argue that the registered mark "The Episcopal Church" is a generic name, and therefore is not entitled to any trademark protection. (Dkt. Nos. 610, 626 at 15 – 31.) "Under the Lanham Act, the issuance of a certificate of registration arms the registrant with 'prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark.'" *Retail Servs., Inc.*, 364 F.3d at 542 *citing* 15 U.S.C. § 1057(b). "Because the PTO may not register a generic mark, the fact that a mark is registered is strong evidence that the mark satisfies the statutory requirements for the distinctiveness necessary for trademark protection." *Id.* Five years of continuous use of a registered mark renders a mark incontestable, and the registration becomes "conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1065; 15 U.S.C. § 1115(b). However, even an incontestable mark is subject to cancellation for certain enumerated reasons, such as if the mark is functional, abandoned, was obtained fraudulently, or if the registered mark "becomes the generic name for

the goods or services." 15 U.S.C. § 1064(3). This is because, "a generic word can never function as a trademark or receive a certificate of registration as one," and therefore, "[e]ven an incontestable mark…comes within the reach of § 1064(3) and may be canceled if it becomes generic." *Retail Servs., Inc.*, 364 F.3d at 548.[13]

Defendants, as the party seeking to establish that "The Episcopal Church" has become generic, must: "(1) identify the class of product…to which use of the mark is relevant; (2) identify the relevant purchasing public of the class of product…; and (3) prove that the primary significance of the mark to the relevant public is to identify the class of product…to which the mark relates." *Glover v. Ampak, Inc.*, 74 F.3d 57, 59 (4th Cir. 1996). The party challenging that a registered mark is generic bears the burden of producing "sufficient evidence to establish that the mark is generic by a preponderance of evidence." *Retail Servs., Inc.*, 364 F.3d at 542. This burden-shifting is "one of production rather than persuasion," and therefore, if "sufficient evidence of genericness is produced to rebut the presumption, the presumption is 'neutralize[d]' and essentially drops from the case, although the evidence giving rise to the presumption remains." *Id.* at 543 (citations omitted). Evidence of genericness may include: "purchaser testimony, consumer surveys, listings and dictionaries, trade journals, newspapers, and other publications." *Glover*, 74 F.3d at 59.

Defendants make two overall arguments regarding the genericness of "The Episcopal Church." First, that "The Episcopal Church" was generic *ab initio*, or from the beginning of the use of the term, and therefore cannot be trademarked. Second, Defendants argue that, even if "The Episcopal Church" was not generic from the beginning, the mark "The Episcopal Church" is generic today. However, under either theory, "The Episcopal Church" is not generic.

---

[13] While § 1064 discusses a petition to cancel a registration before the USPTO, 15 U.S.C. § 1119 permits a court to determine the right to registration, including cancellation, in civil actions.

Assuming, without deciding, that an incontestable mark can be generic *ab initio*, Defendants have failed to identify any evidence creating a dispute of material fact that "The Episcopal Church" is generic under the relevant standard for assessing genericness, either at the time of TEC's creation or now. It is well-settled that a religious organization is entitled to the same protection of the federal trademark laws under the same principles applied to other businesses. *See Purcell v. Summers*, 145 F.2d 979, 985 (4th Cir. 1944). Here, the relevant class of the product is religion,[14] and the question then is whether "The Episcopal Church" identifies a specific religion's service to the consuming public or whether it "signifies the source of goods" or "distinguishes the particular product from other products on the market." *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 394 (4th Cir. 2009). While the Fourth Circuit has yet to opine on drawing this line for religious services, multiple courts of appeal addressing the same question have held that a mark for a religious organization is generic where it names a religion but is descriptive where it properly differentiates a specific denominational organization offering religious services. *See TE-TA-MA Truth Found.--Family of URI, Inc. v. World Church of Creator*, 297 F.3d 662, 666 (7th Cir. 2002) ("A mark is 'generic' when it has become the name of a product (e.g., 'sandwich' for meat between slices of bread) or class of products (thus 'church' is generic)" but finding mark not generic where "[i]t does not name the class of monotheistic religions[, as] [i]n the contemporary United States, variations on 'Church of [Deity]' are used to differentiate individual denominations, not to denote the class of all religions."); *Jews For Jesus v. Brodsky*,

---

[14] This is confirmed by both the registration of the marks, which, among other classes, registered the mark for "religious services," (Dkt. Nos. 595-5; 595-7), and courts of appeals' decisions which assess whether a term refers to a "particular faith." *See Glover*, 74 F.3d at 59 ("The relevant class of goods and services may be that identified in the mark's certificate of registration."); *Gen. Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 412 (6th Cir. 2010) ("well-known terms that society understands to refer to a particular faith in general are generic, and no single party can prevent others from using them.") (collecting cases).

993 F. Supp. 282, 297 (D.N.J.), *aff'd*, 159 F.3d 1351 (3d Cir. 1998) ("although the Plaintiff Organization sometimes refers to its members as 'Jews' who are 'for Jesus,' during the past twenty-four years the Plaintiff Organization has consistently used the phrase 'Jews for Jesus' to refer to the organization itself."); *Gen. Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 413 (6th Cir. 2010) ("It would be inappropriate to conclude as a matter of law... that the public considers 'Seventh-day Adventist' to refer generically to a religion."); *Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1011 (8th Cir. 2011) (finding mark not generic where defendant could not demonstrate that "registered marks have become generic because they identify religion, not COC as an institution.").

Defendants' cited cases are not to the contrary. The Supreme Court of New Jersey, in *Christian Sci. Bd. of Directors of First Church of Christ, Scientist v. Evans*, 105 N.J. 297, 520 A.2d 1347 (1987), found the name "Christian Science Church" generic as it was "the common name of a religion" founded by Mary Baker Eddy and held that a plaintiff has "no right to a monopoly of the name of a religion." *Id.* at 306, 313. Defendants also point to *Universal Church, Inc. v. Universal Life Church/ULC Monastery*, No. 14 CIV. 5213 (NRB), 2017 WL 3669625, at *10 (S.D.N.Y. Aug. 8, 2017*), aff'd sub nom. Universal Church, Inc. v. Toellner*, 752 F. App'x 67 (2d Cir. 2018), which found "Universal Church" to be generic. Defendants focus on *Universal Church*'s statement that "universal church" was generic as it referred a "type of church rather than [the] plaintiff," and the court further noted that "[t]he fact that 'Universal' does not name a religion is not dispositive." *Id.* at 9, 9 n.23. However, the undisputed facts in *Universal Church* focused on the same question as every other similar case: the court found evidence that "universal" referred to "the entire Christian Church or all Christians collectively." *Id.* at *7. The Second Circuit

reiterated this important evidence on appeal, finding that a universal church was "[d]esignating the whole Christian Church or all Christians collectively." *Universal Church, Inc. v. Toellner*, 752 F. App'x 67, 69 (2d Cir. 2018). The court in *Universal Church* even acknowledged that "The Episcopal Church" is a mark "far more distinctive than 'Universal Church.'" *Id.* at 10, 10 n.25. To say the least, as the court found evidence that the name "Universal Church" referred to the entirety of Christianity, the generic name at issue in *Universal Church* denoted an entire religion.

By contrast, Defendants here have introduced no evidence indicating that "The Episcopal Church" refers to a whole religion rather than a specific recognized denominational organization. To begin with, the undisputed record evidence presented by Defendants' experts indicates that the terms "episcopal" or "episcopal church" were used as descriptive terms, rather than the generic name of a religion, to "*describe* churches who either were current or former parishes in the Church of England" (Dkt No. 609-6 at 4) (emphasis added), and was used by "North American Anglicans" who were "dissevered from their mother church in the aftermath of the American Revolution...." (Dkt. No. 609-7 at 2.) While the use of "episcopal" in the name of certain parishes and churches predated the creation of the TEC, the undisputed evidence nonetheless demonstrates that the "adjectives 'Episcopal' and 'Episcopalian' were in use in South Carolina as *descriptive* terms" after churches "lost their relationship as local parishes to the Church of England...." (Dkt. No. 609-6 at 5 – 6) (emphasis added).[15]

Defendants also focus on the individual words making up the term "The Episcopal Church" rather than the mark as an entirety. Defendants reiterate that the word episcopal, coming from the

---

[15] This evidence dating back to before the TEC registered "The Episcopal Church" as a trademark indicates that, even if a mark could be cancelled as generic *ab initio*, "The Episcopal Church" was not generic when first used and therefore, as an undisputed factual matter, the mark was not generic *ab initio*.

Greek *episkopos*, denotes an organization with a "spiritual governance," almost always by a council of bishops. (Dkt. No. 609-8 at 3.) Defendants sole focus on "episcopal," however, is misguided, and instead "courts should not parse terms to determine that they are made up of generic components." *Hunt Masters, Inc. v. Landry's Seafood Rest., Inc.*, 240 F.3d 251, 254 (4th Cir. 2001). The Court is permitted to review the meaning of individual words, yet it is still mandated to look at the "mark as a whole" to determine whether it is generic. *Id.* The meaning of "The Episcopal Church," as a whole does not refer to churches run by bishops in general, and instead, as demonstrated by Defendants' experts and Defendants' briefing, is a descriptive term for a United States-based organization of churches that are aligned with the Anglican communion.[16] (Dkt. No. 626 at 22, 24.) The term is therefore descriptive, and not generic.

Defendants further point to the survey conducted by their expert Hal Poret. However, in addition to the Court ruling the survey inadmissible (Dkt. No. 665), even if it was admitted the survey is unhelpful in demonstrating genericness. The survey juxtaposes a "trademark name,"

---

[16] Defendants repeated refrain that an "episcopal" church is merely one governed by bishops does not mandate that "The Episcopal Church" is generic or that Defendants will be prevented from accurately describing themselves. Though it should not need saying, the holding here does not provide protection solely for the word "episcopal." As the Fourth Circuit recognized decades ago:

> It is said that the words 'Methodist' and 'Episcopal' are generic terms and that defendants have the right to use them for that reason, but defendants are not proposing to use either of these words in a new name so different from the old that no confusion could result. They are using the precise name of the old church; and the question is, not whether they have the right to use 'Methodist' or 'Episcopal' in a new name so constructed as to avoid confusion, but whether they have the right to use the old name in a way that amounts, as we think it does, to implied misrepresentation to the damage of plaintiffs.

*Purcell*, 145 F.2d at 988. The finding that "The Episcopal Church" is not generic does not affect an organization's rights to use the word "episcopal" in a name sufficiently distinct to avoid confusion with TEC's marks, as many other denominations have done, they merely do not have the right to use TEC's names or imitations of them in a way that misrepresents their affiliation.

defined as used by "one organization, or by branches of that organization," and a "category name" which "is a name that identifies a category that *can* include various organizations that are not affiliated with each other" and "*can* be used by more than one organization to identify what *type* of organization they are." (Dkt. No. 609-1) (emphasis added). In addition to these questions leading to incredibly close results, with 43.7% stating that "The Episcopal Church" is a trademark and 55.3% stating it to be a "category," the survey fails to ask the relevant question for genericness. (*Id.* at 18.) The survey does not identify whether the "The Episcopal Church" is perceived as a religion, as would be relevant to determining whether TEC's mark, as a denominational organization, is generic.[17]

Furthermore, as an independent reason for finding the survey flawed and irrelevant, Poret's survey permits a respondent to identify the mark as a "category" if the mark refers to a "*type* of organization," which the survey states "can" be, but is not necessarily, used by organizations that are not affiliated with each other. (Dkt. No. 609-1 at 8.) Disturbingly, the "can" in that sentence would permit the opposite to be true as well: a respondent could choose "category" if the mark refers to a "type of organization" that *is* affiliated with another organization. This question thus permits a respondent to respond "category" even if they perceived "The Episcopal Church" to be a descriptive term for the type of church that is part of the Anglican communion and affiliated with TEC. Poret's survey therefore is irrelevant

---

[17] This is not to say that the name of a church cannot be generic unless it is the name of a religion. *See Universal Church, Inc. v. Universal Life Church/ULC Monastery*, No. 14 CIV. 5213 (NRB), 2017 WL 3669625, at *9 (S.D.N.Y. Aug. 8, 2017), *aff'd sub nom. Universal Church, Inc. v. Toellner*, 752 F. App'x 67 (2d Cir. 2018) ("For example, 'Spanish church' would surely be generic as describing a category of Spanish-language churches, even though there is no denomination known as the 'Spanish Church.'"). However, when assessing the name of a denominational organization, as explained in this Order and multiple other decisions, the correct class of product is a religion and the court must assess whether a mark names a religion such that other religious organizations would be prevented from describing themselves.

