IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| The Right Reverend Charles G. vonRosenberg, et al., | Civil Action No. 2:13-587-RMG |
| Plaintiffs, | |
| The Episcopal Church, | **ORDER AND OPINION** |
| Plaintiff in Intervention | |
| v. | |
| The Right Reverend Mark J. Lawrence, et al., | |
| Defendants. | |

This matter is before the Court on Plaintiffs' Motion to Enforce the Injunction (Dkt. No. 686) and Defendants' Motion to Stay Pending Appeal (Dkt. No. 690). For the reasons set forth below, Plaintiff's Motion to Enforce is granted in part and denied in part and Defendants' Motion to Stay is denied.

I. **Background**

This case arises out of a schism in 2012 in the Historic Diocese, originally known as the "Protestant Episcopal Church in the State of South Carolina," in which certain members and parishes sought to dissociate from The Episcopal Church, a nationwide hierarchical church. The parties have litigated property issues related to the schism in the state courts of South Carolina, culminating in a 2017 decision in the South Carolina Supreme Court holding that The Episcopal Church owned most of the property in dispute and found that twenty-eight of the Disassociated Parishes held real and personal property in trust for TEC. *Protestant Episcopal Church in the Diocese of S.C. v. Episcopal Church*, 421 S.C. 211, 265, 806 S.E.2d 82, 111 (2017). Given the

-1-

long history of this case and the multiple Parties, it is important at the outset to identify the principal Parties:

1) Plaintiff The Episcopal Church (hereafter "TEC") is the national church and an Intervenor Plaintiff in this action;

2) The Protestant Episcopal Church in the State of South Carolina (hereafter the "Historic Diocese"), which was formed as early as 1785 and was long affiliated with TEC;

3) Plaintiff The Episcopal Church in South Carolina (hereafter "TECSC"), which was headed initially by Plaintiff Bishop Charles G. vonRosenberg and subsequently by Plaintiff Provisional Bishop Gladstone B. Adams, III and is affiliated with TEC;

4) Defendant Disassociated Diocese,[1] headed by Defendant Right Reverend Mark Lawrence and was formed following the schism in 2012 to disassociate from TEC.

5) The Defendant parishes associated with the Disassociated Diocese (hereafter "Disassociated Parishes").

While the state courts addressed property issues, in this action the Parties raised issues surrounding the use of certain trademarks in contest between TEC and its affiliates and the Disassociated Diocese and its affiliates. (Dkt. Nos. 146, 150.)

Ultimately, this Court, on September 19, 2019, granted summary judgment in favor of TEC and TECSC, finding that TECSC is the lawful successor of the Historic Diocese, granting summary judgment on Plaintiffs' claims for trademark infringement, trademark dilution and false advertising and issuing an injunction prohibiting the Disassociated Diocese or the Disassociated Parishes from using any of the following marks or any mark that is confusingly similar:

- The Protestant Episcopal Church in the United States;

---

[1] The term "disassociated diocese" was utilized by Chief Justice Beatty in the controlling decision of the South Carolina Supreme Court in *Protestant Episcopal Church in the Diocese of South Carolina v. The Episcopal Church*, 421 S.C. 211, 250 n. 29 (S.C. 2017). The Disassociated Diocese has since selected the new name, "The Anglican Diocese of South Carolina." (Dkt. No. 688 at 2.)

- The Episcopal Church;
- The Episcopal Church Welcomes You;
- La Iglesia Episcopal, and;
- The Episcopal Shield.[2]
- Diocese of South Carolina;
- The Episcopal Diocese of South Carolina;
- The Protestant Episcopal Church in the Diocese of South Carolina;
- The Diocesan Seal.[3]

(hereafter, "enjoined marks") (Dkt. Nos. 667; 668.)

Plaintiffs TEC and TECSC now move to enforce this injunction. (Dkt. No. 686.) Specifically, while TEC and TECSC acknowledge that the Disassociated Diocese and Parishes have made "limited" changes to their websites and advertising materials, Plaintiffs allege that a variety of Defendants' actions violate the injunction, including by: 1) stating that the Disassociated Diocese was "founded in 1785"; 2) stating that Defendant Bishop Lawrence is the Disassociated Diocese's "14th Bishop" or "XIV Bishop"; 3) stating that the Disassociated Diocese will hold its "229th Diocesan Convention"; 4) including the Journals of prior Diocesan Conventions on their websites; 5) stating that the Disassociated Diocese is the publisher of "Jubilate Deo" and posting