Additionally, trademark protection for a generic term would make it "difficult for competitors to market their own brands of the same product. Imagine being forbidden to describe a Chevrolet as a 'car' or an 'automobile' because Ford or Chrysler or Volvo had trademarked these generic words.'" *Retail Servs., Inc.*, 364 F.3d at 538. For this reason, courts have also looked at whether an organizational religious name identifies a religion so to "leave so few alternatives so as to monopolize the concept and debilitate potential competitors." *Jews For Jesus v. Brodsky*, 993 F. Supp. 282, 297 (D.N.J.), *aff'd*, 159 F.3d 1351 (3d Cir. 1998). *See also TE-TA-MA Truth Found.--Family of URI, Inc.*, 297 F.3d at 666 ("'Church of the Creator' as a denominational name leaves ample options for other sects to distinguish themselves and achieve separate identities. It is not remotely like one firm appropriating the word 'sandwich' and thus disabling its rivals from explaining to consumers what's to eat."). In this regard, while Defendants point to multiple other denominational organizations which use the word "episcopal" in their name, e.g. the Reformed Episcopal Church; African Methodist Episcopal Church, Christian Methodist Episcopal Church, these names highlight the fact that trademark protection for "The Episcopal Church" does not prevent other denominations from defining themselves and achieving separate identities. (Dkt. No. 610-1 at 20.) These names therefore demonstrate the propriety of finding that "The Episcopal Church" is not generic. *See Jews For Jesus*, 993 F. Supp. at 297 (finding "Jews for Jesus" not generic where "there are several other names that could be used to refer to individuals of Jewish heritage who believe in Jesus, for example, 'Messianic Jews,' 'Hebrew Christians,' 'Jews for Christ,' or 'Jews for Christianity.'").[18]

---

[18] To determine the "primary significance" of a mark, courts also review "purchaser testimony, consumer surveys, listings and dictionaries, trade journals, newspapers, and other publications." *Glover v. Ampak, Inc.*, 74 F.3d 57, 59 (4th Cir. 1996). While, here, as described above, the Court finds there to be no indication that "The Episcopal Church" refers to a religion and therefore is not generic, the Court also reviews the evidence contemplated by *Glover*. As described below, in

The importance of the distinction set out in this order, between a religion and an organizational name for a denomination, cannot be overstated. The United States is a remarkable country home to many denominational organizations with which a person can affiliate and exercise their religion. Yet, as the Fourth Circuit held decades ago:

> [W]hile such organizations exist for…worship…and for the purpose of benefiting mankind and not for purposes of profit, they are nevertheless dependent upon the contributions of their members for means to carry on their work, and anything which tends to divert membership or gifts of members from them injures them with respect to their financial condition in the same way that a business corporation is injured by diversion of trade or custom.

*Purcell*, 145 F.2d at 985. Defendants' argument, seeking to declare generic "The Episcopal Church" as a "type" of church, would jeopardize the trademark rights, and thus the commercial existence, not only of the Plaintiffs here, but of many denominational religious organizations, even where they have operated for decades or centuries as a specific organization offering specific services among the class of religions.[19] Indeed, it is unclear whether any organization name chosen

---

discussing the strength of the mark, purchaser testimony, including the testimony of multiple 30(b)(6) witnesses for the Disassociated Parishes, confirmed that "The Episcopal Church" refers to TEC, encyclopedia listings demonstrated that "The Episcopal Church" has been used to refer to TEC and an overwhelming number of newspaper articles indicate that "The Episcopal Church" refers to TEC. (*See* Dkt. Nos. 595-1 at 41 – 47.)

[19] Multiple courts have recognized organization names that would be put in jeopardy if Defendants' definition of "generic" was adopted. *See TE-TA-MA Truth Found.--Family of URI, Inc. v. World Church of Creator*, 297 F.3d 662, 666 (7th Cir. 2002) ("Church of God; Church of God (Anderson, Indiana); First Church of God; Worldwide Church of God…; Church of God in Christ; Assembly of God; Korean Assembly of God; Church of the Nazarene; Church of Christ; United Church of Christ; Disciples of Christ; Church of Christ, Scientist; Church of Jesus Christ of Latter Day Saints.") (citations omitted); *Universal Church, Inc. v. Universal Life Church/ULC Monastery*, No. 14 CIV. 5213 (NRB), 2017 WL 3669625, at *10 (S.D.N.Y. Aug. 8, 2017), *aff'd sub nom. Universal Church, Inc. v. Toellner*, 752 F. App'x 67 (2d Cir. 2018) (noting that the following names are "far more distinctive" than "Universal Church," "Church of Religion of God, Divine Church of God, The World's Church of the Living God, Church of God Ministry of Jesus Christ, The United States Church, The Lord of the Universe Church, The Church of Good Karma, Church of God in Christ, Living Church of God, True Jesus Church, Church of the King, Christ's Sanctified Holy Church, The Episcopal Church, New Apostolic Church, and United Church of God and Worldwide Church of God.").

by the Defendants could maintain a trademark under their own proposed genericness test which seeks to parse individual words in a denomination's name and ask whether the denominational organization is a "type" of church. There is therefore no dispute of material fact that "The Episcopal Church" is not generic.

### b.    Priority of Rights

Defendants next argue that TEC cannot demonstrate prior use as to the claimed marks, and therefore may not enforce its trademark rights against the Defendants. (Dkt. 626 at 32; 603 at 22.) In general, "the party claiming ownership of a mark must be the first to use the mark in the sale of goods." *George & Co. LLC*, 575 F.3d at 400. While prior use is not a ground to cancel a registered trademark that has reached incontestable status under the Lanham Act,[20] Defendants are correct that the Lanham Act permits a defense from a claim for trademark infringement on even an incontestable mark where the defendant was the prior user.

Under 15 U.S.C. § 1065, an incontestable mark does not act as a bar to "a valid right acquired under the law of any State or Territory by use of a mark or trade name *continuing from a date prior to the date of registration* under this chapter of such registered mark...." *Id.* (emphasis added). Relatedly, 15 U.S.C. § 1115 provides a defense to an alleged infringer where the mark "was adopted without knowledge of the registrant's prior use *and* has been continuously used by such party or those in privity with him from a date prior to" either the date of constructive use, the registration (depending on the date of filing), or publication of the registered mark. 15 U.S.C. § 1115(5).    The Fourth Circuit has recognized such as defense to trademark infringement, even where a mark is incontestable. *See Armand's Subway, Inc. v. Doctor's Assocs., Inc.*, 604 F.2d 849,

---

[20] *See Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co. LLC*, 223 F. Supp. 3d 207, 213 (D. Del. 2016) (holding that incontestable mark cannot be cancelled based on prior use).

850 (4th Cir. 1979) ("Registration does not become incontestable with respect to a party whose prior use within a particular area dates from a time prior to publication of registrant's mark pursuant to the Lanham Act.").

However, while Defendants are correct on the law, they have not presented any record evidence indicating prior use, either nationwide or in South Carolina. As explained above, TECSC is the continuation of the Historic Diocese in determining trademark ownership. Therefore, while the Disassociated Diocese argues that its use dates back to 1785, (*See* Dkt. Nos. 603 at 23, 609-7 at 15; 626 at 33), this prior use is not the Defendants' to claim. Therefore, while Defendants claim that the undisputed evidence indicates that TEC did not exist until, at the earliest, October 1789, after the first use of the phrase "Protestant Episcopal Church" in South Carolina in 1785, the Disassociated Diocese cannot demonstrate prior use as it was not the organization using those marks in 1785. The marks belong to the successor of the Historic Diocese, TECSC, and therefore the Disassociated Diocese cannot rely on that alleged prior use as a defense under 15 U.S.C. § 1115 as it was neither the prior user nor in privity with the prior user.

Furthermore, even if the Disassociated Diocese could demonstrate prior use as the successor of the Historic Diocese (which it cannot), its arguments would still be foreclosed under the merger doctrine. As held by the Fourth Circuit, "[w]here a name, not merely generic or descriptive is adopted by an order, there is no reason why seceding members should be allowed to use it. Such use by seceding members, over whom the order has no further control, has obviously every element of unfairness that would arise from use by strangers." *Grand Lodge Improved, B.P.O.E. of the World, v. Eureka Lodge No. 5, Indep. Elks*, 114 F.2d 46, 48 (4th Cir. 1940). *See also Nat'l Bd. of Young Women's Christian Ass'n of U.S. A. v. Young Women's Christian Ass'n of Charleston, S. C.*, 335 F. Supp. 615, 621 (D.S.C. 1971) ("In this connection, a religious, benevolent

or fraternal organization is entitled to protect the use of its name against those who secede."). As explained by the Fourth Circuit, this rule applies even where the schismatic group used the mark prior to joining a plaintiff's organization. *See Grand Lodge Improved*, 114 F.2d at 48 ("plaintiff order was organized a number of years before it was incorporated, and unquestionably granted a charter to [Defendant] Eureka Lodge in the year 1899 under which that lodge operated until the relationship was severed in 1939. *Any separate existence which Eureka Lodge may have had prior to 1899 was merged with that of plaintiff on acceptance of the charter*.") (emphasis added).

It is undisputed that the Historic Diocese joined TEC upon its founding in 1789. (595-3 at 14, 17 – 19, 24 – 26; 603 at 17.) Furthermore, Defendant's record historical evidence, from their expert Dr. Jeremy Bonner, confirms that the Historic Diocese continuously acceded to the Constitution and Canons of TEC since at least 1841. (Dkt. No. 609-7 at 23, "The Diocese of South Carolina was a founding Diocese of PECUSA," *Id.*, "[t]here was no explicit acknowledgement of diocesan accession to the PECUSA Constitution and Canons until 1841"; 609-7 at 24, "[a]t South Carolina's Diocesan Convention of 1790, 'the General Constitution and Canons [of PECUS] being read, were unanimously agreed to....'") (emphasis in original). Dr. Bonner disagrees about the nature of the associations, and particularly the ability to disassociate, but there is no dispute that the Historic Diocese acceded to TEC's Constitutions and Canons. Therefore, even had the Disassociated Diocese demonstrated that it was the continuation of the Historic Diocese for purposes of trademark rights (which, as explained above, it is not), it would be prohibited from using TEC's marks under the doctrine of merger as "any separate existence which [the Historic Diocese] had" it lost upon joining the national church. *See Grand Lodge Improved*, 114 F.2d at 48.

Defendants make two arguments against the application of the merger doctrine here. First, Defendants argue that merger only applies where the seceding group was a licensee of the marks, not merely a group that joined a national organization. However, courts in the Fourth Circuit do not require that the merger include a license agreement. In a similar case involving the YMCA, a court in this district found the merger doctrine applicable where a seceding group had used the marks prior to ratifying the plaintiff's constitution, as the Historic Diocese undisputedly did here. *See Nat'l Council of Young Men's Christian Associations of U.S. v. Columbia Young Men's Christian Ass'n of Columbia, SC*, No. CIV.A. 3:86-3304-16, 1988 WL 144985, at *4 (D.S.C. Aug. 2, 1988) ("the Court agrees that the defendant should not be permitted to assert a defense of prior use based on its use of the plaintiff's name or marks before it ratified the plaintiff's constitution and became a charter member of the national organization."). Similarly, in *Grand Lodge Improved*, the agreement between the Parties was a fraternal order that granted a "charter" to the lodge that would ultimately secede. 114 F.2d at 48. Therefore, some form of agreement is certainly necessary, as existed here by the Historic Diocese's accession to TEC's Constitution and Canons, a formal licensing agreement, however, is not.[21] *See Id.* at *5 (applying merger doctrine based on ratification of constitution and declining to rely on plaintiff's arguments regarding

---

[21] Defendants point to *N.A.A.C.P. v. N.A.A.C.P. Legal Def. & Educ. Fund, Inc.*, 753 F.2d 131 (D.C. Cir. 1985), where the court held that the lack of a licensing agreement did not permit the national organization to sue to prohibit use of a mark, "NAACP," twenty-five years after the affiliation ceased. The court was concerned that any contrary rule would lead to the unjust result that "an affiliate's right to use the parent's name [would] cease[] anytime the parent choose." *Id.* at 140. Instead, the court did not apply the merger doctrine and held that "[a] revocable license cannot be contrived from the record." Here, the same issue does not exist as this case was filed in 2013, only one year after the Disassociated Diocese left the TEC. Additionally, the court in *N.A.A.C.P.* recognized that *Grand Lodge Improved* and *Nat'l Bd. of Young Women's Christian Ass'n* established an "affiliate's right [to use the parent's name] expires *when the affiliation ceases*." *Id.* at 140 (emphasis in original). Here, the affiliation has ceased, therefore the right to use TEC's marks, and substantially similar marks, does as well.

licensing agreement). The concern, instead, as expressed by the Fourth Circuit, is that a former-affiliates' use of a mark, after they previously agreed to be part of a parent organization, "amounts to a fraud upon the order and upon the public...." *Grand Lodge Improved*, 114 F.2d at 48.

Defendants additionally argue that the merger doctrine does not apply to marks that are "merely generic or descriptive," citing to *Grand Lodge Improved*, 114 F.2d at 48. (Dkt. No. 650 at 9 – 10.) Defendants are correct, as terms that are "merely generic" or "merely descriptive" are not protectable as a trademark. However, where a mark has achieved incontestable status, as TEC's marks have here, the mark is presumed to have secondary meaning, and therefore is no longer "merely" descriptive. *See Retail Servs., Inc.*, 364 F.3d at 548 ("The validity of the same registered mark, after qualifying for incontestable status, is conclusively presumed and may not be challenged as merely descriptive."). The merger rule therefore is applicable here.

Therefore, there is no dispute of material fact that the Defendants are not entitled to use the marks owned by TEC, or imitations of those marks, based on prior use.