---

2 

3 

prior issues of Jubilate Deo on their website; 6) stating that Camp St. Christopher is an institution of the Disassociated Diocese; 7) redirecting the Historic Diocese's website domains to Disassociated Diocese's websites; and, finally 8) adopting "Anglican Diocese of South Carolina" as their new name. (*Id.*) Defendants oppose this motion, alleging that they complied with the injunction by changing their name to "Anglican Diocese of South Carolina and the uses identified by Plaintiffs do not violate the injunction.[4] (Dkt. No. 688.) Plaintiffs filed a reply. (Dkt. No. 689.) Additionally, Defendants have moved to stay this Court's Order and Injunction pending appeal, which Plaintiffs oppose. (Dkt. Nos. 690, 691, 692.)

## II. <u>Legal Standard</u>

### A. **Motion to Enforce (Dkt. No. 686)**

A court has continuing jurisdiction over its permanent injunction regardless of a pending appeal. *Hudson v. Pittsylvania Cty., Va.*, 774 F.3d 231, 234 (4th Cir. 2014). While Plaintiffs style their motion a petition to enforce the injunction, a court enforces its injunctions through "a finding of contempt, [which] springs from the court's inherent equitable powers." *Innovation Ventures, LLC v. N2G Distrib., Inc.*, 763 F.3d 524, 544 (6th Cir. 2014*) citing Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S.Ct. 1086 (1946). To make out a claim for civil contempt, the movant must demonstrate, by clear and convincing evidence, four elements:

> (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's "favor"; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) that the movant suffered harm as a result.

*Rainbow Sch., Inc. v. Rainbow Early Educ. Holding LLC*, 887 F.3d 610, 617 (4th Cir. 2018)

---

[4] The Disassociated Diocese represents that it has ceased redirecting the Historic Diocese's website domains to its new website addresses. (Dkt. No. 688 at 14.)

(citations omitted). Importantly, intent is irrelevant to a finding of civil contempt. *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S. Ct. 497, 499 (1949) ("Since the purpose is remedial, it matters not with what intent the defendant did the prohibited act."). However, the order allegedly violated must be one that had set forth "'in specific detail an unequivocal command' which a party has violated." *In re Gen. Motors Corp.*, 61 F.3d 256, 258 (4th Cir. 1995) (citations omitted).

### B. Motion to Stay

A stay "is not a matter of right" and the party seeking a stay bears the burden of demonstrating the presence of the exacting standards for the granting of such relief. *Nken v. Holder*, 556 U.S. 418, 434, 129 S.Ct. 1749, 1761 (2009). The standard for granting a stay resembles the standard for a preliminary injunction, and requires: (1) "a strong showing" that the party requesting the stay will succeed on the merits; (2) the presence of irreparable injury by the party seeking the stay; (3) whether the stay will substantially injure other parties to the litigation; and (4) whether the public interest is served by the grant of the stay. *Id.*

### III. Discussion

#### A. Motion to Enforce

As explained by courts of appeal, when faced with parties who have already been found to violate a trademark, "[t]he sole issue before the district court...[is] whether [defendants] violated the injunction, that is, whether the [the new mark] is 'confusingly similar' to the [enjoined mark]." *Wella Corp. v. Wella Graphics, Inc.*, 37 F.3d 46, 48 (2d Cir. 1994) *citing Oral-B Labs. v. Mi-Lor Corp.*, 810 F.2d 20, 22-23 (2d Cir.1987). In making this determination, it is well-settled that "a party subject to a preliminary injunction has a 'duty to keep a safe distance from the line drawn by the district court's injunction.'" *Simone v. VSL Pharm., Inc.*, No. CV TDC-15-1356, 2016 WL 3466033, at *16 (D. Md. June 20, 2016) *citing Oral-B Labs.*, 810 F.2d at 24. *See also Howard*

*Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1517 (11th Cir. 1990) ("[T]he legal posture of this case places a heavier burden upon the [alleged infringer] of avoiding a colorable imitation of or diluting [its competitor's] trade and service marks than upon a party not already preliminarily enjoined from engaging in such activity."); 5 McCarthy on Trademarks and Unfair Competition § 30:21 (5th ed.) ("A trademark infringer, once caught, should expect some fencing in. It should have its conduct carefully scrutinized in future use and should not be allowed to claim the same leniency accorded a good faith user who starts use of the mark which the enjoined defendant has shifted to.")