### c. *Secondary Meaning*

Defendants next argue that the marks are descriptive and lack secondary meaning. (Dkt. No. 626 at 34.) This argument is misplaced. A mark is only "subject to challenge based on its lack of distinctiveness *until* it acquires incontestable status." *Retail Servs., Inc.*, 364 F.3d at 548. "[A]fter qualifying for incontestable status, [validity] is conclusively presumed and may not be challenged as merely descriptive." *Id. See also Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 196, 105 S. Ct. 658, 662 (1985) ("The language of the Lanham Act also refutes any conclusion that an incontestable mark may be challenged as merely descriptive."). Regardless, as explained in discussing the primary significance of the marks, the strength of the marks, and the

fame of the marks, these marks have secondary meaning.[22]  Defendants therefore may not challenge TEC's marks as merely descriptive and lacking secondary meaning: instead, the marks are presumed to be distinctive.

### 2.  Used in Commerce Without Consent

It is undisputed that the Defendants are using TEC's marks in commerce without its authorization.  (Dkt. No. 595-2 at ¶ 10.)  Plaintiffs submitted an affidavit attesting that TEC did not give Defendants authorization to use the marks, and Defendants have submitted no evidence that they have authorization to use the marks.[23]  (*Id.*)  Instead, this lawsuit centers on ownership, protectability and likelihood of confusion related to the marks, and no party claims any authorization for use.  Therefore, it is undisputed that Defendants used the marks in commerce without authorization.

### 3.  Mark or Imitation Used to Sell or Advertise Goods or Services

It is undisputed that Defendants used TEC's marks, or imitations of them, in advertising goods and services.  As with the second factor above, Defendant does not specifically contest this prong.  Defendants acknowledge, in their Answer, that they refer to the Disassociated Diocese as "The Episcopal Diocese of South Carolina" and "The Protestant Episcopal Church in the Diocese of South Carolina," and in addition to other evidence, Plaintiffs submitted evidence that various institutions associated with the Disassociated Diocese use similar terms, such as "The Episcopal Church Home," and that a publication produced by the Disassociated Diocese, Jubilate Deo,

---

[22] Defendants' further claim that TEC must demonstrate that their marks had secondary meaning in the relevant market, South Carolina, prior to Defendant's entry into the market.  (Dkt. No. 626 at 34 – 35.)  However, as held above and by the South Carolina Supreme court, the Plaintiff TECSC is the successor Diocese, and therefore the Disassociated Diocese did not enter the market until 2012, long after it is undisputed that TEC's marks achieved secondary meaning.

[23] Additionally, Plaintiffs submitted undisputed evidence that the marks were used in commerce. (*See, e.g.* Dkt. No, 439 at ¶ 27; 595-7; 595-72; 595-73; 595-94 – 595-95.)

referred to the Disassociated Diocese as the "Episcopal Diocese of South Carolina." (*See, e.g.* Dkt. No, 439 at ¶ 27; 595-71; 595-72; 595-73; 595-94 – 595-95.) Therefore, as it is undisputed that Defendants use TEC's marks, or similar imitations of them, in referring to the Disassociated Diocese to the public, there is no dispute of material fact that Defendants used TEC's marks, or imitations of them, in advertising goods and services.

### 4. Likelihood of Confusion

There is no material dispute that Defendants' use of marks substantially similar to TEC's marks is likely to cause, and has caused, confusion with consumers. The Fourth Circuit has articulated nine factors relevant to determining likelihood of confusion:

> (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.

*Rosetta Stone Ltd.*, 676 F.3d at 153. The Court considered each of these factors and, as discussed below, determined there is no material dispute regarding likelihood of confusion.

### a. Strength and Distinctiveness of Mark

It is undisputed that TEC's marks are strong. The Court assess this factor first, as "encroachment upon a strong mark is more likely to cause confusion*. " Rosetta Stone Ltd.*, 676 F.3d at 154. There are two steps to determining strength of a mark: first, the "conceptual strength," and next the "commercial strength." *See CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 269 (4th Cir. 2006).

"A mark's conceptual strength is determined in part by its placement into one of four categories of distinctiveness: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful." *George & Co. LLC*, 575 F.3d at 393–94. As held above, the mark, "The Episcopal

Church," is not generic, and Defendants present no evidence indicating any other registered mark is generic. Instead, The Episcopal Church's marks are descriptive, imparting information regarding characteristics of the church. *Id.* at 394. ("Descriptive marks define a particular characteristic of the product in a way that does not require any exercise of the imagination. Examples of descriptive marks include 'After Tan post-tanning lotion' and '5 Minute glue.'"). There is therefore no dispute that the marks are descriptive.[24] Further, the Court presumes secondary meaning, necessary to find the descriptive marks distinctive for purposes of trademark protection, as the marks have all achieved incontestable status. *See CareFirst of Maryland, Inc.*, 434 F.3d at 269 ("Thus...although CareFirst need not show secondary meaning [as its mark is incontestable], it still must demonstrate commercial strength.").[25] Therefore, the Court finds no dispute of material fact that TEC's marks are descriptive and have acquired secondary meaning.

However, regardless of whether a mark has conceptual strength, the Court must determine whether it has commercial strength. To determine commercial strength, the Court considers the following factors: "(1) the plaintiff's advertising expenditures; (2) consumer studies linking the mark to a source; (3) the plaintiff's record of sales success; (4) unsolicited media coverage of the plaintiff's business; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the plaintiff's use of the mark." *George & Co. LLC*, 575 F.3d at 395.[26]

---

[24] As the Court has ruled that "The Episcopal Church" is not generic, Defendants conceded that, if the mark was not generic, it is descriptive. (Dkt. No. 603 at 29 – 30, "To the extent they [the marks] are not [generic], they are at best geographically descriptive...and descriptive."). TEC also stated the marks were descriptive. (Dkt. No. 643 at 14, "the Church concedes that it is [descriptive], but also that it has acquired distinctiveness")

[25] Further, for the same reasons described below for commercial strength, the Court finds that TEC's marks have become "sufficiently distinctive to establish a mental association in buyers' minds between the alleged mark and a single source of the product," and thus have secondary meaning. *George & Co. LLC*, 575 F.3d at, 394.

[26] While relevant to a presumption of conceptual distinctiveness, the Court does not consider the incontestability of a mark when assessing commercial strength or the overall strength of the mark.

Defendants fault TEC for not adducing any evidence of its advertising expenditures or record of sales success, and TEC does not dispute that it has not presented evidence on those factors. (Dkt. No. 643 at 22.) However, a plaintiff does not need to meet each factor in order for their mark to be strong, and instead the Fourth Circuit, in initially articulating the test, held that "the following factors [are] relevant…though not dispositive…." *Perini Corp. v. Perini Const., Inc.*, 915 F.2d 121, 125 (4th Cir. 1990). *See also George & Co. LLC*, 575 F.3d at 395 (adopting *Perini* test for commercial strength). *See Booking.com B.V. v. Matal*, 278 F. Supp. 3d 891, 921 (E.D. Va. 2017), *aff'd sub nom. Booking.com B.V. v. United States Patent & Trademark Office*, 915 F.3d 171 (4th Cir. 2019) ("a party need not prove all six factors…."). Further, courts have found a mark strong where evidence only supports a subset of the relevant factors. *See, e.g. Mayson-Dixon Strategic Consulting, LLC v. Mason-Dixon Polling & Strategic Consulting, Inc.*, 324 F. Supp. 3d 569, 578 (D. Md. 2018) (finding mark strong based on extensive use, media attention, and consumer understanding). The lack of evidence regarding advertising expenditures or sales success is therefore not dispositive and, in this case, not surprising as the Court is assessing the strength of a religious organizations' marks rather than a for-profit enterprise.

Plaintiffs have presented voluminous and unrebutted evidence of unsolicited media coverage of TEC's marks and widespread recognition of TEC's marks. Most notably, the number of newspaper and other media references to the TEC as "The Episcopal Church" is overwhelming. The articles come from national media outlets, such as CNN, Fox News, the Washington Post, USA Today and the Chicago Tribune, and state-wide major outlets, such as The State newspaper.

---

*See Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 171 (5th Cir. 1986) ("Incontestable status does not make a weak mark strong."). *See also* Challenge to strength of an incontestably registered mark, 6 McCarthy on Trademarks and Unfair Competition § 32:155 (5th ed.) (incontestability relevant to "*inherent* distinctiveness of a mark" but is irrelevant to the "*acquired* distinctiveness and strength of the mark in the real world marketplace.") (emphasis in original).

(Dkt. No. 595-92 at 59 – 122.) The articles refer to major news events, such as a royal wedding in the United Kingdom, the funeral of President George H.W. Bush, and matters regarding the theology and mission of the Episcopal Church. (*Id.*) Other media entries confirm that "The Episcopal Church" refers to the TEC.[27] Major encyclopedias, such as the Academic American Encyclopedia, Collier's Encyclopedia, Encyclopedia Americana, and The World Book Encyclopedia, each refer to TEC as the "Protestant Episcopal Church," and make clear that it is also known as "The Episcopal Church." (Dkt. No. 595-115 at 4 – 15; *See e.g.* Dkt. No. 595-115 at 8, "The Episcopal Church operates 14 theological seminaries.") Most compellingly, and again undisputed, Plaintiffs submitted substantial evidence that Defendants, in their own media publication, such as newsletters and pamphlets, refer to TEC as "The Episcopal Church." (Dkt. Nos. 595-94 – 595-109.) This media evidence is overwhelming evidence of commercial strength.

Though not truly "sales" success since, as explained above, that factor is of more limited relevance in the non-profit religious context, the record evidence also demonstrates that TEC has had wide consumer success and recognition with their marks. As acknowledged by the Defendants, TEC has at least 1.9 million members.[28] (Dkt. Nos. 626 at 39; 626-2 at 13.) While Defendants note other churches, also with "episcopal" in their name, also have broad memberships, this does not negate the success demonstrated by TEC's large membership. TEC also showed other uncontroverted forms of commercial success, or at least marketplace recognition, of the mark. The leadership of many of the Disassociated Parishes each confirmed that "The Episcopal Church" referred solely to TEC. (*See, e.g.* Dkt. Nos. 595-15 at 34; 595-17 at

---

[27] Indeed, even the newspaper articles submitted by Defendants, likely to show disclaimers and knowledge of the disassociation, uniformly refer to TEC as "The Episcopal Church." (Dkt. No. 624.)

[28] TEC has up to 2.9 million members based on Pew Research center data. (Dkt. No. 607-1 at 2.)

27; 595-21 at 25 – 26; 595-25 at 32; 595-27 at 31; 595-31 at 32; 595-42 at 32 – 33; 595-53 at 29; 595-55 at 28; 595-56 at 41.)  This was reiterated by the leadership of various other Christian denominations.  (Dkt. Nos. 595-89 at 5; 595-110 at 5; 595-111 at 5.)  This unrebutted evidence demonstrates recognition by the relevant consuming public that "The Episcopal Church" refers to TEC and therefore supports a finding of a commercially strong mark.

The Court also finds relevant additional uncontroverted evidence submitted by Plaintiffs. Plaintiffs submitted uncontroverted evidence of internet search engine results, from Yahoo and Google, from 2018.  (Dkt. Nos. 585-4; 595-116.)  The searches performed in South Carolina produced 267 results on the first 20 pages of a Google search, and 246 results on the first 20 pages of a Yahoo search.[29]  (*Id.*)  Notably, each result for "The Episcopal Church" referred to TEC . (*Id.*) Though not traditionally one of the six *Perini* factors, courts recognize that search engine results may reflect the strength of a mark.[30]  *See Codename Enterprises, Inc. v. Fremantlemedia N. Am., Inc.*, No. 16CIV1267ATSN, 2018 WL 3407709, at *7 (S.D.N.Y. Jan. 12, 2018) ("The Court does not take such a cramped view; prominence in search engine results may inform the commercial strength of a mark…. Given the importance of search engines in today's internet-based economy, search results may be one indicator of commercial strength.") (citations omitted); *Am. Eagle Outfitters, Inc. v. Am. Eagle Furniture, Inc.*, No. 11 C 02242, 2013 WL 6839815, at *12 (N.D. Ill. Dec. 27, 2013) ("[t]he number of Google results may say something of the mark's strength.").

---

[29] In a separate Order, the Court excluded the evidence of searches performed by Dr. Walter Edgar's son-in-law in Massachusetts on the basis of relevancy and admissibility regarding authentication, but held that the searches performed directly by Dr. Edgar are admissible through Dr. Edgar as a fact witness.

[30] The Court notes that search engine results could be considered a part of the unsolicited media coverage factor.  Nonetheless, given the fact that the *Perini* factors were articulated in 1990 as "relevant…though not dispositive" factors, the Court finds it important to consider search engine evidence in assessing commercial strength given the importance of search-engines to any commercial or advertising activity today.  *Perini Corp.*, 915 F.2d at 125.

Therefore, this evidence of search results, with each result pointing to TEC and not any other organization, points to the commercial strength of TEC's marks.

Finally, the sixth factor looks at the length and exclusivity of TEC's use of "The Episcopal Church." The mark was incorporated into TEC's Constitution in 1967, and 1967 is listed as the year of first use in the trademark registration. Additionally, Defendants have submitted no evidence of any other denomination or church known simply as "The Episcopal Church." When looking at the name, TEC has shown exclusive, and lengthy, use of "The Episcopal Church."