In reviewing an infringer's later use, the so-called "Safe Distance Rule" is an equitable principle that permits courts to:

> require a business to 'keep a safe distance away from the margin line—even if that requirement involves a handicap as compared with those who have not disqualified themselves.'...The safe distance rule thus 'prevent[s] known infringers from using trademarks whose use by non-infringers would not necessarily be actionable.'

*Simone*, 2016 WL 3466033, at *26 *quoting John Allan Co. v. Craig Allen Co.*, LLC, 540 F.3d 1133, 1142 (10th Cir. 2008); *Innovation Ventures, LLC v. N2G Distrib., Inc.*, 763 F.3d 524, 544 (6th Cir. 2014). It is a standard that, "reliev[es] the reviewing court of the need to retry the entire range of issues that may be relevant in an infringement action for each small variation the defendant makes to the enjoined mark." *Id. quoting PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.*, 520 F.3d 109, 118 (2d Cir.2008). While the Fourth Circuit has not formally adopted the rule, it has commented that the rule's reasoning is "persuasive." *Osem Food Indus. Ltd. v. Sherwood Foods, Inc.*, 917 F.2d 161, 164 (4th Cir. 1990) ("we note that some courts have indicated persuasively that once a company commits an unfair business practice it 'should thereafter be required to keep a safe distance away from the margin line.'") (citations omitted).

Having stated the applicable law in determining whether there has been a violation of the

injunction, the Court turns to the actions that Plaintiffs allege violate the Court's injunction.

> 1. *Stating that the Diocese was "Founded in 1785"; Stating that Bishop Lawrence is the "14th Bishop" or "XIV Bishop"; Stating that the Disassociated Diocese will hold its "229th Diocesan Convention"*

The Court addresses the first three alleged violations together as they all implicate the same legal question, namely, whether the Disassociated Diocese and Disassociated Parishes are violating this Court's Order and Injunction by continuing to co-opt the history and goodwill of TEC and TECSC's marks. The answer is yes.

Plaintiffs have submitted clear and convincing evidence that the Disassociated Diocese have continued to claim that the Disassociated Diocese was "Founded in 1785," that their Bishop, Defendant Bishop Mark Lawrence, is the "14th Bishop" or "XIV Bishop" of the Disassociated Diocese and that the Disassociated Diocese will hold its "229th Diocesan Convention." (Dkt. No 686 at 9 – 12.) Defendants acknowledge that they use these terms on their websites and in their publications. (Dkt. No. 688 at 12, 14.) However, Defendants allege that they are entitled to use these terms because they "are part of the shared 228-year history prior to the Diocese split in 2012." (*Id.* at 13.) Specifically, the Defendants allege that:

> [u]ntil 2012, the Plaintiff and the Disassociated Diocese were the same entity. After the split in 2012, the two entities emerged from that single Diocese. The groups who can claim the right to the control of the corporate entity *and the names* is being litigated in state court.

(*Id.* at 11.) (emphasis added). The Disassociated Diocese further argues that whether a permanent injunction from the state court is "still in place" was not necessarily decided by the South Carolina Supreme Court and instead is "being decided by the South Carolina Court of Common Pleas." (*Id.* at 11.) Yet, the Defendants' position ignores the clear Order of this Court and only serves to demonstrate that the Defendants' continue to disregard this Court's Order by misappropriating the

goodwill associated with the enjoined marks.[5]

Turning to the first factor for civil contempt, whether there was a valid decree, contrary to Defendants' position, this Court held clearly that the Disassociated Diocese is not a successor of the Historic Diocese, and instead is an organization that was formed in 2012. (*See* Dkt. No. 667 at 47, "The Disassociated Diocese is an organization formed in 2012 that maintains the right to use the marks of a group with which it is not associated."; *Id.* at 54, "the Defendants intended to capitalize on the goodwill by intentionally holding themselves out as the continuation of the Historic Diocese"; *Id.* at 55, "Defendants are not the successor to the Historic Diocese, yet continue to claim they are."; *Id.* at 65, "The Disassociated Diocese is not the successor to the Historic Diocese and therefore any reference in commercial advertisements to the Disassociated Diocese as the "Diocese of South Carolina"…" is literally false."). The Court also found it undisputed that TECSC is the successor of the Historic Diocese. (*Id.* at 11 "TECSC is the lawful successor to the Historic Diocese."; *Id.*, "this Court independently holds that TECSC is the lawful successor of the Historic Diocese[.]") Further, the Court explained that it was already decided "by a majority of the South Carolina Supreme Court that TECSC is the lawful successor to the Historic Diocese." (*Id.*) While the Disassociated Diocese seemingly still attempts to rely on holdings and an