Defendants did not present any evidence to create a dispute of material fact regarding the unsolicited media coverage, commercial success, or length and exclusive use of "The Episcopal Church" mark. Nonetheless, Defendants argue vociferously that extensive third-party use of the words "episcopal" and "church" in names of other denominational organizations demonstrates that "The Episcopal Church" is a weak mark. To support their argument, Defendants present a list of twenty organizations that use the phrase "episcopal" and "church" in their name, though sometimes not in sequence. (Dkt. Nos. 609-9; 625 at 38.)

The Fourth Circuit has recognized that third-party use may be relevant to the issue of commercial strength. *See CareFirst of Maryland, Inc.*, 434 F.3d at 269–70; *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 227 F. App'x 239 (4th Cir. 2007). However, it is undisputed that the third-party use identified here does little to weaken the commercial strength of "The Episcopal Church." To begin with, the evidence submitted by Defendants, through the expert report of Dr. Grant Wacker, reflects that, of the twenty organizations identified, Dr. Wacker was only able to present more detailed information regarding fourteen of the churches, and of those fourteen, ten have no presence in South Carolina and seem to have limited membership or geographic presence. (*See* Dkt. No. 609-8, the following churches have no presence in South

Carolina: The United Episcopal Church of North America, The Christian Episcopal Church, The Communion of Evangelical Episcopal Churches, The Christian Methodist Episcopal Church, The Charismatic Episcopal Church of North America, Celtic Episcopal Church, St. Luke's Episcopal Church, Episcopal Missionary Church, White Rock Independent Methodist Episcopal Church, The Apostolic Episcopal Church.). *See John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 975 (11th Cir. 1983) (strength of mark partially "based…upon the amount of use of the term by others in this product and *geographical area*") (emphasis added) *citing* 1 J.T. McCarthy, Trademarks & Unfair Competition § 11:24, at 401 (1973).

More fundamentally, none of the church names identified by the Defendants use the TEC's mark in its entirety, "The Episcopal Church," and instead intersperse other dominant features that distinguish it from "The Episcopal Church."[31] *See* 4 McCarthy on Trademarks and Unfair Competition § 23:42 (5th ed.) ("It is appropriate in determining the question of likelihood of confusion to give greater weight to the important or 'dominant' parts of a composite mark, for it is that which may make the greatest impression on the ordinary buyer."). These added words include, among others, "African Methodist," "African Methodist…Zion," "Charismatic," "Christian," "Methodist," Reformed," "Southern," and "White Rock." (Dkt. No. 626 at 8.)

This is not the case of a single word essentially comprising a mark repeatedly being used by third-parties. *See Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 94 (4th Cir. 1997) (finding mark weak where Plaintiff had word "Petro" registered in fourteen marks, and there was evidence of third-party registration of marks containing Petro). Instead, here,

---

[31] At least four of the identified other organizations, The Reformed Episcopal Church, The Southern Episcopal Church, United Episcopal Church and The Christian Episcopal Church, were schismatic groups from TEC which have an additional dominant word or phrase in their name to distinguish themselves from TEC, as opposed to the Defendants here. (Dkt. No. 609-8 at 7.)

no organization identified by Defendants use "The Episcopal Church" mark in its entirety, and to the extent other churches use the words "episcopal church," the marks contain additional dominant words, sometimes separating the words "episcopal" and "church." These additional distinctive and dominant words in the third-party uses therefore would not permit any reasonable juror to determine that the "The Episcopal Church" is not a strong mark.[32] *See Safeway Stores, Inc. v. Safeway Disc. Drugs, Inc.*, 675 F.2d 1160, 1165 (11th Cir. 1982) *abrogated on other grounds, Tobinick v. Novella*, 884 F.3d 1110 (11th Cir. 2018) ("third-party users that incorporate the word Safeway along with distinctive additional words…may not diminish the strength of the Safeway mark."); *Alabama Credit Union v. Credit Union of Alabama Fed. Credit Union*, No. CV 05-B-1692-W, 2008 WL 11422068, at *4 (N.D. Ala. Mar. 31, 2008) ("the proper inquiry is not simply how many total third-party uses exist, but 'whether the unauthorized third-party uses significantly diminish the public's perception that the mark identifies items connected with the owner of the mark.' Because of its distinctive additional words, it is doubtful that the existence of the Alabama *Mental Health* Credit Union significantly diminishes the connection in the consumer's mind between [Alabama Credit Union] and its mark.") (citations omitted); *Pub. Impact, LLC v. Bos. Consulting Grp., Inc.*, 169 F. Supp. 3d 278, 293 (D. Mass. 2016) (finding evidence of "third-party use is not…sufficient to counteract the evidence that the PUBLIC IMPACT mark has some strength," in part, because "[f]or the most part, the third-party uses to which BCG refers are of limited value in assessing the strength of the PUBLIC IMPACT mark. As noted, many of the uses

---

[32] Further, while Defendants introduce the names of the other denominational organizations, and limited facts about the churches' membership and history, Defendants have not introduced evidence specific to the extent of the use of those third-party names. *See Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1373 (Fed. Cir. 2005) ("As this court has previously recognized where the 'record includes no evidence about the extent of [third-party] uses … [t]he probative value of this evidence is thus minimal.'") (citations omitted).

include only one of the words "PUBLIC" or "IMPACT," and most do not use the words consecutively, as they are in plaintiff's mark.").[33]

Therefore, based on the overwhelming and unrebutted evidence of repeated and voluminous unsolicited media coverage, widespread success, marketplace recognition, including among Defendants, and the length and exclusive use of "The Episcopal Church" mark, the Court finds no dispute of material fact that "The Episcopal Church" is a strong mark. The evidence of third-party use, albeit often in disparate geographic regions and with the addition of distinct dominant words, somewhat lessens the strength of the mark. Yet, the core question when ascertaining the strength of a mark is what the mark means to the relevant consuming public. *See Coryn Grp. II, LLC v. O.C. Seacrets, Inc.*, 868 F. Supp. 2d 468, 485 (D. Md. 2012) *citing George & Co. LLC*, 575 F.3d at 393 – 95. Here, considering all factors, including the overwhelming evidence submitted by Plaintiffs, the Court finds there is no dispute that the mark is strong.

Finally, for the same reasons as above, the Court finds that "Protestant Episcopal Church in the United States of America" is a strong mark. Notably, Defendants have presented *no* evidence rebutting the fact that this mark is a strong, instead focusing solely on "The Episcopal Church." Further, based on the evidence cited above, particularly testimony from the

---

[33] Defendants also focus on TEC's initial trademark application in 2006, where TEC argued that "Reformed Episcopal Church" was a weak mark, in part, because of third party use of the term "episcopal church." (Dkt. Nos. 604-1 at 91; 626 at 37.) Defendants' arguments are misplaced. First, the evidence is from thirteen years ago, and six years prior to the schism at issue here, and therefore is of limited value compared to the overwhelming recent evidence submitted by Plaintiffs. Further, the fact that "Reformed Episcopal Church" may be a weak mark for an organization with a distinct history and smaller organization does not affect the multi-factor assessment of the strength of TEC's marks. Finally, in 2006 the USPTO was assessing whether "The Episcopal Church" could be registered based on another already registered mark and not ruling on the strength of "The Episcopal Church, and to the extent "Reformed Episcopal Church" is a weak mark, it only supports the determination that its third-party use does not affect the strength of the mark "The Episcopal Church."

Disassociated Parishes, search results, encyclopedias, and the exclusive use dating back to 1789, the Court finds it undisputed that the "Protestant Episcopal Church in the United States of America" is a strong mark.

Therefore, the strength of the marks weighs in favor of finding a likelihood of confusion.

### b. Similarity of Marks

It is undisputed that Defendants use exceptionally similar marks to TEC. To determine similarity of marks, courts "focus on the dominant portions of the parties' marks.... In other words, we focus on whether there exists a similarity in sight, sound, and meaning which would result in confusion." *George & Co. LLC*, 575 F.3d at 396. To begin with, certain marks used by Defendants include substantially TEC's entire mark, such as "The Episcopal Church Home." Furthermore, the use of the mark "Protestant Episcopal Church in the Diocese of South Carolina" is substantially the same as The Episcopal Church's mark "The Protestant Episcopal Church in the United States in America." The only difference is a geographic term substituted as the end: South Carolina instead of the United States. It is well settled that merely changing a geographic term will not avoid confusion. *See Atlas Copco AB v. Atlascopcoiran.com*, 533 F. Supp. 2d 610, 614 (E.D. Va. 2008) ("These 'dominant' terms are paired with the generic terms "CASPIAN" and "IRAN," which are generic geographic terms that do not distinguish the Defendant Domain Names from the ATLAS COPCO trademark."). *See also* 4 McCarthy on Trademarks and Unfair Competition § 23:50 (5th ed.) ("the fact that defendant places an indication of different geographical origin on its goods...will usually not be sufficient to prevent confusion of ordinary buyers.").

Defendants further argue that they have not adopted similar typefaces or graphics to TEC. (Dkt. No. 626 at 50 – 51.) However, to the extent there is some difference in the typeface between the two marks, which is minimal at best, the Defendants have not presented any evidence that the

different stylization sufficiently distinguishes Defendants marks from TEC's marks.[34] Additionally, any different of typefaces is of limited value here. While for consumer products, like the cases cited by Plaintiffs, typefaces appearing on the front of the products can distinguish products on a shelf, here the marks appear in newspapers, and in the Parties' signs and publications without *any* stylization. (*See, e.g.* Dkt. Nos. 567-11; 595-71; 595-72; 595-73; 595-92 at 59 – 122; 595-94 – 595-95.) Therefore, any style or typeface sometimes used on Defendants' marks do not affect their similarity to TEC's marks here.

Defendants reliance on a disclaimer to argue that the marks are not similar is also misplaced. In general, a disclaimer "does not serve to cure an otherwise clear case of likely confusion." 4 McCarthy on Trademarks and Unfair Competition § 23:51 (5th ed.). Further, any disclaimer here does not affect the similarity of the marks or confusion overall. Defendants rely on allegedly "lengthy and publicly accessible explanations of its disassociation from Plaintiffs." (Dkt. No. 626 at 51.) Yet, there is no evidence that these disclaimers were actually present with the marks or that consumers would see the disclaimers when encountering Defendants' marks in the marketplace, instead relying on disclaimers that appeared in newspaper articles or that are accessible, but not readily apparent, on the Disassociated Diocese's website. (Dkt. Nos. 624; 636.) *See, e.g. Lamparello v. Falwell*, 420 F.3d 309, 311 (4th Cir. 2005) (finding disclaimer effective where "the homepage prominently stated, 'This website is NOT affiliated with Jerry Falwell or his ministry'" and included a link to Falwell's website). To the contrary, where there is no evidence that consumers will see the disclaimer when using a defendants' services, just as potential members, parishioners or other interested individuals will not see "accessible explanations" when

---

[34] The argument about stylization is further undercut as the Disassociated Diocese has adopted the identical marks, including the Diocesan Seal, that the TECSC claims ownership over.

attending church, seeing signs, or visiting Defendants' webpages, courts find that disclaimers do not dispel confusion. *See The Shell Co. (Puerto Rico) v. Los FraIles Serv. Station, Inc.*, 605 F.3d 10, 22 (1st Cir. 2010) ("signs stating 'We Do Not Sell Shell Gasoline' were not enough to avoid likely confusion, not least because customers could only see those signs after they were already at the gas pump."). Any disclaimers here therefore do not affect the similarity of marks or overall likelihood of confusion.

The Court also finds it undisputed that "The Episcopal Diocese in South Carolina" is similar to Plaintiffs' marks. When considering the similarity of marks, courts "compare whole words, not parts...and generally use the phrase 'dominant portion' to refer to the non-generic words in multiword marks." *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 159 (4th Cir. 2014). Here, the dominant phrase is "Episcopal Church," a descriptive phrase for a church governed by bishops/broke off from the church of England. Notably, as held below, TECSC is the owner of the mark the "Diocese of South Carolina." Defendants' argument, comparing "The Episcopal Diocese of South Carolina" solely to "The Episcopal Church" is therefore nonsensical: it would lead to the perverse result that a mark simultaneously imitating two of a plaintiff's marks would be entitled to greater protection as the amalgamation means the marks are not sufficiently similar. Instead, here, "Episcopal Church" is the dominant phrase repeated by the two marks, and the substitution of Diocese of South Carolina for Church, especially as a mark owned by TECSC, acts as no more than a geographical marker. As held above, this geographical addition does nothing more than lead a consumer to believe that the geographic modifier identifies a regional affiliate of "The Episcopal Church." *See Atlas Copco AB*, 533 F. Supp. 2d at 614; 4 McCarthy on Trademarks and Unfair Competition § 23:50 (5th ed.) ("This kind of addition of a geographically descriptive modifier to another's mark may lead buyers to think that a territorially customized

version of the brand is being offered."). The is particularly true here, where the added geographical modifier, "Diocese of South Carolina" *is* the name of the regional affiliate of TEC. There is therefore no dispute of material fact that "The Episcopal Diocese of South Carolina" is similar to TEC's marks.

This factor therefore weighs in favor of finding a likelihood of confusion.