---

[5] Defendants separately argue that Plaintiffs cannot seek enforcement of the injunction here since they have "unclean hands." (Dkt. No. 688 at 10 – 13.) Defendants focus on the Plaintiffs' alleged claim to the Historic Diocese's history after an injunction entered by a state court. (*Id.* at 12.) However, as Defendants acknowledged elsewhere, Plaintiffs "complied with the literal requirements of the state court injunction," and therefore there seems to be no issue of unclean hands. (Dkt. No. 690 at 15.) Further, as this Court already explained, the state court's injunction regarding trademark issues was reversed by the South Carolina Supreme Court, which deferred all issues regarding trademarks to this Court. (*See* Dkt. No. 667 at 7 – 8.) *See Protestant Episcopal Church in the Diocese of S.C. v. Episcopal Church*, 421 S.C. 211, 231, 248, 251 at n. 28 (2017). Regardless, to the extent Defendants believed Plaintiffs violated the since-reversed injunction, the proper forum for adjudicating that claim was the issuing court. (*Id.*) *Cf. Bell v. United States*, 521 F. Supp. 2d 462, 463 (D. Md. 2007), *aff'd*, 275 F. App'x 221 (4th Cir. 2008) (courts should defer to issuing court to enforce its injunction) *citing Lapin v. Shulton, Inc.*, 333 F.2d 169 (9th Cir. 1964).

injunction from a reversed lower state court decision, this issue was also already decided by the Court. (*Id.* at 8, "Defendants argue…that this Court should defer to the findings of fact of the reversed state lower court decision regarding service marks, a contention plainly without merit."). Finally, the Court enjoined Defendants from using any of TEC or TECSC's marks, or any confusingly similar marks, detailing each mark that Defendants were prohibited from using. (*Id.* at 72 – 73.) Defendants are free to, and have, appealed this Court's Order. However, Defendants may not subvert this Court's clear Order, as detailed above, by continuing to co-opt the goodwill of the exact marks they are enjoined from using.

Second, regarding whether the decree was in the movant's favor, the Court's Orders (Dkt. Nos. 667, 668) were in favor of Plaintiffs, and therefore they may move to enforce the Injunction.

Third, the Court must assess whether the Defendants Disassociated Diocese and Disassociated Parishes violated the terms detailed above and had knowledge of the violations. The Defendants here clearly violated the terms of the Court's Order and Injunction. To begin, the Court finds a violation of the express terms of the Court's Order and Injunction. As detailed above, the Court enjoined Defendants from using the marks "Diocese of South Carolina," "The Episcopal Diocese of South Carolina" and "The Protestant Episcopal Church in the Diocese of South Carolina" and clearly held that the Disassociated Diocese is not the continuation of the Historic Diocese, and instead is an organization that was formed in 2012. (Dkt. No. 667 at 11, 27, 47, 54 – 55, 60, 65, 71 – 73.) The Court further held that TECSC is the successor of the Historic Diocese with the sole rights to its marks and goodwill associated with the marks. (*Id.*) Further, the Court's Order found not only trademark infringement, but also false advertising, holding that any advertising indicating that the Disassociated Diocese is the "Diocese of South Carolina" is literally false. (*Id.* at 65, "The Disassociated Diocese is not the successor to the Historic Diocese and

therefore any reference in commercial advertisements to the Disassociated Diocese as the 'Diocese of South Carolina,' including use of the Diocesan Seal of the Historic Diocese which states 'Diocese of South Carolina,' is literally false.").

The Defendants' use of "Founded in 1785," "14th Bishop," "XIV Bishop," and "229th Diocesan Convention" violate this Order and Injunction by continuing to claim goodwill as a successor to the Historic Diocese when only TECSC has that right. In complying with an injunction, "[m]ore is required than a grudging, half-hearted or foot-dragging attempt at compliance." 5 McCarthy on Trademarks and Unfair Competition § 30:22 (5th ed.). Instead, courts recognize that it is not only use of the specific mark that is enjoined, but also a retention of the goodwill associated with the mark. *See Osem Food Indus. Ltd. v. Sherwood Foods, Inc.*, 917 F.2d 161, 164 (4th Cir. 1990) *citing Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 705 (5th Cir. 1981) (citing positively decision to prohibit an attempt to "retain the goodwill [defendants] have appropriated by the use of plaintiff's name, through the use of a name which, while perhaps not confusingly similar, is so reminiscent of the plaintiff's that it continues to accord the defendants some of the same unfair advantage they have previously enjoyed."); *Star Fin. Servs., Inc. v. AASTAR Mortg. Corp.*, 89 F.3d 5, 13 (1st Cir. 1996) (upholding finding of civil contempt where infringer sent out notices informing clients that "we've changed our name," which the constituted "'an effort to preserve the goodwill to which [it] had no right,' deliberately disobey[ing] the order.").