### c.    Similarity of Goods and Services

There is no dispute that the Parties offer similar services. Both offer religious services and religious education. Additionally, the nature of the religious services has significant overlap as well, as the Disassociated Diocese and Parishes use the Book of Common Prayer and TEC's hymnals. (Dkt. No. 595-77.) While the Defendants argue that they have disclaimed any affiliation, as explained above, the disclaimer here was undisputedly ineffective and, regardless, does not cure a clear likelihood of confusion. While Defendants conclusorily state that parishioners "recognize a difference" in services, (Dkt. Nos. 626 at 53; 650 at 18), for this factor to be met "the goods in question need not be identical or in direct competition with each other." *George & Co. LLC*, 575 F.3d at 397. Therefore, as all Parties offer religious services and often use identical prayer books and hymnals, there is no dispute of material fact that Defendants offer similar services and this factor weighs in favor of finding a likelihood of confusion.

### d.    Similarity of Facilities

There is further no dispute of material fact regarding the similarity of facilities. "[W]hen considering the similarity of facilities, courts are trying to determine if confusion is likely based on 'how and to whom the respective goods of the parties are sold,' and the key question is whether 'both products [are] sold in the same 'channels of trade.'" *Rosetta Stone Ltd.*, 676 F.3d at 155. While this case is unique, as a church is not generally presumed to be involved in traditional "channels of trade," it is clear that services are provided in the same manner to the same class of

consumers in the same context: namely, to parishioners, potential parishioners or other interested individuals in parishes, educational facilities, and other religious institutions.

The similarity of the facilities here is further heightened as many of the Disassociated Parishes, though not all, inhabit facilities that were formerly affiliated with the Historic Diocese. (Dkt. No. 595-76.) The fact that a company later occupied the same building as a plaintiff is a relevant when analyzing the similarity of facilities. *See Choice Hotels Int'l, Inc. v. Zeal, LLC*, 135 F. Supp. 3d 451, 467 (D.S.C. 2015) ("The facilities used by the parties are as similar as they could possibly be because the defendants are operating a facility that used to be an ECONO LODGE."); *Putt-Putt, LLC v. 416 Constant Friendship, LLC*, 936 F. Supp. 2d 648, 658 (D. Md. 2013) ("Due to Defendant 416 CF's use of the same building that once housed a former authorized Putt-Putt franchise, the similarity of facilities factor is easily satisfied.").[35] Therefore, there is no dispute of material fact that the services are offered in similar facilities, and this factor weighs in favor of finding a likelihood of confusion.

### e. *Similarity of Advertising*

All Parties acknowledge that they engage in limited advertising, though any advertising is similar based on "shared use of certain advertising media." (Dkt. Nos. 595-1 at 28; 603 at 41; 626 at 54; 619 at 24.) Because of the limited advertising here, the Court considers this factor neutral.

---

[35] Defendants confusingly argue that there must be "overlap in individual retail outlets" to find similar facilities, relying on *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 263 (4th Cir. 2007). (Dkt. No. 626 at 53 – 54.) While in *Louis Vuitton*, and other cases related to retail goods, considering individual retail outlets is relevant, that is distinct from the facts of this case where the Court is considering parties that provide religious services, which are not offered on a store shelf. Instead, this factor looks at "how and to whom the respective goods of the parties are sold," *Rosetta Stone Ltd.*, 676 F.3d at 155, which is undoubtedly similar here.

###### f. *Defendants' Intent*

There is no dispute in the record that the Defendants intended to infringe on TEC's marks. "If there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion, since one intending to profit from another's reputation generally attempts to make his signs, advertisements, etc., to resemble the other's so as deliberately to induce confusion." *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1535 (4th Cir. 1984). However, "[t]he intent of a junior user is relevant only if the junior user intended to capitalize on the good will associated with the senior user's mark." *CareFirst of Maryland, Inc.*, 434 F.3d at 273. The Fourth Circuit has indicated that continued use of infringing names after a civil complaint can support a finding of intent. *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 937 (4th Cir. 1995) (finding bad faith where "Alpha opened a new restaurant in Baltimore under the same name after the commencement of this lawsuit and despite Lone Star's requests that Alpha change the name of its restaurant."); *JFJ Toys, Inc. v. Sears Holdings Corp.*, 237 F. Supp. 3d 311, 339 (D. Md. 2017) (finding intent after two cease and desist letters).

It is undisputed that, even after following the Complaint here was served in 2013, Defendants continued to use allegedly infringing names, including confirming in their 2018-filed Answer that the Disassociated Diocese continue to use "The Episcopal Diocese of South Carolina" and "The Protestant Episcopal Diocese of South Carolina," and various other uses of similar marks long-after 2013. (*See, e.g.* Dkt. No, 439 at ¶ 27; 595-7; 595-72; 595-73; 595-94 – 595-95). This alone supports a finding of intent.

Further, significantly more probative and uncontroverted is the Defendants' continued insistence that they are the continuation of the Historic Diocese and "adopted [the] marks well prior to the dates of first use [The Episcopal Church] has claimed[.]" (Dkt. No. 626 at 49.) The Disassociated Diocese, however, is *not* the continuation of the Historic Diocese. Defendants

admit, in their briefing, in their publications, and throughout all stages of the litigation, that they are *intentionally* using the marks of the Historic Diocese and claiming to be the successor of the Historic Diocese, and thus are intending to capitalize on the good will of that organization. The Disassociated Diocese is an organization formed in 2012 that maintains the right to use the marks of a group with which it is not associated. There is therefore no dispute of material fact regarding the Disassociated Diocese's intent to use the marks of the Plaintiffs.

g.    *Actual Confusion*

"Actual confusion can be demonstrated by both anecdotal and survey evidence." *Rosetta Stone Ltd.*, 676 F.3d at 156 *citing George & Co. LLC*, 575 F.3d at 398. "Both types of evidence are relevant, and neither category is necessarily required to prove actual confusion." *Id.* Plaintiffs have presented both anecdotal and survey evidence here, and while Defendants present arguments regarding the weight and admissibility of this evidence, Defendants have presented no evidence of their own rebutting Plaintiffs' evidence. Further, Plaintiffs' evidence is both overwhelming and admissible. There is therefore no dispute of material fact of actual confusion here.

The anecdotal evidence is substantial. As examples, Plaintiffs presented uncontroverted evidence that Bishop Adams, the bishop of TECSC, received "many phone calls" from individuals confused about churches which had the word "episcopal in" the name. Bishop Adams also testified that he had conversations with an individual who misdirected a hurricane-relief check to Defendants rather than Plaintiff. Further, a couple attended St. Michael's Church in Charleston not realizing it was not affiliated with TEC, and multiple individuals called, e-mailed, and mailed items to the TECSC, either misdirecting their communications or inquiring regarding which churches were associated with which diocese. Additionally, at least one priest and multiple parishioners and other individuals contacted Bishop Adams to attempt to determine the affiliation of a parish and the Porter-Gaud School. Services in the name of "The Episcopal Church" were

also offered at the Citadel, in Charleston, when no clergy from TEC was present. Gifts and Christmas cards were misdirected between the Dioceses. Summing up this confusion, Bishop Adams testified that "at every parish visi[t], somebody brings up something about confusion, their confusion about…what is a part of The Episcopal Church and what isn't." (Dkt. No. 595-1 at 20 – 22; 595-81 at 6 – 5, 15, 18; 595-83 at 4 – 9, 12 – 16; 595-85 at 4 –5; 595-119 at 6 – 10; 696-120 at 4 – 7.) This evidence, standing alone, sufficiently demonstrates actual confusion. Indeed, far fewer instances of anecdotal evidence have been sufficient to demonstrate actual confusion. *See Choice Hotels Int'l, Inc. v. Zeal, LLC*, 135 F. Supp. 3d 451, 469 (D.S.C. 2015) (finding that two instances of anecdotal evidence of confusion support finding of actual confusion). Yet, while Defendants construe this evidence as "de minimis at best," (Dkt. No. 626 at 45), it is clear that the testimony refers to numerous known instances of confusion. This is far from *de minimis*. *See Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 466 (4th Cir. 1996) (holding anecdotal evidence is "overwhelming" from testimony of six women who purchased wrong product and "service merchandisers" testified regarding confusion of store personnel).

Defendants attempt to minimize the evidence here by arguing that much of the testimony, from Bishop Adams and employees of TECSC, is either inadmissible hearsay or should be given limited weight as the testimony of a plaintiff's employees. The Fourth Circuit, however, has expressly held that this type of testimony, of an individual testifying regarding the effect of a similar mark on a third-party, is admissible since the testimony does not go to "the truth of the matter asserted" (here that the different Dioceses are in fact the same), but rather merely to prove that third-parties "expressed their belief" that they were confused as to a parish, church or organization's affiliation. *See Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001) (crediting testimony of school principal and parents regarding children's responses to a

costume, and holding that "[plaintiff] did not offer the children's statements or the newspaper articles to prove the truth of the matter asserted—i.e., that the persons wearing the Duffy costume were in fact Barney—but rather merely to prove that the children and the newspaper reporters *expressed their belief* that those persons were Barney. This was direct evidence of the children's and the reporters' reactions and not hearsay.") (emphasis in original). This type of testimony, from individuals regarding the effect of confusing marks on third-parties is the precise type of evidence that the Fourth Circuit often relies on to find strong anecdotal evidence. *See Sara Lee Corp.*, 81 F.3d at 466 (relying on testimony that "service merchandisers also told of massive confusion by store personnel.").

Defendants also argue the Court should discount the anecdotal evidence of confusion as it is largely from Plaintiffs' employees. (Dkt. No 626 at 43.) However, while this critique may go to the weight of the evidence at trial, it does not create a dispute of material fact at summary judgment. Defendants argument fail factually as well: while some evidence here is from Plaintiffs' employees, the expressions of confusion are from unrelated third-parties, not Plaintiffs employees. Further, the Disassociated Diocese's own treasurer testified to misdirected phone-calls and at least one misdirected check. (Dkt. No. 595-84 at 5.) Finally, as above, this type of testimony from employees regarding third-party confusion has been explicitly relied upon by the Fourth Circuit. *See Sara Lee Corp.*, 81 F.3d at 466 (relying on testimony of "service merchandisers").[36] There is therefore substantial anecdotal evidence of actual confusion.

---

[36] Defendants allege that any confusion is only because of the "disassociation," seemingly distinguishing the disassociation from the use of Plaintiffs' marks. (Dkt. No. 626 at 42.) However, this argument purports to create a distinction where there is none: the disassociation created the confusion in part *because* the Disassociated Diocese utilized the names, marks, and facilities of the Historic Diocese and substantially similar marks to TEC. Further, Defendants argument ignores that much of Plaintiffs anecdotal evidence of confusion focuses on the marks at issue, such as the father of a Citadel student expressing confusion regarding services offered in the name of

Plaintiffs also submitted an actual confusion survey by Robert Klein, which surveyed whether people believed that "The Protestant Episcopal Church in the Diocese of South Carolina" and "The Episcopal Diocese of South Carolina," two marks that Defendants acknowledge they use, are affiliated with a "national or international organization," and, if the respondent answers is yes, they were asked "which" organization. (Dkt. No. 595-86.) Defendants submit no survey evidence of their own, and instead merely argue that the survey should be excluded as inadmissible under *Daubert*. However, as explained in a separate Order, Klein's survey is both admissible and relevant to actual confusion here. Klein's survey results are striking: forty-one percent of Episcopalians, and eighteen percent of South Carolina residents overall, associate "The Protestant Episcopal Church in the Diocese of South Carolina" with TEC. Further, sixty-four percent of Episcopalians, and twenty-four percent of South Carolina residents overall, associate "The Episcopal Diocese of South Carolina" with TEC. (*Id.* at 14 – 18.) These results far exceed percentages that the Fourth Circuit has previously held to be "clear evidence" of actual confusion. *See Rosetta Stone Ltd.*, 676 F.3d at 159 (holding that where "17 percent of consumers demonstrate actual confusion[,]…[the] result is clear evidence of actual confusion for purposes of summary judgment."); *Sara Lee Corp.*, 81 F.3d at 467 (holding that survey would show "significant degree" of actual confusion even if the "true figure" was half the survey results of "thirty to forty percent" confusion).

---

"The Episcopal Church" at the Citadel, confusion regarding which churches were affiliated with TEC and similar evidence. (*See* Dkt. No. 595-1 at 20 – 22; 595-83 at 5, 8.)

Therefore, based on clear and unrebutted anecdotal and survey evidence of actual confusion, there is no dispute of material fact regarding actual confusion and this factor weighs in favor of finding a likelihood of confusion. [37]

### h.    Quality of Defendants' Product

Both Parties concede that that their services are of similar quality. (Dkt. Nos. 595-1 at 28; 626 at 52.)  The concern here is not regarding whether the alleged infringer has a low-quality product, no Party here alleges that any services provided are low-quality and it seems clear to the Court that the services provided are high-quality and meaningful to the Parties and consumers, but rather whether similar quality will lead to confusion.  As the Second Circuit recognized, "where the junior user's products are of approximately the same quality as the senior user's, there is a greater likelihood of confusion, but less possibility of dilution." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 461 (2d Cir. 2004).  Therefore, as all Parties agree the quality of services is similar, this factor weighs in favor of finding a likelihood of confusion.