Indeed, as Defendants accurately note, a core purpose of trademark protection is to "secure to the owner of the mark the goodwill of his business[.]" (Dkt. No. 688 at 5); *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 198 (1985). Here, however, Defendants continue to attempt to benefit and preserve the goodwill from marks that identify Plaintiffs' organizations. The terms

"Founded in 1785," "14th Bishop," "XIV Bishop," and "229th Diocesan Convention" co-opt the goodwill contained in the enjoined marks, particularly the "Diocese of South Carolina," "The Episcopal Diocese of South Carolina" and "The Protestant Episcopal Church in the Diocese of South Carolina" as these terms inaccurately represent to the public that the Defendants *are* the Historic Diocese.[6] Therefore, these uses violate the Court's Order and Injunction.

As an independent and sufficient ground, the Court also finds that the Defendants failed to 'keep a safe distance away from the margin line' of infringement by using the terms "Founded in 1785," "14th Bishop," "XIV Bishop," and "229th Diocesan Convention." Instead, Defendants changed their name but continued to claim the goodwill of the marks they are prohibited from using by continuing to claim the Historic Diocese's history as their own. By continuing to claim the history associated with TECSC's marks, Defendants failed to ensure that their new marks were "so far removed from any characteristic of the plaintiff so as to put the public on notice that the two are not related" and therefore violated the injunction. *Innovation Ventures, LLC*, 763 F.3d at 544 *citing Taubman Co. v. Webfeats*, 319 F.3d 770, 779 (6th Cir. 2003).[7]

Fourth, and finally, the Court must determine whether the movants, Plaintiffs here, suffered harm from the violation. As this Court already found in its summary judgment Order, co-opting the goodwill of the Plaintiffs' marks causes harm to the Plaintiffs' goodwill and business. (*See* Dkt. No. 667 at 65 – 67.) *See Purcell v. Summers*, 145 F.2d 979, 983 (4th Cir. 1944) (recognizing

---

[6] The implication is clear: each of these terms either claims that the Disassociated Diocese was the Historic Diocese at the time of its founding in 1785 or that the Disassociated Diocese, by continuing the Historic Diocese's numbering for bishops and conventions, is the successor to the Historic Diocese.

[7] Under the test for civil contempt, the Court is also required to determine whether an alleged violator had knowledge of the violative acts. This issue is not in dispute: it is clear the Defendants had knowledge of the violative acts as Plaintiffs included screenshots of webpages using the terms and Defendants acknowledge using the terms at issue. (Dkt. Nos. 686 at 9 – 12; 688 at 11 – 14.)

that using name of religious organization by seceding faction "will result in injury and damage" is "so clear to our minds as hardly to admit of argument."); *Simone*, 2016 WL 3466033 at *18 (finding civil contempt and holding that violations "which were designed to further…take away market share" and "erod[e] any distinction" between products caused harm) *citing Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 273 (4th Cir. 2002). As Defendants continue to attempt to claim the goodwill and history of the TECSC's organization, Plaintiffs have demonstrated harm from the violation.

Based on the foregoing, the Court finds that Defendants violated the Court's Order and Injunction by continuing to use the terms "Founded in 1785," "14th Bishop," "XIV Bishop," and "229th Diocesan Convention."

    *2.    Journals of Historic Diocesan Conventions, Diocesan Constitution and Canons, and Report of the Trustees*

Plaintiffs next argue that Defendants violate the injunction by providing links on their website to Diocesan Convention Journals, to the Diocesan Constitution and Canons, and to the Report of the Trustees. These Journals, Constitution and Reports include the enjoined marks, such as "Diocese of South Carolina," "Protestant Episcopal Church in South Carolina," and the Diocesan Seal. (Dkt. No. 686 at 12 – 18.) These actions therefore present a straightforward violation of the injunction by explicitly using the marks enjoined by the Court. (Dkt. No. 667 at 72 – 73.) For example, in the Journal of the 2006 Diocesan Convention, the first page includes both the Diocesan Seal and "Diocese of South Carolina," (*available at* https://adosc.org/wp-content/uploads/2017/12/journal_216.pdf), and the same is true for the Journal of the 2013 Diocesan Convention, (*available at*, https://adosc.org/wp-content/uploads/2017/12/journal_222.pdf). The Diocesan Constitution and Canons and the Report of the Trustees similarly includes the Diocesan Seal and the mark "Diocese of South Carolina,"

and the Report of the Trustees includes the mark "Protestant Episcopal Church in South Carolina," (*available at*, https://adosc.org/wp-content/uploads/2018/03/journal_226.pdf).