### i.    Sophistication of the Consuming Public

The Parties concede that parishioners are generally sophisticated. (Dkt. Nos. 595-1 at 28; 622 at 22; 626 at 40.)  Defendants support their contention by TEC's own submissions to the USPTO, which acknowledges that consumers of religious services make careful decisions, and by

---

[37] The Disassociated Parishes separately argue that Plaintiffs cannot show actual confusion as to the Disassociated Parishes.  (Dkt. No. 622 at 9.)  This however, ignores that much of the evidence specifically relates to anecdotes of confusion regarding parishes, and the survey evidence of confusion is generally applicable to all Defendants as it focused on the specific marks at issue.  Further, the Disassociated Parishes ignore that evidence of similarity, strength, and similar services, facilities and strength are also all generally applicable.  Therefore, Plaintiffs have carried their burden on these claims as to the Disassociated Parishes.  Further, as affiliates of the Disassociated Diocese that have used the Plaintiffs' marks, they are within the scope of any injunctive relief.  However, to the extent that the Disassociated Parishes argue that the Plaintiffs' evidence does not go to the parish-specific similar marks, such as inclusion of certain words in parish names, those issues are dealt with in a separate Order.

unchallenged expert reports submitted by Defendants. (Dkt Nos. 609-4; 609-5.) Yet, the Parties'
views are overly narrow: while the most-relevant consuming public is potential parishioners, the
anecdotal evidence of confusion demonstrates that the potential consuming public includes
individuals who may never attend a Parties' church or have to decide between doctrines and
communities. Instead, the uncontroverted evidence shows that the consuming public includes
relatives of local students, students at The Porter-Gaud School and carriage tour-guides in
Charleston. (Dkt. No. 595-1 at 20 – 22; 595-81 at 6 – 5, 15, 18; 595-83 at 4 – 9, 12 – 16; 595-85
at 4 –5; 595-119 at 6 – 10; 696-120 at 4 – 7.) This should not be surprising: many individuals may
visit, attend services, donate or attend events run by either diocese even if they are not affiliated
with a church or are Christian.[38] As the Fourth Circuit has recognized, "[b]arring an unusual case,
buyer sophistication will only be a key factor when the relevant market is not the public at-large."
*Sara Lee Corp.*, 81 F.3d at 467.[39] Parishioners are sophisticated. However, the public at large,
who can equally take advantage of the Parties' services, may not be, and the Parties have submitted
no evidence regarding the sophistication of these other individuals.[40]

---

[38] Defendants evidence regarding consumer sophistication related solely to individuals, eighteen
and older, who are "Protestant" or non-denominational Christian and who have "visited churches
seeking to find a church or to consider switching churches." (Dkt. No. 609-05 at 7.)

[39] The Court is cognizant of the holding in *Perini Corp. v. Perini Const., Inc.*, 915 F.2d 121, 128
(4th Cir. 1990), which held that, even where every other factor indicates a likelihood of confusion,
"in a market with extremely sophisticated buyers, the likelihood of consumer confusion cannot be
presumed on the basis of the similarity in trade name alone...." Here, as opposed to the district
court in *Perini*, the Court has considered consumer sophistication, and while *Perini* found
"extremely sophisticated buyers" relevant, namely "a highly trained procurement professional,"
there is no evidence in the record that most consumers at issue here, even parishioners, have the
extreme level of sophistication that concerned the court in *Perini*.

[40] While the Court does not weigh this evidence, it is important to note that the survey evidence
showing actual confusion actually *increases* with more sophisticated consumers. Namely, while
Episcopalians, likely the most sophisticated consumers surveyed, reported a net confusion of sixty-
four percent regarding an association between "The Episcopal Diocese of South Carolina" and
TEC, other Christians reported a net confusion of thirty-percent, and all South Carolina residents
in general reported a net confusion of only twenty-four percent. (Dkt. No. 595-86 at 18.) The

The Sixth Circuit in *Gen. Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d

402 (6th Cir. 2010) rejected a similar argument to Defendants' argument here that sophistication

of consumers should preclude summary judgment. In *McGill*, the defendant, who separated from

the Seventh-Day Adventist church because of a theological dispute, argued that the relevant public

"are so discerning," particularly related to theological beliefs, "that there is a genuine issue of

material fact about the likelihood that they would confuse McGill's church for the plaintiffs'

church." *Id.* at 416. The Sixth Circuit rejected that argument, holding "while it may indeed be

hard to envision a person mistakenly joining the wrong church, it is not at all difficult to imagine

a person consuming McGill's published materials and ascribing his teachings to the General

Conference, especially in light of the relatedness of the parties' services and similarity of the

marks." *Id.* So too here, while Defendants demonstrated that potential parishioners are discerning,

there is no proof that the public-at large, or even the casual parishioner, is sophisticated such to

preclude summary judgment.

The Court therefore finds that consumer sophistication is, at most, neutral regarding a

finding of actual confusion given the lack of consideration or evidence regarding non-Episcopalian

sophistication.

> *j.   Likelihood of Confusion Overall*

Having reviewed all factors articulated by the Fourth Circuit, the Court finds that there is

no dispute of material fact that Defendants' use of TEC's marks, or marks substantially similar to

TEC's marks, creates a likelihood of consumer confusion. Reviewing all the elements, the Court

finds that that the following factors strongly support finding a likelihood of confusion: (1) TEC's

---

general theory is that the more sophisticated the consumer, the less likely they will be confused.
However, here the opposite is true: the evidence of actual confusion indicates that the more
knowledgeable the consumer, the *more* likely confusion.

-53-

marks, "The Episcopal Church" and "The Protestant Episcopal Church in the United States," are strong marks; (2) Defendants' use marks that are substantially similar to TEC's marks, including "The Protestant Episcopal Church in the Diocese of South Carolina" and "The Episcopal Diocese of South Carolina"; (3) the marks identify similar religious and religious educational services; (4) the facilities used are substantially similar, namely, churches and other religious buildings; (5) the Defendants intended to capitalize on the goodwill by intentionally holding themselves out as the continuation of the Historic Diocese and using marks substantially similar to TEC's marks; (6) there is substantial anecdotal evidence of actual confusion and clear survey evidence of actual confusion, and (7) the similar quality of the Parties' services. Two factors are neutral: advertising is a neutral factor given the limited advertising conducted by the Parties, and consumer sophistication is neutral given the limited scope of evidence regarding potential consumers. Regardless, even if those factors weighed in favor of finding confusion, given the clear and uncontroverted evidence regarding all other factors, particularly regarding actual confusion and strength of marks, there is no dispute of material fact that The Episcopal Church is entitled to summary judgment.

As the Fourth Circuit held over two decades ago:

If the strength of the senior mark is the alpha of infringement analysis, then evidence of actual confusion is surely the omega; where the defendant in an infringement case has elected to use a mark similar to that of a competitor's distinctive mark, and, as a result, has actually confused the public, our inquiry ends almost as soon as it begins.

*Sara Lee Corp.*, 81 F.3d at 467.[41] Having determined that TEC's marks are strong and that there is substantial evidence of actual confusion, in addition to other undisputed factors, TEC's claims

---

[41] Further, the Fourth Circuit has recognized that, where marks are strong and actual confusion is present, there is a likelihood of confusion regardless of whether there are other factors not weighing in favor of a likelihood of confusion. *See Sara Lee Corp.*, 81 F.3d at 467 ("Even if most of the

are easy to resolve: it is clear and undisputed that Defendants have been infringing on TEC's marks dating back to 2012. Defendants are not the successor to the Historic Diocese, yet continue to claim they are. Defendants are not affiliated with the "Protestant Episcopal Church," yet continue to use marks indicating that they are. If Defendants wish to leave TEC, they have every right to do so; the law simply prohibits them from appropriating their former-church's marks as they go.

Once it is established that TECSC is the lawful successor of the Historic Diocese under the control of TEC, a hierarchical church, the dispute over the Disassociated Diocese's use of the Plaintiffs' marks becomes straightforward. This is obviously not the first instance where courts have been confronted with the situation of a religious schismatic group, after breaking away, has continued to use the marks of its former church organization. In an early and thoughtfully reasoned opinion of Chief Judge John J. Parker, the Fourth Circuit observed:

> The fact that the seceding members had been members of the Methodist Episcopal Church, South, does not justify their use of the name of that organization after they had ceased to be members thereof. The right to use the name inheres in the institution, not in its members; and, when they cease to be members of the institution, use by them of the name is misleading and, if injurious to the institution, should be enjoined. No question of religious liberty is involved. Men have the right to worship God according to the dictates of conscience; *but they have no right in doing so to make use of a name which will enable them to appropriate the good will which has been built up by an organization with which they are no longer connected.*

*Purcell*, 145 F.2d at 987 (emphasis added). This Court follows the principles of *Purcell*, and multiple other courts, in holding that a schismatic religious organization, like any organization, has no right to continue to use the same mark, or substantially similar marks, to the organization

other factors did not indicate—as they do in this case—a strong likelihood of confusion, the strength of the L'eggs mark in conjunction with the solid evidence of actual confusion compels us to conclude that Kayser–Roth's current use of its Leg Looks mark is an infringing one."). *See also Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 171 (4th Cir. 2006) ("Not all of these factors will be relevant in every trademark dispute, and there is no need for each factor to support Synergistic's position on the likelihood of confusion issue.").

with which they were previously affiliated. *See also Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1010 (8th Cir. 2011) (granting summary judgment on trademark infringement claim against church formed by former members of Community of Christ); *Gen. Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 416 (6th Cir. 2010) (granting summary judgment on trademark infringement against defendant who separated from Seventh-Day Adventists); *Nat'l Bd. of Young Women's Christian Ass'n of U.S. A. v. Young Women's Christian Ass'n of Charleston, S. C.*, 335 F. Supp. 615, 628–29 (D.S.C. 1971) (Blatt, J.) (finding trademark infringement by local YWCA that disaffiliated from national organization). *See also* 1 McCarthy on Trademarks and Unfair Competition § 9:7.50 (5th ed.) ("A parent religious group is entitled to protection against a schismatic group or a dissident minority's confusing use of the same name.").

The Court therefore grants summary judgment to TEC on its claim for trademark infringement under the Lanham Act.

### D. Trademark Dilution

As explained by the Fourth Circuit, in addition to trademark infringement, the Lanham Act prohibits trademark dilution, providing:

> [T]he owner of a famous mark ... shall be entitled to an injunction against another person who ... commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1).[42] *Rosetta Stone Ltd.*, 676 F.3d at 167. There are two forms of dilution: first, "dilution by blurring" occurs from the "association arising from the similarity between a mark

---

[42] "Dilution is not concerned with confusion in the marketplace. Rather, dilution theory provides that 'if customers or prospective customers see the plaintiff's famous mark used by other persons in a non-confusing way to identify other sources for many different goods and services, then the

or trade name and a famous mark that impairs the distinctiveness of the famous mark," second, "'[d]ilution by tarnishment' is defined as the 'association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark.'" *Id.* To state a claim for trademark dilution under the Lanham Act, the plaintiff must demonstrate:

(1) that the plaintiff owns a famous mark that is distinctive;

(2) that the defendant has commenced using a mark in commerce that allegedly is diluting the famous mark;

(3) that a similarity between the defendant's mark and the famous mark gives rise to an association between the marks; and

(4) that the association is likely to impair the distinctiveness of the famous mark or likely to harm the reputation of the famous mark.

*Id.* at 168. While TEC includes a conclusory allegation of dilution by tarnishment in its Complaint, (Dkt. No. 150 at ¶ 40), it alleges no facts regarding reputational harm, and therefore the Court solely focuses on dilution by blurring.[43]

There is no dispute of material fact that Defendants are diluting TEC's marks. First, as held above in discussing the strength of TEC's marks, Plaintiffs have submitted substantial and unrebutted evidence of overwhelming unsolicited media coverage in major media outlets, commercial success in terms of the membership of TEC and widespread recognition of the mark by relevant individuals, such as the Disassociated Parishes and representatives of churches not

---

ability of the famous mark to clearly identify and distinguish only one source might be 'diluted' or weakened.'" *Rosetta Stone Ltd.*, 676 F.3d at 167 (citations omitted).

[43] Defendants also argue that their adoption of the allegedly diluting marks prior to TEC's first use precludes TEC's claim for dilution. (Dkt. Nos. 622 at 27; 626 at 56.) As held previously, this argument fails as the Disassociated Diocese is not the continuation of the Historic Diocese and therefore the Disassociated Diocese did not commence using the mark prior to Plaintiffs.

affiliated with TEC, a lengthy duration of uninterrupted use throughout the United States,[44] federal registration, and inclusion in various widely-distributed encyclopedias and dictionaries.[45] There is therefore no dispute of material fact that the marks at issue, The Episcopal Church and The Protestant Episcopal Church in the United States of America, are "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A).[46]

Second, as held previously, the Court finds there is no dispute of material fact that Defendants are using marks in commerce that allegedly dilute TEC's marks, namely, "The Protestant Episcopal Church in the Diocese of South Carolina" and "The Episcopal Diocese of South Carolina."

Third, based on the same facts above there, there is no dispute of material fact that there is a similarity between Defendants' marks and TEC's famous marks giving rise to an association. In addition to explaining at length the similarity of the marks at issue, the Court also relies on Klein's survey which found that individuals associated marks used by Defendants with TEC's famous marks. Sixty-four percent of Episcopalians, and twenty-four percent of South Carolina residents overall associated "The Episcopal Diocese of South Carolina" with TEC. (Dkt. No. 595-86 at 14 – 18.) There is therefore no dispute of material fact that the similarity between Defendants' marks and TEC's famous marks gives rise to an association.