Furthermore, for the same reasons as above, posting or claiming as history any of the Diocesan Conventions prior to October 2012 violates the Court's Order and Injunction by claiming the goodwill and history of TECSC, the successor to the Historic Diocese. The Disassociated Diocese must therefore remove the Journals of the Diocesan Conventions, Diocesan Constitution and Canons, and the Report of the Trustees from their website. However, to the extent the Disassociated Diocese holds future Diocesan Conventions, they may post Journals on their website so long as the Journals do not use any of the enjoined marks or misappropriate the goodwill of the marks. Further, as Journals since 2012 may include important information for parishioners, the Disassociated Diocese may re-post the Journals of any Diocesan Conventions held since October 2012 if the Disassociated Diocese removes all infringing marks or other terms that misappropriate the goodwill of Plaintiff's marks, which includes numbering indicating that the Convention dates back to 1785. Similarly, the Disassociated Diocese may repost their own Diocesan Constitution and Canons and any Reports of the Trustees since October 2012 so long as they remove all infringing marks or other terms that misappropriate the goodwill of Plaintiffs' marks.

3. *Jubilate Deo*

Plaintiffs next argue that Defendants publication of and use of the name "Jubilate Deo," a newspaper that was allegedly published by the Historic Diocese since at least the 1970s, violated the Court's Order and Injunction. (Dkt. No. 686 at 18 – 24.) However, as Defendants correctly note, the ownership over the mark or publication of "Jubilate Deo" was never raised in this case and the Court's Order cannot be expanded at this time to cover a topic never previously raised or briefed by the Parties. However, certain issues of Jubilate Deo posted on the Disassociated Diocese's website nonetheless violate the injunction. (Dkt. No. 686 at 20 – 23; *available at*

https://adosc.org/news-events/jubilate-deo/.) Specifically, each issue of Jubilate Deo currently posted, including the most-recent issue from Fall 2019, uses enjoined terms to identify the publisher of the paper, namely, "Diocese of South Carolina" or the "Episcopal Diocese of South Carolina," and many issues, including issues after October 2012, use other marks owned by Plaintiffs. Therefore, each issue of Jubilate Deo must be removed and may only be re-posted after Defendants have removed all enjoined marks or other terms that misappropriate the goodwill of those marks.

### 4. *Camp St. Christopher*

Plaintiffs next allege that the Defendants are violating the Court's Order and Injunction by "advertising and representing" that the Historic Diocese's institutions are owned by the Disassociated Diocese, most notably Camp St. Christopher. (Dkt. No. 686 at 24 – 28.) As with the ownership of Jubilate Deo, the ownership over the mark "Camp St. Christopher" was never raised in this case previously and the case will not be expanded at this time to cover a topic never previously raised or briefed by the Parties. Furthermore, the ownership over Camp St. Christopher is fundamentally a real property issue. As this case is focused solely on intellectual property rather than real property issues, the best forum for enforcement of the South Carolina Supreme Court's decision regarding real property rights is the South Carolina state court. (Dkt. No. 140 at 10 – 1.) Therefore, the Court finds no violation of the injunction based on the Disassociated Diocese's continued use of the mark "Camp St. Christopher."

### 5. *Redirecting Website Domains*

Plaintiffs allege that the Disassociated Diocese is violating the Court's Order and Injunction by using website names that are abbreviations of the enjoined marks, www.dioceseofsc.org and www.diosc.org, to redirect internet users to the Disassociated Diocese's new website domain. (Dkt. No. 686 at 29.) Defendants acknowledge that they were previously

automatically forwarding visitors to those sites to the Disassociated Diocese's new website. (Dkt. No. 688 at 14.) However, they represent that this was a mistake and that they have ceased automatically forwarding visitors to these sites to the Disassociated Diocese's new website.[8] (*Id.*) Since the violation has ceased and there has been no showing of damages, the Court will only order Defendants to not resume redirecting domain names.