---

[44] It is uncontroverted that TEC has used "The Protestant Episcopal Church in the United States of America" since 1789 and "The Episcopal Church" since 1967.

[45] The Court is guided by the factors articulated in 15 U.S.C. § 1125(c)(2)(A)(i) – (iv).

[46] The Court finds these marks famous not because the Court held them to be strong marks: rather, it is based on the voluminous, and uncontroverted, evidence that supports both a finding that the marks are strong and famous.

Finally, reviewing the factors in 15 U.S.C. § 1125(c)(2)(B)(i) – (iv), the Court finds no dispute of material fact that the association is likely to dilute the marks by impairing their distinctiveness. As held previously, the marks used by Defendants have a high degree of similarity to TEC's famous marks, TEC's famous marks are distinctive with secondary meaning and have a strong commercial strength, TEC is the exclusive user of the famous marks at issue, there is widespread recognition of the famous marks (as demonstrated by a substantial amount of media coverage and the repeated testimony of representatives from Defendants and other churches), Defendants' intended to create an association to the famous marks by continuing to claim they are the successor to the Historic Diocese and, as discussed with evidence of actual confusion, there is clear evidence of individuals associating the marks Defendants' use with TEC's famous marks.

Therefore, there is no dispute of material fact that TEC is entitled to summary judgment on its claim for trademark dilution.

### E.    TECSC's Claim for Trademark Infringement

Plaintiff TECSC separately brings a claim for trademark infringement against Defendants, claiming ownership of the following marks:

- Diocese of South Carolina;

- The Episcopal Diocese of South Carolina;

- The Protestant Episcopal Church in the Diocese of South Carolina;

- The Diocesan Seal.

(Dkt. Nos. 581-1 at 7; 584-3.) As these is no dispute that these marks are not federally registered, TECSC's claim for trademark infringement arises under 15 U.S.C. § 1125(a), which applies the same test for trademark infringement. Under § 1125(a), a plaintiff must prove:

(1) that it possesses a mark; (2) that the defendant used the mark; (3) that the defendant's use of the mark occurred "in commerce"; (4) that the defendant used

the mark "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (5) that the defendant used the mark in a manner likely to confuse consumers.

*People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001). *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S. Ct. 2753, 2757 (1992) ("it is common ground that § 43(a) protects qualifying unregistered trademarks and that the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a).").

First, it is undisputed that Plaintiff TECSC owns the marks at issue. To demonstrate ownership of a mark, in the absence of a presumption raised by a federal registration, "so long as a person is the first to use a particular mark to identify his goods in a given market, and so long as that owner continues to make use of the mark, he is 'entitled to prevent others from using the mark to describe their own goods' in that market." *George & Co. LLC*, 575 F.3d at 400. It is undisputed that the TECSC was the first to use these marks, and that it has continued to use the mark. As the Court held that the TECSC, for purposes of trademark rights, is the successor to the Historic Diocese, its first use of the marks dates prior to Defendants' first use, which could be no earlier than 2012. Additionally, the TECSC used the marks continuously and only ceased in response to a Court-order. Therefore, the TECSC owns the Historic Diocese's marks at issue.

Additionally, Defendants, throughout their pleadings and briefing, have conceded to using the Diocesan seal and the name "The Diocese of South Carolina" in commerce to offer religious services, as is apparent by Defendants' briefing asserting their right to use "Diocese of South Carolina," by webpages submitted throughout summary judgment briefing and by compilations of the Disassociated Parishes' use of "The Diocese of South Carolina," "The Protestant Episcopal Church in the Diocese of South Carolina" and the Diocesan Seal. (Dkt. No. Dkt. No, 439 at ¶ 27; 595-75; 595-78; 595-79; 621-2; 621-3.)

While Defendants have not submitted their own evidence regarding likelihood of confusion, they have incorporated the arguments contained in TEC's briefing that dealt with the issue at length. (Dkt. No. 584-1 at 7; 595-1.) To begin with, no party has submitted evidence regarding the strength of TECSC's marks, yet it is clear at the very least that "The Episcopal Diocese of South Carolina," "Protestant Episcopal Church in the Diocese of South Carolina," for the reasons described above, are descriptive, and the Diocesan Seal is, at least, a suggestive, if not arbitrary, mark.[47] Importantly, assessing commercial strength, the only evidence in the record regarding commercial strength demonstrates long and exclusive use of the marks at issue, with the Historic Diocese, and the TECSC as a successor, using the Diocesan Seal since 1869, the Diocesan Seal with color since 1911, "The Episcopal Diocese of South Carolina" since 1997, "The Diocese of South Carolina" since 1930, and "The Protestant Episcopal Church in the Diocese of South Carolina" since 1821. (Dkt. Nos. 584-3.) The Court therefore finds it undisputed that the marks have some strength, especially given the lack of evidence presented by Defendants regarding the strength of TECSC's marks. Yet, TECSC's marks, even if weak, are entitled to protection from the use of identical marks in the same geographic region by directly competing goods. *Choice Hotels Int'l, Inc. v. Zeal, LLC*, 135 F. Supp. 3d 451, 465 (D.S.C. 2015) ("even a relatively weak mark is entitled to protection from sufficiently similar marks used to promote sufficiently similar product.") (citations omitted); *Plus Prod. v. Plus Disc. Foods, Inc.*, 722 F.2d 999, 1006 (2d Cir. 1983) ("the scope of protection accorded a weak mark…will be confined to competing products"). *See also* 2 McCarthy on Trademarks and Unfair Competition § 11:77 (5th ed.) ("A mark which is relatively weak in the overall market for all goods and services can nonetheless be strong enough

---

[47] No party has briefed the conceptual strength of "Diocese of South Carolina," or whether it has secondary meaning. At most, therefore, the Court finds that it is a weak mark based on its use by the Historic Diocese since 1930. (Dkt. No. 584-3.)

to make confusion likely when a junior user uses a similar mark in the same general line of business.").

The Court next assess actual confusion, as it is the only other factor that differs from the assessment of TEC's marks. To begin with, there is some limited anecdotal evidence of actual confusion regarding the Disassociated Diocese's use of TECSC's marks. At least one man reported to Bishop Adams that he had difficulty identify a church affiliated with TEC to attend because he had "looked at the Diocese of South Carolina and assumed that was the Episcopal diocese." (Dkt. No. 595-83 at 8.) In another instance, an organization affiliated with TECSC received a gift that was "listed as a gift to The Diocese of South Carolina," and there were four or five instances overall of money having been sent to the wrong diocese. (*Id.* at 12.) Further, as above, there are multiple anecdotes of actual confusion overall with individuals calling the incorrect diocese or inquiring as to the affiliation of individual parishes. No party presented any survey evidence of actual confusion focusing on TECSC's marks. Yet, it is well settled, that while both survey and anecdotal evidence are relevant, "neither category is necessarily required to prove actual confusion." *Rosetta Stone Ltd.*, 676 F.3d at 156 (citations omitted).[48] Based on this evidence, and the lack of any evidence creating a dispute of material fact from Defendants, the Court finds that this factor weighs in favor of finding a likelihood of confusion.

The other factors the Court must review for a likelihood of confusion of TECSC's marks are substantially similar to the analysis above for TEC's marks: TECSC's marks and the marks used by the Disassociated Diocese are similar as they are identical; the good or services are similar

---

[48] Indeed, the Fourth Circuit has even made clear that no evidence of actual confusion is necessary to make out a likelihood of confusion. *See Lone Star Steakhouse & Saloon, Inc*, 43 F.3d at 933 ("In applying this standard, this Court has emphasized that a trademark owner need not demonstrate actual confusion.").

as both TECSC and the Disassociated Diocese offer religious services and religious education and many use the Book of Common Prayer and the same hymnal; the facilities are highly similar as both Parties offer their services in churches and, indeed, many of the Disassociated Parishes offer services in building previously associated with TECSC; the Defendant's intent to use the infringing marks is clear as they incorrectly claim to be the successor to the Historic Diocese, and; quality of the services offered is highly similar. As above, similarity of advertising and consumer sophistication are neutral factors.

Therefore, the Court finds it undisputed that Defendants are infringing of TECSC's marks. This conclusion is based on the straightforward facts of the case: TECSC is the lawful successor to the Historic Diocese and therefore owns those marks, and Defendants are using the identical marks in the identical market offering substantially identical services. Therefore, TECSC is granted summary judgment on its claim for trademark infringement under the Lanham Act.

**F.      Trademark Infringement and Cancellation Under South Carolina Law**

As held above, Plaintiff TECSC is the common law owner of the state-registered marks. Additionally, as the lawful successor to the Historic Diocese,[49] TECSC owns the state registrations of these marks. *See* S.C. Code Ann. § 39-15-1105 ("'Registrant' means the person to whom the registration of a mark under this article is issued and the legal representatives, *successors*, or

_____

[49] As held by the South Carolina Supreme Court. To the extent TECSC is not the owner of the registrations under South Carolina law, the registrations must be cancelled as TECSC owns the federal marks. *See* S.C. Code Ann. § 39-15-1145 (registration shall be cancelled where "registrant is not the owner of the mark"); 3 McCarthy on Trademarks and Unfair Competition § 22:2 (5th ed.) ("State trademark law and registrations cannot override rights provided by federal law for federal registrations. That is, when state rules conflict with federal law, the federal trademark law preempts state rules.") (collecting cases). *See also Purolator, Inc. v. EFRA Distributors, Inc.*, 687 F.2d 554, 560 (1st Cir. 1982) ("(t)he Supremacy Clause…bars ... state statutes or doctrine that would permit the sort of confusing or deceptive practices the draftsmen of the Lanham Act sought to prevent.") (citations omitted).

assigns of that person.") (emphasis added). South Carolina law permits injunctive relief where an infringer uses a "counterfeit or imitation of the registered mark." S.C. Code Ann. § 39-15-1170(A). As the marks are identical, the Defendants' use of TECSC's marks here easily meets that test, and TECSC is entitled to an injunction prohibiting Defendants' use of their marks.

Finally, TECSC has requested, in the alternative, that the Court cancel the state registrations. (Dkt. No. 584-1 at 28.) As TECSC is the owner of the marks, they may request that the Secretary of State cancel the registrations at any time. *See* S.C. Code Ann. § 39-15-1145 (1) ("The secretary shall cancel from the register, in whole or in part: (1) a registration concerning which the secretary receives a voluntary request for cancellation of it from the registrant or the assignee of record[.]") The Court therefore finds that TECSC is entitled to injunctive relief under South Carolina law.

### G. False Advertising Under the Lanham Act

In addition to claims for trademark infringement and dilution, the Lanham Act prohibits "false or misleading description of fact, or false or misleading representation of fact, which ... in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1). A plaintiff asserting a claim for false advertising must establish:

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 (4th Cir. 2002)

For the first factor, false misrepresentation, it is undisputed that Defendants made false statements. There are two theories of falsehood: literal falsity and an implied falsehood likely to mislead consumers. *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 (4th Cir. 2002). Here, Plaintiff TECSC have demonstrated literal falsity. The Disassociated Diocese is not the successor to the Historic Diocese and therefore any reference in commercial advertisements to the Disassociated Diocese as the "Diocese of South Carolina," including use of the Diocesan Seal of the Historic Diocese which states "Diocese of South Carolina," is literally false. Further, Defendants do not dispute, and cannot dispute, that they use "Diocese of South Carolina" or the Diocesan seal in advertisements. Indeed, the premise of Defendants' briefing is that they are permitted to use the name and the seal.

For the second factor, materiality, Plaintiff TECSC must show that "the defendants misrepresented an 'inherent quality or characteristic' of the product." *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001). It is manifest that a religious organization's history, denominational affiliation and name is an "inherent quality or characteristic" of the religious organization. *See Purcell*, 145 F.2d at 983 (recognizing that using name of religious organization by seceding faction "will result in injury and damage" is "so clear to our minds as hardly to admit of argument."). Materiality is therefore undisputed.

For the third factor, Plaintiff must demonstrate that the misrepresentation "actually deceives or has the tendency to deceive a substantial segment of its audience." *Scotts Co.*, 315 F.3d at 272. Yet, as recognized by the Fourth Circuit and other courts of appeal, "[w]here the advertisement is literally false, a violation may be established without evidence of consumer deception." *Id.* citing *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 311 (1st Cir. 2002). *See also Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 693 (6th

Cir. 2000) ("most of the circuits have ruled that when a statement is literally false, a plaintiff need not demonstrate actual customer deception in order to obtain relief under the Lanham Act."). Therefore, as the statements that the Disassociated Diocese is the "Diocese of South Carolina," including use of the seal, is literally false, it is undisputed that Defendants' statements actually deceive.

For the fourth factor, Plaintiff TECSC has submitted numerous publications and websites demonstrating that Defendants made the false statements in interstate commerce. (Dkt. No. 621-1 – 621-5.) *See TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 829 n.3 (9th Cir. 2011) ("A plaintiff bringing a false advertising claim must also show that defendant caused its false or misleading statement to enter interstate commerce…but this is virtually automatic for websites.") (citations omitted). Defendants do not contest this factor. (Dkt. No. 603 at 50.)