### 6. *Anglican Diocese of South Carolina*

Finally, Plaintiffs allege that the Disassociated Diocese violated the Court's Order and Injunction by adopting as a new name "Anglican Diocese of South Carolina," which Plaintiffs contend is confusingly similar to the enjoined mark "Diocese of South Carolina." (Dkt. No. 686 at 32.) Plaintiffs argue that "Anglican Diocese of South Carolina" merely represents an "insignificant change" to the enjoined mark as the added word, "Anglican," is commonly used to describe "The Episcopal Church" since TEC is a member of the worldwide Anglican Communion. (*Id.* at 34.) Plaintiffs support this argument by identifying dictionaries linking the term "Anglican" with churches in communion with the Church of England. (*Id.* at 35.) Yet, the Court's Order and Injunction never addressed the term "Anglican" and Defendants are correct that TEC's reply in support of summary judgment invited Defendants to "incorporate the name of their new demonization—the Anglican Church of North America—into their diocesan name...." (Dkt. No. 643 at 27.) The Court, in its Order, further recognized that the addition of "dominant features" in addition to Plaintiffs' marks could sufficiently distinguish the marks and indicated that there "may be other marks that properly identify [the Disassociated Diocese's] affiliation with [the Anglican Church of North America]." (Dkt. No. 667 at 38, 71.) Even considering the "safe distance rule,"

---

[8] From the Court's review, it appears this is accurate as the websites listed do not redirect to the Disassociated Diocese's website, or any website at all.

the Court cannot find on this record that there was any order prohibiting Defendants from using the term "Anglican," or that there is clear evidence that "Anglican Diocese of South Carolina" is confusingly similar to any of the enjoined marks. At this stage, the Court needs to determine whether there was "'unequivocal command' which a party has violated." *In re Gen. Motors Corp.*, 61 F.3d at 258 (citations omitted). Having never assessed the word "Anglican," with the Order silent on the use of that term, and with no record evidence before the Court regarding the use of the term "Anglican" in this mark, the Court cannot determine that any "unequivocal command" was violated. Therefore, the use of the term "Anglican Diocese of South Carolina" does not violate the Court's Order and Injunction.

Since Plaintiffs have not requested sanctions or identified any monetary losses, the Court will enforce its finding of civil contempt at this time through an order enjoining the noncompliant acts described above.

### B. Motion to Stay (Dkt. No. 690)

Defendants have moved to stay the Court's Injunction pending appeal. (Dkt. No. 690.) However, Defendants cannot meet the four-factor test for a stay: (1) "a strong showing" that the party requesting the stay will succeed on the merits; (2) the presence of irreparable injury by the party seeking the stay; (3) whether the stay will substantially injure other parties to the litigation; and (4) whether the public interest is served by the grant of the stay. *Nken*, 556 U.S. at 434.

First, as this Court already explained extensively in its Order on summary judgment, there is no dispute of material fact that Plaintiffs, not Defendants, succeeded on the merits of this case. (Dkt. Nos. 667, 668.) Further, the sole case cited by Defendants for this factor, *MicroStrategy, Inc. v. Bus. Objects, S.A.*, 661 F. Supp. 2d 548 (E.D. Va. 2009), found no likelihood of success where the movant "fail[ed] to identify a flaw in the court's legal reasoning" and only "argue[d]

that the evidence it presented was more compelling than the evidence presented by [the opposing party]." *Id.* at 559 – 60. Similarly, here, Defendants have presented no new argument why they believe the Court's decision was incorrect or why they believe they have a better chance on appeal. This first factor weighs against granting a stay.

Second, Defendants have not shown an irreparable injury absent the stay. Defendants argue a stay is necessary to maintain the status quo. (Dkt. No. 690 at 12.) However, as Defendants noted extensively in their response to Plaintiffs' motion to enforce the Injunction, shortly after the Court's Order on September 19, 2019, Defendants changed their name, changed their website address, and the Disassociated Parishes removed references to the enjoined marks. (Dkt. No. 688 at 1 – 2.) Defendants waited for over two months to file this motion and, therefore, at this point the status quo is the Disassociated Diocese's new name and granting this motion would only sow further confusion regarding Defendants' name and marks. Furthermore, the lack of any evidence of harm to Defendants since the name change over two months ago indicates that there is no irreparable harm to Defendants absent a stay. *See Nat'l Grange of the Order of Patrons of Husbandry v. California State Grange*, No. CV 2:14-676 WBS DAD, 2016 WL 10807691, at *2 (E.D. Cal. Jan. 12, 2016) (denying motion to stay and finding no irreparable harm where defendant had already been taking steps to comply with injunction, including changing its name and communicating the name change to its members); *SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 890 F. Supp. 1559, 1584 (N.D. Ga. 1994) ("the Court finds that a name change would not be irrevocable and that Plaintiff could reverse the process should Plaintiff succeed on appeal."). This second factor therefore weighs against granting a stay.