Finally, TECSC must demonstrate that it has been or is likely to be injured as a result of the misrepresentation, either by a diversion of sales or lessening of goodwill. Defendants argue that TECSC's claim for false advertising must fail as TECSC cannot demonstrate damages or financial harm, relying on the statement by the Fourth Circuit that "it is the core requirement that a plaintiff 'show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising' that assures Article III standing in Lanham Act cases." *Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 299–300 (4th Cir. 2017). Yet, the section cited by Defendants is specifically regarding actions "[t]o recover damages under the Lanham Act," and here TECSC solely seeks injunctive and declaratory relief. Furthermore, as the Fourth Circuit held in *Verisign*, standing can be met "either by direct diversion of sales or by a lessening of goodwill associated with its product." *Id.* at 300. Therefore, as Plaintiffs have shown a lessening of goodwill in a religious institution, the injury is one recognized by the Fourth Circuit. As the Fourth Circuit held:

> That the use of the name of the Methodist Episcopal Church, South, by the seceding members as the name of the new and rival organization that they are creating will result in injury and damage to the united church into which the Methodist Episcopal Church, South, has been merged, is not only established by allegation and proof but it seems so clear to our minds as hardly to admit of argument.

*Purcell*, 145 F.2d at 983. The Fourth Circuit recognized an injury to a plaintiff's goodwill where members use the precise name of their former affiliation and went on to note that any confusion would ultimately effect donations and bequests. *Id.* at 983 – 84. So too here, the injury and loss of goodwill is clear. Defendants are using Plaintiff TECSC's precise marks, effectively barring TECSC from using their own name, and therefore Defendants are clearly harming TECSC's goodwill and ability to operate as a religious organization. Further, Plaintiffs' have presented evidence of the exact type of injuries contemplated by *Purcell*, including mail, e-mails, checks and donations that were sent to the Disassociated Diocese when they were intended for TECSC. (Dkt. No. 595-81 at 8; 595-81 at 5; 595-120 at 4 – 7.) Therefore, there is no dispute of material fact that Plaintiff TECSC has been, and is likely to be, injured as a result of the misrepresentation.

As TECSC presented uncontroverted evidence on all five factors of their false advertising claim for an actual falsehood, namely Defendants representing themselves as the Diocese of South Carolina, TECSC is entitled to summary judgment on their Lanham Act false advertising claim.

## H.    The Court is Not Barred From Ruling On These Motions

Defendants also argue that the Court is barred from ruling on these motions by the doctrine of laches and the Anti-Injunction Act. As held below, both arguments are without merit.[50]

---

[50] Defendants also make repeated reference to certain Defendants who have ceased using some of Plaintiffs' marks, or allegedly related marks. For the sake of completeness, the Court holds that "it is well established that the voluntary discontinuance of challenged activities by a defendant does not necessarily moot a lawsuit." *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 800 (4th Cir. 2001). Therefore, as Defendants continue to claim the right to use the marks "The Episcopal Diocese of South Carolina" and "The Protestant Episcopal Church in the Diocese of South Carolina," the Court holds that there is a reasonable expectation that, if the Disassociated

### 1. Laches

Defendants argue that laches bars TEC's claims here. (Dkt. No. 603 at 57.) Defendants correctly note that the Lanham Act borrows "analogous state limitations period," which here is three years. *Secret of the Islands, Inc v. Hymans Seafood Co. Inc.*, No. 2-17-CV-00342, 2018 WL 1566706, at *3 (D.S.C. Mar. 30, 2018) (citations omitted). Therefore, Defendants argue that TEC did not bring their claims in a timely manner and are therefore barred by laches from asserting their trademark claims.[51] Though addressed in the context of a statute of limitations defense, the Court has already addressed and denied a similar argument. (Dkt. No. 411 at 5.) As explained previously, Plaintiffs solely seek prospective remedies, namely injunctive and declaratory relief, and do not seek any damages. These claims do not relate to an injury that occurred only in 2012, and instead the allegations assert ongoing violations. This includes the Defendants' acknowledgment, in their Answer filed in 2018, that they refer to the Disassociated Diocese as "The Episcopal Diocese of South Carolina" and "The Protestant Episcopal Church in the Diocese of South Carolina." (*See,* Dkt. No, 439 at ¶ 27.) As the Fourth Circuit has held, "even in equity under the Lanham Act, laches does not bar a claim for prospective injunctive relief." *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 797 (4th Cir. 2001) ("A prospective injunction is entered only on the basis of current, ongoing conduct that threatens future harm. Inherently, such conduct cannot be so remote in time as to justify the application of the doctrine of laches"). Therefore, since Plaintiffs do not seek damages and seek equitable relief for ongoing violations, their claims are not barred by laches.

Further, the Court finds that equitable relief remains necessary and TEC did not

---

Diocese or certain Disassociated Parishes have ceased using certain marks, their pleadings and briefing indicates they will resume using the phrases absent an injunction.

[51] The Episcopal Church intervened in this action in August 2017. (Dkt. Nos. 83, 89.)

"unreasonably delay" in seeking redress. The Fourth Circuit, in *Sara Lee Corp.*, 81 F.3d 455, held that, "[i]n a trademark case, courts may apply the doctrine of estoppel by laches to deny relief to a plaintiff who, though having knowledge of an infringement, has, to the detriment of the defendant, unreasonably delayed in seeking redress." The court further held that "the doctrine is sparingly applied where, as here, a plaintiff seeks only equitable relief" and that "in consideration of the public interest, estoppel by laches may not be invoked to deny injunctive relief if it is apparent that the infringing use is likely to cause confusion." Equitable relief is clearly necessary here for the public interest. As demonstrated by uncontroverted evidence, there is widespread actual confusion and a likelihood of confusion caused by Defendants' infringement affecting a matter of public interest, namely, the identity of a major denominational religious organizations. Additionally, TEC did not "unreasonably" delay. Instead, TEC moved to intervene only twelve days after the South Carolina Supreme Court issued its decision in *The Protestant Episcopal Church*, (Dkt. No. 83), when it became clear that trademark matters would be decided before this Court. Therefore, as Plaintiffs seek prospective relief, equitable relief is necessary in consideration of the public interest, and TEC did not unreasonably delay, laches does not bar the claims here.

### 2. Anti-Injunction Act

The Anti-Injunction Act states that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. Defendants argue that the Court cannot provide relief under the Lanham Act as it would act as an injunction on the state proceedings currently on remittitur to the trial court after the South Carolina Supreme Court's ruling. (Dkt. No. 625 at 24 – 31.) However, the relief requested in no way affects or enjoins any state court proceedings. Rather, as explained above, the South Carolina Supreme Court, by a majority of three to two, reversed all of the state trial court's holdings on

trademarks and, as the narrowest ruling, explicitly deferred those determinations to this Court. Any rulings, findings, injunctions or judgments on trademarks from the state trial court were therefore reversed prior to reaching this Court and deferred to this Court,[52] and this Court's ruling therefore does not enjoin the pending state court action. The Court has the ability, the record and the jurisdiction to rule on these motions and this Order has no injunctive effect on state court proceedings.[53] The Anti-Injunction Act therefore does not bar any requested relief here.

## I.    Permanent Injunctive Relief

The Lanham Act, 15 U.S.C. § 1116, gives the Court the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title." 15 U.S.C. § 1116(a). To be granted a permanent injunction, a plaintiff must satisfy the traditional permanent-injunction analysis. *Mary Kay Inc. v. Ayres*, 827 F. Supp. 2d 584, 595 (D.S.C. 2011). Namely, a plaintiff must demonstrate irreparable harm, inadequacy of purely legal remedies, hardships balancing in its favor, and that the public interest would not be disserved by the injunction. *See PBM Products, LLC v. Mead Johnson & Co.*, 639 F.3d 111, 126 (4th Cir. 2011). The Fourth Circuit has noted that "an injunction is the preferred remedy to ensure that future violations will not occur...." *Lone Star Steakhouse & Saloon, Inc.*, 43 F.3d at 939.

An injunction is necessary here. As has been cited throughout this Order, the Fourth Circuit

---

[52] A fourth Justice, Justice Toal, also "decline[d] to address the effect of federal law on the parties' service marks." *Protestant Episcopal Church*, 421 S.C. 211, at 290.

[53] The Fourth Circuit on two previous occasions has held that this Court may not abstain from determining these claims. Defendants arguments seemingly ignore these holdings, instead again asking for the Court to defer to the state courts even after the South Carolina Supreme Court explicitly deferred to this Court.

has made clear the necessity of enjoining a breakaway organization from continuing to use the name of its prior affiliate:

> Upon these facts, we do not think that there can be any doubt as to the right of plaintiffs to the injunction prayed. The use by one organization of the name of another for the purpose of appropriating the standing and good will which the other has built up is a well recognized form of the wrong known to the law as unfair competition, against which courts of equity have not hesitated, in any jurisdiction, to use the full power of the injunctive process.

*Purcell*, 145 F.2d at 984. The obvious and ongoing infringement and dilution of TEC's marks will continue to cause irreparable harm to TEC, and the ongoing false advertising co-opting the Historic Diocese's name will also continue to cause irreparable harm to the Historic Diocese's successor, TECSC. Further, purely legal remedies are plainly inadequate: this is not a matter of monetary damages, instead it is the issue of an adoption of the Plaintiffs' history, goodwill, and name. Further, legal remedies would not sufficiently protect against future violations. The hardships weigh strongly in TEC's and TECSC' favor as they are subject to trademark infringement, trademark dilution and false advertising by Defendants and Defendants have no right to infringe on, dilute or otherwise falsely advertise with Plaintiffs' marks. Finally, the public interest would be served by preventing future consumers from being misled.

The time has come for this dispute to be resolved. The Defendants have every right to disassociate from the TEC and pursue their doctrine and community as they see fit, yet they may not leave with the Plaintiffs' goodwill and marks generated over the course of over two centuries. The Court is cognizant that Defendants have since associated with a new denominational organization, and there may be other marks that properly identify their affiliation with this organization and would be sufficiently distinct to not cause any confusion with or dilute TEC's marks or constitute false advertising. However, on the facts presented here, the Court finds it undisputed that the Defendants infringed on TEC and TECSC's marks, diluted TEC's marks and

engaged in false advertising regarding their affiliation with TECSC and their identity. Therefore, as detailed below, the Court issues an injunction against further trademark infringement, trademark dilution, and false advertising.[54]

## IV.  Conclusion

For the foregoing reasons, the Court **GRANTS** Plaintiffs The Right Reverend Charles G. vonRosenberg, *et al.*'s Motion for Summary Judgment (Dkt. No. 584). The Court **GRANTS** TEC's Motion for Summary Judgment (Dkt. No. 595). The Court **DENIES** Defendants The Right Reverend Mark J. Lawrence, *et al.*'s Motion for Summary Judgment (Dkt. No. 603). The Court **DENIES** Defendants The Right Reverend Mark J. Lawrence, *et al.*'s Motion for Summary Judgment as to Genericness. (Dkt. No. 610.)

The Court further **DECLARES** that TEC owns its five federally registered marks (Dkt. Nos. 595-5; 595-7; 595-8; 595-9; 595-11; 595-64; 595-65; 595-67; 595-68) and that TECSC owns the marks designated in the state registrations (Dkt. No. 584-3).

Additionally, the Court hereby issues the following **PERMANENT INJUNCTION** and **ENJOINS** all Defendants, their officers, agents, servants, employees, associates, subsidiaries and

---

[54] While the evidence focused on "The Episcopal Diocese of South Carolina," "The Protestant Episcopal Church in the Diocese of South Carolina," and Defendants' use of identical marks to TECSC's marks (the two marks previously mentioned and the "Diocese of South Carolina" and the Diocesan Shield), the Court enjoins Defendants from using any of TEC and TECSC's marks, including "The Episcopal Church Welcomes You," "La Iglesia Episcopal" and The Episcopal Shield in addition to those previously mentioned, as "[t]to ensure…that relief is effectual, otherwise permissible practices connected with the acts found to be illegal must sometimes be enjoined. *United States v. Loew's, Inc.*, 371 U.S. 38, 53, 83 S. Ct. 97, 106 (1962), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 126 S. Ct. 1281 (2006). *See also* 5 McCarthy on Trademarks and Unfair Competition § 30:4 (5th ed.) ("In a clear case, the court has power to enjoin an act, which if done alone could be legal, but when performed in the context of a totality of acts does constitute unfair competition." (collecting cases).

affiliates from using the following marks or any mark confusingly similar:[55]

- The Protestant Episcopal Church in the United States;

- The Episcopal Church;

- The Episcopal Church Welcomes You;

- La Iglesia Episcopal, and;

- The Episcopal Shield.[56]

The Court further enjoins Defendants their officers, agents, servants, employees, associates, subsidiaries and affiliates from using the following marks or any mark confusingly similar:

- Diocese of South Carolina;

- The Episcopal Diocese of South Carolina;

- The Protestant Episcopal Church in the Diocese of South Carolina;

- The Diocesan Seal.[57]

**AND IT IS SO ORDERED.**

_____
Richard Mark Gergel
United States District Court Judge

September 1̇9, 2019
Charleston, South Carolina

---

[55] The Court holds explicitly that "The Episcopal Diocese of South Carolina" and "The Protestant Episcopal Church in the Diocese of South Carolina" are likely to cause confusion with TEC's marks and Defendants are enjoined from using those marks.


56


57