Third, granting the stay would substantially harm Plaintiffs. As this Court already found in granting the injunction, there is obvious and ongoing harm to TEC and TECSC through

Defendants' trademark infringement, dilution and false advertising. (Dkt. No. 667 at 71.) Granting a stay, and returning to the infringement, dilution and false advertising therefore is unacceptable and would substantially harm Plaintiffs. This third factor therefore weighs against granting a stay.[9]

Finally, Defendants argue that the public interest will be harmed without a stay. However, as the Court already held, the public interest is served by the injunction in order to prevent consumers from being confused. Further, at this point, over two months after Defendants already changed their name and website, the public interest would be disserved by a stay as it would cause more public confusion by requiring additional name changes for major religious organizations. Finally, the fact that the Supreme Court granted *certiorari* to a Fourth Circuit case regarding whether the addition of ".com" to an otherwise generic term does not affect this analysis. (Dkt. Nos. 690 at 10 – 12; 692 at 3 – 5.) *See Booking.com B.V. v. United States Patent & Trademark Office*, 915 F.3d 171 (4th Cir. 2019). To begin, the genericness analysis only affected one out of nine marks at issue in this case, "The Episcopal Church." Further, the Court's analysis did not turn on the addition of ".com" to any mark and therefore, while the Court will not speculate whether a decision in *Booking.com* will ultimately have a bearing on this case, at this point the

---

[9] Defendants make three additional arguments regarding harm to Plaintiffs, each without merit. First, as with their response to the motion to enforce, Defendants argue that Plaintiffs have "unclean hands." (Dkt. No. 690 at 15.) For the same reasons explained above in Footnote 5, this argument is unavailing. Second, Defendants argue that Plaintiffs will not be harmed as they did not challenge two other dioceses that use the word "Anglican" in their name. (Dkt. No. 690 at 15 – 16.) However, as noted above, the Court does not find that the addition of the word "Anglican" violates the Injunction, and instead the harm contemplated here relates to Defendants' request to resume using Plaintiffs' marks. Finally, Defendants argue that the state court proceedings from the 2013 lawsuit remain pending and will decide "the use of the names of the diocese." (*Id.* at 16.) The issue of the names of the Historic Diocese, a trademark issue, was before this Court and this Court issued its ruling. Defendants may, and have, appealed the ruling, but they may not ignore the Injunction or subvert the federal courts' jurisdiction to determine the trademark issues.

question presented in *Booking.com* does not demonstrate any public interest in granting a stay here. This fourth factor therefore also weighs against granting a stay.

As all four factors weigh against granting a stay, Defendants' request for a stay pending appeal is denied.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' Motion to Enforce the Injunction (Dkt. No. 686). The Motion is **GRANTED** regarding Defendants' use of "Founded in 1785," "14th Bishop," "XIV Bishop," and "229th Diocesan Convention." To remedy these violations, the Court hereby issues the following **PERMANENT INJUNCTION** and **ENJOINS** all Defendants, their officers, agents, servants, employees, associates, subsidiaries and affiliates from taking the following actions or using the following marks or any mark confusingly similar:

- Founded in 1785;

- 14th Bishop;

- XIV Bishop;

- 229th Diocesan Convention or any numbered Convention indicating a history dating to 1785;

- Redirecting website domains that are similar to Plaintiffs' marks to the Disassociated Diocese's webpage;

- Posting, publishing or otherwise distributing any Journal of any Diocesan Conventions from prior to October 2012;

- Posting, publishing or otherwise distributing any publication, including the Journal of Diocesan Conventions, Jubilate Deo, Diocesan Constitution and Canons or Report of the Trustees, which contains the enjoined marks.

The Motion is otherwise **DENIED**. The Court also **DENIES** Defendants' Motion to Stay Pending Appeal. (Dkt. No. 690.)

**AND IT IS SO ORDERED.**

_____
Richard Mark Gergel
United States District Court Judge

December 18, 2019
Charleston, South Carolina